FILED

2021 May-20  AM 11:34
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT FOR

# THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| AMERICA'S FRONTLINE DOCTORS, ETC.; and | ) ) ) | |
| DR. SCOTT JENSEN, MD, Individually; and | ) ) ) | |
| ELLEN MILLER, Individually and as Guardian of 3 Minor Siblings; and | ) ) ) ) | Case No. _____ |
| JODY SOBCZAK, Individually and as Father of 2 Minor Children; and | ) ) ) ) | **PETITION FOR TEMPORARY RESTRAINING ORDER** |
| DEBORAH SOBCZAK, Individually and as Mother of 2 Minor Children; and | ) ) ) ) | |
| LYLE BLOOM, Individually and as Father of 2 Minor Children; and, | ) ) ) ) | |
| JULIE BLOOM, Individually and as Mother of 2 Minor Children; and | ) ) ) ) | |
| ANDREA MCFARLANE, RN Individually and as Mother of 4 Minor Children; and | ) ) ) ) | |
| JENNIFER GREENSLADE, Individually and as Mother of 2 Minor Children; and | ) ) ) ) | |

-1-

|  |  |
|---|---|
| STEVEN M. ROTH, MD,<br>Individually; and | ) |
| | ) |
| MATT SCHWEDER,<br>Individually and as Father of<br>a Minor Child. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| XAVIER BECERRA, Secretary of<br>the U.S. Department of Health<br>and Human Services, and U.S.<br>DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES, AND<br>John & Jane Does I-V; Black &<br>White Partnerships; and ABC<br>Corporations I-V, | ) |
| | ) |
| Defendants. | ) |

*"The Constitution of this Republic should make special provision for medical freedom. To restrict the art of healing to one class will constitute the Bastille of medical science. All such laws are un-American and despotic. … Unless we put medical freedom into the constitution the time will come when medicine will organize into an undercover dictatorship and force people who wish doctors and treatment of their own choice to submit to only what the dictating outfit offers."* Attributed to Dr. Benjamin Rush – Founding Father, signer of the Declaration of Independence and personal physician to George Washington.

*"The more it (vaccination) is supported by public authorities, the more will its dangers and disadvantages be concealed or denied."* M. Beddow Bayly – Physician.

*"Kids are one third of our population and all of our future. Kids are never the experiment. Protect the Children."* AFLDS.

## PETITION FOR TEMPORARY RESTRAINING ORDER

## I. SUMMARY

Plaintiffs bring before the Court today a request for a Temporary Restraining Order ("TRO") against the U.S. Department of Health and Human Services (DHHS), and the relevant subagencies and personnel including but not limited to the Food and Drug Administration (FDA), Centers for Disease Control and Prevention (CDC), National Institutes of Health (NIH), the DHHS Secretary, the DHHS Assistant Secretary for Preparedness and Response, and the DHHS Vaccines and Related Biological Products Advisory Committee, seeking temporary injunctive relief against any existing or further authorization **for use in children under the age of 16**, of any of the COVID-19 "vaccines"[1] that have been approved under the Emergency Use Authorization ("EUA") provided in 21 U.S. Code § 360bbb–3. In this Motion, Plaintiffs ask only that the *status quo* be <u>maintained - that</u> <u>the EUAs not permit the use of COVID-19 vaccines in children under the age</u>

---

[1] Plaintiffs explicitly reject the term "vaccine" as a description of the injections approved under EUA for use in reducing the symptoms of COVID-19. The traditional definition of a vaccine as given by Cambridge Dictionary is "a substance containing a virus or bacterium in a form that is not harmful, given to a person or animal to prevent them from getting the disease that the virus or bacterium causes." This definition is the one relied upon by health care professionals and the lay public since vaccines first emerged, but recently has been altered in a number of places to allow for the synthetic and experimental material colloquially referred to as the "COVID-19 vaccines" to be included. Plaintiffs will refer to the injections of this material as the "vaccine" or "injection" for purposes of this filing but reject the categorization.

of 16, and that no further expansion of the EUAs to children under the age of 16 be granted prior to the resolution of these issues at trial. Such relief would protect the lives and safety of millions of children in the American public for whom serious illness and mortality from COVID-19 represent a zero percent (0%) risk statistically, but who face substantial risks from these experimental injections.

Plaintiffs not only face the imminent threat of irreparable injury of various types absent a TRO, but they also represent a diverse cross-section of the American public. They are doctors and other medical professionals. They are parents and children. They are coaches and mentors. They are healthy, and they suffer from underlying conditions. They are from various states. They are from various walks of life. They are individuals and organizations. They are experts and they are lay people. Most or all have been fully vaccinated in the past. **And they all have one thing in common**. Absent the requested relief, each of their lives stands to be inexorably and irreparably altered forever.

Plaintiffs will bring suit in the near future. The case will challenge the EUAs for the injections on several counts. It will be made clear to the Court in that case, based on the law and well-founded scientific evidence, that: the EUAs should never have been granted, the EUAs should be revoked immediately, the injections are dangerous biological agents that have the

potential to cause substantially greater harm than the COVID-19 disease itself, and numerous laws have been broken in the process of granting these EUAs and pushing these injections on the American people.

In the specific instance of minor Plaintiffs under 16, the Court must consider that an "EUA requires that an intervention address a serious or life-threatening condition[2], and for known and potential benefits of the intervention to be balanced against the known and potential harms."  There is not even a pretense of a factual basis that COVID-19 represents a serious or life-threatening condition for children under 16, since the CDC acknowledges they face 0% risk of mortality from COVID-19 statistically.

The Complaint will include claims for, *inter alia* (1) a declaration that the extension of the EUAs for the COVID-19 vaccines making them available for use in children under the age of 16 violates 45 CFR § 46.401, *et seq.*, which applies to "all research involving children as subjects, conducted or supported by [DHHS]"; (2) an order enjoining the use of COVID-19 vaccines in children under the age of 16, until such time as the DHHS Secretary has complied with 45 CFR § 46.401, *et seq.*; and (3) claims for civil money damages against individual government officials within DHHS, in their personal capacities, for violations of the Constitution, under 42 U.S.C. § 1983.

---

[2] https://blogs.bmj.com/bmj/2021/05/07/covid-vaccines-for-children-should-not-get-emergency-use-authorization/

On May 11, 2021, without any prior notice, the FDA extended the EUA issued for the Pfizer-BioNTech COVID-19 Vaccine for use in 12 to 15 year-old children. Given the extreme exigencies, Plaintiffs are seeking the temporary relief set forth herein even before filing their Complaint. <u>Studebaker Corp. v. Griffin</u>, 360 F.2d 692, 694 (2d Cir. 1966); <u>United States v. Lynd</u>, 301 F. 2d 818, 823 (5th Cir. 1962) ("The grant of a temporary restraining injunction need not await any procedural steps perfecting the pleadings"); <u>National Organization for Reform of Marijuana Laws v. Mullen</u>, 608 F.Supp. 945, 950 n. 5 (N.D. Cal. 1985) ("[o]wing to the peculiar function of the preliminary injunction, it is not necessary that the pleadings be perfected, or even that a complaint be filed, before the order issues").

## II. PLAINTIFFS

1.     **America's Frontline Doctors** ("AFLDS") is a non-partisan, not-for-profit organization of hundreds of member physicians that come from across the country, representing a range of medical disciplines and practical experience on the front lines of medicine. AFLDS' programs focus on a number of critical issues, including:

- Providing Americans with science-based facts about COVID-19;
- Protecting physician independence from government overreach;
- Combating the "pandemic" using evidence-based approaches without compromising Constitutional freedoms;
- Fighting medical "cancel culture" and media censorship;
- Advancing healthcare policies that protect the physician-patient relationship;

- Expanding COVID-19 treatment options for all Americans who need them; and
- Strengthening the voices of front-line doctors in the national healthcare conversation.

AFLDS' core beliefs, shared by each of its member health care professionals, include the following:

- That the American people have the right to accurate information using trusted data derived from decades of practical experience, not politicized science and Big Tech-filtered public health information.
- That critical public health decision-making should take place away from Washington and closer to local communities and the physicians that serve them. They are steadfastly committed to protecting the physician-patient relationship.
- That front-line and actively practicing physicians should be incorporated into the nation's healthcare policy conversation.
- That safe and effective, over-the-counter COVID preventative and early treatment options should be made available to all Americans who need them. They reject mandatory government lockdowns and restrictions not supported by scientific evidence. They support focused care for the nation's at-risk population, including seniors and the immune-compromised.

AFLDS, through its member physicians, is deeply committed to maintaining the physician-patient relationship in the face of government encroachment.

Each of AFLDS' member physicians is also deeply committed to the guiding principle of medicine, "FIRST, DO NO HARM". They take gravely their ethical obligations to their patients. It is axiomatic that a physician's duty is to his or her patient.

AFLDS has recommended that the experimental Covid-19 vaccines be prohibited for use in the under-20 age category, and strongly discouraged for use in the healthy population above the age of 20 through the age of 69. These recommendations have two sound and broadly scientific foundations upon which they are based. First, there is the undeniable fact that the Covid-19 vaccines are experimental and either lack clinical testing or have presented serious risks for young people in the 12 to 15 age group. The risks and safety evidence based upon such trials as there are, cannot justify the use of these vaccines in younger persons. Because AFLDS has taken the science-based position that it is unethical even to advocate for Covid-19 vaccine administration to persons under the age of 50, its and its membership cannot administer it or support any agency that attempted to do so for juvenile persons in the 12 to 15 age category.

It should be noted here that AFLDS is NOT against vaccines generally as a class of medical interventions. It has praised the speedy progress of the vaccine development program. It has taken care to ensure clarity in its position regarding support of the proper use of approved vaccines and the proper application of emergency use authorizations. It holds sacrosanct the relationship between doctor and patient where truly informed decisions are to be made, taking into consideration all of the factors relating to the patients' health, risks, co-morbidities and circumstances.

Given these considerations it would be grossly unethical and therefore impossible for AFLDS members to stand idly by while their patients and their patients' families are subjected to the imminent risk of experimental COVID-19 vaccine injections being administered to minor children. If the EUAs are allowed to stand unrestrained and extended to young children in the 12-15 year age group, AFLDS member physicians will be forced into further untenable positions of unresolvable conflict between their ethical and moral duties to their patients, and the demands of many of the hospitals in which they work.

Many of AFLDS member physician's employers subscribe to and follow the recommendations of the American Medical Association ("AMA"). In a special meeting in November of 2020, the AMA's Council on Ethical and Judicial Affairs, updated a previously published Ethics Opinion in the AMA *Code of Medical Ethics* as opinion 8.7, "Routine Universal Immunization of Physicians."

In this updated opinion, the astonishing position was taken that *not only* do physicians have an ethical and moral obligation to inject themselves with the experimental COVID-19 vaccination, *but they also* have an ethical duty to encourage their patients to get injected with the experimental COVID-19 vaccination. The ethics opinion repeatedly uses the phrase "safe and effective" as a descriptor for the experimental COVID-19 vaccination.

The AMA's ethics opinion goes on to state that institutions may have a **responsibility to require immunization of all staff**:

> *"Physicians and other health care workers who decline to be immunized with a safe and effective vaccine, without a compelling medical reason, can pose an unnecessary medical risk to vulnerable patients or colleagues,"* said AMA Board Member Michael Suk, MD, JD, MPH, MBA. *"Physicians must strike an ethical balance between their personal commitments as moral individuals and their obligations as medical professionals."*

> *The ethical opinion adopted by the AMA House of Delegates says that* doctors *"***have an ethical responsibility to encourage patients to accept immunization when the patient can do so safely***, and to take appropriate measures in their own practice to prevent the spread of infectious disease in health care settings.*

> [. . .]

> *"***Physician practices and health care institutions have a responsibility to proactively develop policies and procedures for responding to epidemic or pandemic disease with input from practicing physicians, institutional leadership, and appropriate specialists***," says the updated opinion. "Such policies and procedures should include robust infection-control practices, provision and required use of appropriate protective equipment, and a process for making appropriate immunization readily available to staff.* ***During outbreaks of vaccine-preventable disease for which there is a safe, effective vaccine, institutions' <u>responsibility</u> may extend to requiring immunization of staff***.[3] *(emphasis added)*

It is clear from this ethics opinion that AFLDS member physicians would be considered by their employers to be both morally and ethically bound by a duty to encourage 12-15 year old minors to receive the experimental COVID-19 vaccination injection.

---

[3] https://www.ama-assn.org/delivering-care/public-health/are-physicians-obliged-get-vaccinated-against-covid-19

The AMA even offers a "COVID-19 VACCINE SCRIPT FOR PATIENT INQUIRIES".[4] Despite being styled as a script for *inquiries*, the script clearly intends for phone messages and office websites to lead with the following message for *every* caller, not simply those who wish to inquire about vaccines.

The proposed script reads: "*We are encouraging our patients to receive the COVID-19 vaccine when it is available and offered to them.*"[5]

To the extent that the AFLDS member physicians either lack control of their office website or telephone system, or are simply unaware of the message that has been placed there absent their knowledge and consent, the member physicians will have been forced unwittingly into an utterly untenable position. Such would create an unresolvable conflict for the member physicians, and deep confusion for their patients, who would thereby be receiving irreconcilable and contradictory messages from the same office.

To illustrate just how unresolvable these conflicts are, it is necessary to consider the massive power of big pharmaceutical companies over the institutions who employ the physicians and the ease with which a physician's career can be destroyed through widely unregulated reporting which opens an investigation that can and often does render the physician virtually

---

[4] https://www.ama-assn.org/system/files/2021-01/covid-19-vaccine-patient-inquiry-script.pdf
[5] https://www.ama-assn.org/system/files/2021-01/covid-19-vaccine-patient-inquiry-script.pdf

unemployable. Not only do physicians have to choose between their ethical obligations to their patient to do no harm and their current job; the reality is that many of them will be choosing between their patients and their medical career.

It is critical to point out that for AFLDS member physicians, the practice of medicine is not simply a job. Neither is it merely a career. Rather, it is a sacred trust. It is a true high calling that often requires a decade or more of highly focused sacrificial dedication to achieve. The depth and the horror of the bind that this ethics opinion places the member physicians of AFLDS in, simply cannot be overstated.

To grasp the irreparable nature of the harm they face, one must consider the ease with which even an anonymous report can be made that may injure or haunt a physician's career.[6] The National Physicians Database ("NPDB") was created by Congress with the intent of providing a central location to obtain information about practitioners. However, as Darryl S. Weiman, M.D., J.D. pointed out, the "black mark of a listing in the NPDB may not accomplish what the law was meant to do; identify the poor practitioner."[7] Weiman goes on to point out that "It is the threat of a NPDB

---

[6] https://aapsonline.org/doctors-sue-texas-medical-board-for-misconduct-cites-institutional-culture-of-retaliation-intimidation/ (*Doctors were retaliated against and disciplined based on anonymous reports*).
[7] https://www.huffpost.com/entry/the-national-practitioner_b_13173046

report which prevents the open discussion, fact-finding, and broad based analysis and problem solving which was the intent of the meaningful peer-review of the HCQIA."[8]

The gross imbalance of equities between an individual physician and the various large institutions and pharmaceutical companies which exert tremendous sway over his or her professional calling has many physicians fearful of pushing back against such ethical binds as have been described above.[9] Many physicians have a family and medical school debts to consider and should never be forced into such a bitter double bind.

The types of harm the AFLDS member physicians are inevitably subjected to by this extension of the EUAs to inject 12-15 year old minors with the experimental COVID-19 vaccine is truly irreparable. Such harm strikes at the moral and ethical underpinnings of their calling as a physician and drives irreparable wedges into the sacred doctor-patient relationship that cannot be healed and certainly cannot be addressed with monetary damages.

2.    **Dr. Scott Jensen, MD** is a board-certified family medicine physician of 40 years. Dr. Jensen resides and practices in the state of Minnesota, where he was honored as the "Minnesota Family Physician of the Year" in 2016. Dr. Jensen is well aware the children in the 0-16 year old age

---

[8] Id.

[9] https://aapsonline.org/doctors-sue-texas-medical-board-for-misconduct-cites-institutional-culture-of-retaliation-intimidation/ (*Doctors were retaliated against and disciplined based on anonymous reports*).

group have a 0% chance statistically of dying from COVID. As to the EUAs for the experimental COVID-19 vaccines, Dr. Jensen is keenly aware of the risks and benefits of these investigational agents as well as the current vaccine schedule for other diseases. Given that the statistical chance of death for children ages 0 to 16 is 0%, Dr. Jensen believes it would be reckless to subject anyone in that age group to the experimental COVID-19 vaccine. To recommend something that he considers reckless would violate his oath as a doctor and place him in an untenable position. It would place his young patients in that age group at risk and create similar conflicts to those described in the preceding paragraphs relating to the AFLDS member physicians. In addition, and based on the facts and statistics set forth in Dr. Jensen's Declaration attached hereto and incorporated herein by reference as Exhibit A, Dr. Jensen believes the use of coercion in the 0-16 year old age group that is not at risk of harm from COVID-19 would irreparably undermine public trust in all vaccines. He therefore requests an immediate temporary restraining order to halt the extension of the EUAs of the experimental COVID-19 vaccine for any and all ages under 16.

3.      **Ellen Millen** (Ellen) is a resident of Huntsville, Alabama. Ellen is the Guardian of three siblings ages 5, 4 and 4. These children have been entrusted to her by Child Protective Services and she is responsible for making medical decisions for them. Ellen has obtained a medical exemption for vaccines and neither she nor their biological parents wish the children to receive the experimental COVID-19 vaccination. Ellen stands not only for the children currently in her care but for those who may be placed in her care in the future. She stands for her 22-year-old son and four other children who are unable to stand for themselves in opposing the application of the experimental COVID-19 vaccination to children of all ages who are at NO

statistical risk of death from COVID-19. Without a temporary restraining order as requested in this motion Ellen knows that the children in her care will face overwhelming pressure to receive the experimental COVID-19 vaccination injection from friends, parents of friends, sports organizations, summer camps, schools and colleges. The fear and pressure that this fragile at-risk population of children will be subjected to if the temporary restraining order is not granted is greater than that which is often faced by children from intact nuclear families. The nature of their placement outside of their home and away from their biological family leaves them particularly susceptible to the pressures and the fear mongering that they will receive from peers and authority figures. The harm that they will undergo emotionally, mentally, and/or physiologically is precisely the type of harm considered irreparable by the law in this case. The trauma that is created in this type of a situation will quite likely be carried for life, and no amount of damages can possibly erase the effects. Ellen's Declaration is attached hereto and incorporated here by reference as <u>Exhibit B</u>. Ellen seeks an immediate temporary restraining order to halt the extension of the EUAs for the experimental COVID-19 vaccines for any and all children 15 years old and younger.

4.      **Jody Sobczak** (Jody), of Huntsville Alabama, is the father of two minor children ages 15 and 17. Jody has researched the experimental COVID-19 vaccines and fiercely opposes their use in healthy children of any age. He knows that his own children are placed at immediate and irreparable risk of harm by extending the EUAs for the experimental COVID-19 vaccines to adolescents. Jody is well aware that there are safe and effective alternative treatments readily available, and he adamantly opposes the suppression of those treatments in favor of experimental and potentially life-threatening agents. Jody's Declaration is attached hereto and incorporated herein as

Exhibit C. Jody seeks an immediate temporary restraining order to halt the extension order of EUAs for the experimental COVID-19 vaccines for any and all children 15 years old and younger.

5.     **Deborah Sobczak** (Deborah), of Huntsville Alabama, is the mother of two minor children ages 15 and 17. Deborah has researched the experimental COVID-19 vaccines and also fiercely opposes their use in healthy children of any age. She knows that her own beloved children are placed at immediate and irreparable risk of harm by extending the EUAs of the experimental COVID-19 vaccine to adolescents. Deborah is well aware that there are safe and effective alternative treatments readily available and she adamantly opposes the suppression of those treatments in favor of experimental and potentially life-threatening agents. Deborah's Declaration is attached hereto and incorporated herein by reference as Exhibit D. Deborah seeks an immediate temporary restraining order to halt the extension of the EUAs for the experimental COVID-19 vaccines for any and all children 15 years old and younger.

6.     **Lyle Bloom** (Lyle), of Huntsville, Alabama, is the father of two children ages 10 and 16, and the father of one young adult age 21. Lyle has researched the experimental COVID-19 vaccines and fiercely opposes their use in healthy children of any age. He knows that his own children are placed at immediate and irreparable risk of harm by extending the emergency use authorizations of the experimental COVID-19 vaccine to adolescents. Lyle is well aware that there are safe and effective alternative treatments readily available and he adamantly opposes the suppression of those treatments in favor of experimental and potentially life-threatening agents. Lyle's duly executed Declaration is attached hereto and incorporated herein as Exhibit E. Lyle seeks an immediate temporary restraining order to halt the extension

of EUAs of the experimental COVID-19 vaccines for any and all children 15 years old and younger.

7.     **Julie Bloom** (Julie), of Huntsville Alabama, is the mother of two children ages 10 and 16, and the mother of one young adult age 21. Julie has researched the experimental COVID-19 vaccines and also fiercely opposes their use in healthy children of any age. She knows that her own beloved children are placed at immediate and irreparable risk of harm by extending the EUAs for the experimental COVID-19 vaccines to adolescents. Julie is well aware that there are safe and effective alternative treatments readily available and she adamantly opposes the suppression of those treatments in favor of experimental and potentially life-threatening agents. Julie's duly executed Declaration is attached hereto and incorporated herein as <u>Exhibit F</u>. Julie seeks an immediate temporary restraining order to halt the extension of EUAs for the experimental COVID-19 vaccines for any and all children 17 years old and younger.

8.     **Andrea McFarlane, RN** (Andrea) of Huntsville, Alabama currently works as a trauma/ICU nurse at Vanderbilt. She is the mother of 4 children, 10, 12, 14 and 16. As a nurse, Andrea has seen tremendous pressure placed on staff to get the experimental COVID-19 vaccines. Even medical staff that have had COVID-19 are pressured relentlessly to take the experimental COVID-19 vaccines. It is well known among the staff that taking the experimental COVID-19 vaccines will leave you sick for days, and they accommodate for the expected sick reactions in their staffing plans. Andrea is also in school and as a student she is pressured and incentivized to get "vaccinated". As a mother, Andrea knows only too well the tremendous pressure her boys will be under to get "vaccinated". They will be under social and school pressure and Andrea deeply fears for their safety. She has studied

the vaccine. She knows that it is experimental and that it has proven harmful in many cases. She knows that her children are not at risk from COVID-19 and believes it should be illegal and that it is immoral to give an experimental and untested vaccine to children who are not at risk. She believes that if the TRO is not granted, not only will her children be at grave risk of irreparable harm, but she will be subjected to pressure in her profession to comply with an immoral policy. We know that the AMA through their ethics opinion set forth above in this Motion has already opined that institutions will likely have an obligation to require that their staff get injected with the experimental COVID-19 vaccinations. Should this happen, Andrea will be unable to work because she will not follow a policy that she believes is immoral. Andrea's duly executed Declaration is attached hereto and incorporated herein by reference as <u>Exhibit G</u>.  Andrea is asking that this Court immediately impose the requested TRO in order to protect her children as well as herself from the grave risk of immediate and irreparable harm.

9.    **Jennifer Greenslade** (Jennifer), of Remlap, Alabama, has an autoimmune disorder for which she takes medicine on a daily basis. She has researched the experimental COVID-19 vaccines and is aware that to take it would be to inject herself with an unknown agent that is largely unstudied but which carries risk to anyone with an autoimmune disease. She fears deeply for her own health and the health of her children, ages 9 and 12. The type of disease she has can be hereditary and nobody knows how it might interact with her children's health, whereas COVID-19 itself poses no risk of death to her children whatsoever. Jennifer has two cousins who did allow themselves to be injected with the experimental COVID-19 vaccines. They were both healthy prior to the injection. They became extremely ill after

being injected and spent weeks on the brink of death in the ICU. They are now out of the ICU but neither of them can walk and they require care from their children. This type of vaccine related injury constitutes irreparable harm. Her cousins were in good health and now they are unable to walk even though they survived the initial onslaught of the vaccine related sickness. Jennifer's health is not strong and her children may have inherited her autoimmune disorder. If they are pressured or mandated to take the vaccine and experience reactions similar to Jennifer's cousins' reactions, she and her children might not survive. For a mother of two small children it is a stark and terrifying concern to think that they may be killed or paralyzed or that she may be rendered unable to care for them or worse. Jennifer's duly executed Declaration is attached hereto and incorporated herein by reference as Exhibit H. She is seeking an immediate temporary injunction on behalf of herself, her children, and other similarly situated parents against the extension of the EUAs for children 15 and younger, who are at no risk from COVID-19.

10.     **Steven M. Roth, MD** (Dr. Roth), of Alabama, has been a practicing emergency medicine physician for 13 years. As part of his practice, Dr. Roth sees patients of all ages. He is aware of the risks and benefits of these investigational agents as well as the current vaccine schedule for other diseases. Based on the most recent numbers from the CDC from May 5, 2021, anyone under the age of 16 has statistically NO risk of dying of Covid-19.

Dr. Roth has not seen a COVID-19 patient in many months, but he is currently seeing many patients who come to the emergency department as post-COVID-19 injection patients. All of these patients came in with COVID-19 like symptoms that occurred within 48 hours of the injection. All these

patients required hospital admission. Several of these patients progressed to death, caused by the vaccine.

Dr. Roth's concern is that based upon what he is seeing in the community, and because of the schools asking that students take the experimental COVID-19 injections and putting obstacles around those who do not take it, young people are being pressured to take an experimental injection, and many are succumbing to that pressure. This is deeply disturbing to Dr. Roth, because it is universally known that children virtually never die from COVID-19 and given that children have a very strong immune system, they are more likely than adults to have an over-reaction to the shot. This means that there is not only no benefit, but also an increased risk for children who receive the experimental COVID-19 injections. Also, with all prior viruses and vaccines, it has been accepted in the medical community that natural immunity is superior to vaccination, and there is no basis to believe that would be different with SARS-CoV-2. Because of these factors, it is actually not preferable to give the vaccine *even if it was definitely safe*, which these are not.

In addition, Dr. Roth is extraordinarily concerned that there have been no animal studies, nor long-term studies, of the COVID-19 vaccines, especially since prior coronavirus vaccines all caused death in the animals subjected to them.

Dr. Roth is aware of many thousands of physicians who agree with him, but who are under great pressure to say nothing. Dr. Roth has chosen to speak out now, at great personal cost to himself, because the alternative is unbearable. Dr. Roth could not live with himself if he stood by and allowed these experimental COVID-19 injections to be inflicted upon children universally, resulting in death and destruction over the

years. He considers it immoral and unconscionable that this experimental therapy will be given to children. Not only are children NOT at risk of death from COVID-19, but they are also NOT mini-adults. Their organs are still forming, and they are even more vulnerable than adults to developing auto-immune disease in this situation.

Dr. Roth would be deeply and directly affected by a change in FDA guidelines regarding vaccines for young people, and as a result he is imploring this Court to grant an immediate TRO to halt the approval of the infliction of the experimental COVID-19 injections upon children. In addition to the direct threat of irreparable harm posed to Dr. Roth's young patients, an additional unwelcome consequence of using coercion to mandate or pressure the participation of healthy young people who are statistically at NO risk is the risk of sharply reducing the public trust in all vaccines. This would also create what can only be described as irreparable harm to the public generally. Dr. Roth's duly executed Declaration is attached hereto and incorporated herein by reference as Exhibit I.

11. **Matt Schweder** (Matt) of Lexington, Kentucky, is the father of one minor daughter, age 15, and an adult son, age 25. Matt's son is in the Advanced Nurse Practitioner Program at Vanderbilt University. Matt's daughter is an active student and plays soccer for her high school. Matt has, until recently, coached girls select soccer for a number of years and he is very aware of the extraordinary power of peer pressure in the life of young adolescents. Matt's daughter is subjected to a barrage of peer pressure regarding vaccinating, which is a constant source of conversation for her friends, who have been taught to fear that which should hold no fear. In addition, her school system bombards her with weekly emails, pressuring and shaming her and her family into allowing themselves to be experimented on

with the experimental COVID-19 injections. The pressure is so intense that one of Matt's daughter's friends was forced to take the injection by his own mother, against his will, at the age of 16, and Matt's daughter had to undergo the trauma of knowing that her friend had become part of this dangerous human experiment even though he was adamantly opposed to doing so. Matt has conducted his own research into COVID-19, and he is well aware that children under the age of 16 have a 0% chance statistically of dying from COVID-19. Matt knows that safe and effective treatments for COVID-19 are available and he fiercely opposes the suppression of these treatments in favor of using untested and potentially life-threatening agents against children who are not at risk. As a father, Matt has witnessed the growing concern his son has, that his school or potential employer might decide to make the experimental agents mandatory, which would put his education to waste. The damages that Matt and his family face are irreparable if this EUA is permitted to be inflicted upon minor children, whose only risk of death comes from the vaccine itself. Therefore, Matt urgently moves this Court to find for his children and the children of America and immediately grant the TRO sought by this Motion. Matt's Declaration is attached hereto and incorporated herein by reference as Exhibit J.

## III. REGULATORY AND FACTUAL CONTEXT

The EUAs for COVID-19 vaccines have been illegal from the start. There is and has been no *bona fide*, underlying, epidemiological emergency from COVID-19. Instead, an artificial emergency that is nothing more than a legal construct has been imposed on the population, based on a false COVID-19 death count (the result of illegal rule changes obliterating the

distinction between "dying with" and "dying from" COVID-19 and changing procedures and definitions for COVID-19 death certificates) and a false COVID-19 case count (the result of extensive PCR testing deployed at amplification cycles universally agreed, even by the WHO, the CDC and Dr. Fauci, to produce false positive test results).

The false emergency and attendant psychological manipulation through incessant, prolonged, fear-based reporting of the inflated death and case counts, have culminated in a campaign to coerce the American people to accept the COVID-19 vaccines, which are untested and unproven biological agents.

The American public are being misled as to the COVID-19 vaccines on multiple levels, including *inter alia*: to believe that they are FDA-approved; to believe that they are actually and in fact "safe and effective," as opposed to federal bureaucrats with apparent undisclosed conflicts-of-interest having determined merely that there is a "reasonable basis to conclude" that they are safe and effective; that there are no risks and many benefits, whereas in fact there are many risks and few benefits, particularly for children 15 and younger; that they are standard vaccines that involve the injection of dead or attenuated virus, versus gene therapy; that they prevent infection with COVID-19, and the transmission of COVID-19 to others; and that there are

no other effective alternative treatments.[10]   At the same time, the American public are being presented with countless incentives to induce their acceptance of the COVID-19 vaccines, and threats of negative consequences if they refuse them.   All of this vitiates informed consent.

## A.   Regulatory Context.

The central legal issues arise from 21 U.S.C. § 360bbb–3 (which provides the legal framework for EUAs), as informed by 21 CFR § 202.1 (which relates to the advertising of prescription drugs and which requires a true statement of information relating to side effects, contraindications and effectiveness (§ 202.1(e)), customary international law, 21 CFR  Parts 50 and 312, and 45 CFR Part 46 (which describes the requirements for human experimentation).

### (1)   21 CFR § 202.1.

21 CFR § 202.1(e)(3) states specifically that "**If any part or theme of the advertisement would make the advertisement false or misleading by reason of the omission of appropriate qualification or pertinent information, that part or theme shall include the appropriate qualification or pertinent information**".   Advertising is categorically prohibited for an experimental

---

[10] Plaintiffs contend that there are a number of safe and effective alternative treatments available that have been suppressed for what appears to be financial reasons, and are prepared to present scientific and medical evidence thereof.

vaccine that is not yet approved, which is a more stringent standard than for prescription drugs.

In addition, as Dr. Peter McCullough, the most cited and studied medical scholar on Covid-19 recently pointed out, there is a formal and overt collusion between Government stakeholders with a financial interest in the experimental vaccines, and the media, to actually <u>suppress</u> negative information about the experimental vaccines, rather than disclose the information, as any law relating to informed consent would mandate. Dr. McCullough describes a "whitewash of historic proportions":

> "So I think this was effectively a scrubbing, like we've seen elsewhere. There is a **Trusted News Initiative**,[11] which is very important for Americans to understand, this was announced Dec. 10, and this is a coalition of all the major media and government stakeholders in vaccination, where they are not going to allow any negative information about vaccines to get into the popular media because they're concerned about vaccine hesitancy, that if Americans got any type of fair, balanced coverage on safety events then they simply would not come forward and get the vaccine"[12] (emphasis added).

The very concept of a consortium of Government stakeholders and major news outlets suppressing information is a gross violation of the legal principles further set forth in 21 CFR § <u>202.1(e)(5)</u>, which states in relevant part:

---

[11] https://www.bbc.com/news/entertainment-arts-55257814

[12] https://www.lewrockwell.com/2021/05/no_author/highly-cited-covid-doctor-comes-to-stunning-conclusion-govt-scrubbing-unprecedented-numbers-of-injection-related-deaths/

*(5) "True statement" of information.* **An advertisement does not satisfy the requirement that it present a "true statement" of information in brief summary relating to side effects, contraindications, and effectiveness if:**

*(i) It is false or misleading with respect to side effects, contraindications, or effectiveness; or*

*(ii) It fails to present a fair balance between information relating to side effects and contraindications and information relating to effectiveness of the drug…*(emphasis added).

Dr. McCullough identifies financial stakeholders as including: "…the stakeholders – the CDC, NIH, FDA, Big Pharma, World Health Organization, Gates Foundation – they have made a commitment to mass vaccination".[13]

Dr. McCullough further identifies the colluding news outlets as including:

*"The partners signed onto the Trusted News Initiative to date are: Associated Press, AFP; BBC, CBC/Radio-Canada, European Broadcasting Union (EBU), Facebook, Financial Times, First Draft, Google/YouTube, The Hindu, Microsoft, Reuters, Reuters Institute for the Study of Journalism, Twitter, The Washington Post. The New York Times has also participated in the past."*[14]

This type of formal collusion in order to suppress information necessary for basic informed consent is antithetical to the protective purposes of 21 U.S.C. § 360bbb–3, 45 CFR Part 46 and 21 CFR § 202.1. The very agencies and officials responsible for protecting the American public from these experimental COVID-19 vaccines are deeply conflicted by substantial

---

[13] Id.

[14] Id.

financial incentives,[15] and are they are pushing to provide what amounts to costly retail units of experimental agents to children who have no statistical risk to COVID-19, and do not need these interventions.   Dr. McCullough suggests there is an incestuous relationship between these agencies and the pharmaceutical industry which causes the regulators to ignore safety issues:

> "A lot of Americans don't understand how tight these stakeholders are. Keep in mind the NIH [National Institutes of Health] is a co-owner of the Moderna patent, so they have a vested financial interest in keeping these vaccines going," he said.

> More than 15 months into the COVID nightmare, the evidence is beginning to suggest the U.S. government colluded from the outset with the Gates Foundation, CDC, FDA, the United Nations World Health Organization and Big Pharma to make the vaccines the central focus of the global COVID response effort. They started promoting the vaccines before they were even out of clinical trials, McCullough said, which is against U.S. regulatory law"[16] (emphasis added).

(2)   Customary International Law; 21 CFR Chapter 1, Part 50, Protection of Human Subjects, § 50.1 et seq., 21 CFR Part 312, Investigational New Drug Application, 45 CFR Part 46, Protection of Human Subjects

Customary international law applies directly to the United States and its agencies and instrumentalities.   It is well established that customary international law includes a norm that prohibits non-consensual human

---

[15] See attached Exhibit K "VAX ADVISORY CONFLICTS" for a detailed preliminary overview of the profound conflicts under the section entitled **FDA Vaccines and Related Biological Products Advisory Committee Roster: Content current as of 4/9/21.**
[16] https://www.lewrockwell.com/2021/05/no_author/highly-cited-covid-doctor-comes-to-stunning-conclusion-govt-scrubbing-unprecedented-numbers-of-injection-related-deaths/

medical experimentation.  Abdullahi v. Pfizer, 562 F.3d 163, 174-188 (2nd Cir. 2009).  In August 1947, an International Military Tribunal ("IMT") sitting in Nuremberg, Germany convicted 15 Nazi doctors for crimes against humanity for conducting medical experiments without the consent of their subjects.  "Among the nonconsensual experiments that the tribunal cited as a basis for their convictions were **the testing of drugs for immunization against malaria, epidemic jaundice, typhus, smallpox and cholera.**"  Id. at 178 (quoting United States v. Brandt, 2 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 181-182 (1949) (emphasis added). The Nuremberg Code was created as part of the IMT's judgment, and its first principle is that **"[t]he voluntary consent of the human subject is absolutely essential.**"   Id. at 179.  It contains other principles relevant here, for example that "[t]he experiment should be such as to yield fruitful results for the good of society, unprocurable by other methods or means of study, and not random or unnecessary" (Principle 2), and "[t]he experiment should be [ ] designed and based on the results of animal experimentation" (Principle 3), and "[t]he degree of risk to be taken should never exceed that determined by the humanitarian importance of the problem" (Principle 6).

The Nuremberg Code has been adopted and amplified by numerous international declarations and agreements, including the World Medical

Association's Declaration of Helsinki, the guidelines authored by the Council for International Organizations of Medical Services, Art. 7 of the International Covenant on Civil and Political Rights, International Covenants on Human Rights, the Universal Declaration on Bioethics and Human Rights, and others.

"The history of the norm in United States law demonstrates it has been firmly embedded for more than 45 years and [ ] its validity has never been seriously questioned by any court." Id. at 182.   Federal Regulations relating to the protection and informed consent of human subjects implement this norm, and are binding legal obligations.

45 CFR § 46.401, *et seq.*, applies to "all research involving children as subjects, conducted or supported by [DHHS]." § 46.405 states:

> *HHS will conduct or fund research in which the IRB finds that more than minimal risk to children is presented by an intervention or procedure that holds out the prospect of direct benefit for the individual subject, or by a monitoring procedure that is likely to contribute to the subject's well-being, only if the IRB finds that:*
> *(a)  The risk is justified by the anticipated benefit to the subjects;*
> *(b)  The relation of the anticipated benefit to the risk is at least as favorable to the subjects as that presented by available alternative approaches; and*
> *(c)  Adequate provisions are made for soliciting the assent of the children and permission of their parents or guardians, as set forth in § 46.408.*

It is entirely reasonable to posit that the U.S. public health establishment would in fact design, fund, supervise and implement a non-consensual human medical experiment, in conjunction with private sector

actors.  It has done so in the past.  On October 1, 2010, President Obama apologized to the Guatemalan government and people for a program of non-consensual human experimentation that had been funded and approved by the U.S. Public Health Service ("PHS") and implemented on the ground by a PHS doctor employed for this purpose by private institutions but reporting to supervisors including PHS doctors.  The evidence was suppressed and remained buried until discovered by a private researcher in 2010.  A presidential commission investigated and found that in fact thousands of Guatemalans, including orphans, insane asylum patients, prisoners and military conscripts, had been intentionally exposed to syphilis, gonorrhea and other pathogens in furtherance of experiments on the use of penicillin as a prophylaxis.[17]

On May 16, 1997, President Clinton apologized to the African-American community for the "Tuskegee Study of Untreated Syphilis in the Negro Male", a non-consensual human medical experiment funded, organized and implemented by the PHS, again with important private sector participation. This was the longest non-therapeutic, non-consensual experiment on human beings in the history of public health, run by the PHS, spanning 40 years from 1932 until its exposure by a whistleblower in 1972. The purpose of the study was to observe the effects of untreated syphilis in black men and their

---

[17] https://bioethicsarchive.georgetown.edu/pcsbi/taxonomy/term/179.html

family members.  There are numerous other examples, too many for inclusion in this Motion.

That children are going to be used as experimental test subjects (guinea pigs) in medical experimentation using the COVID-19 vaccines is undeniable.  The Texas State Senate heard sworn testimony on May 6, 2021 from Dr. Angelina Farella, a pediatrician who has given tens of thousands of vaccinations in her office. She testified:

"I have given tens of thousands of vaccinations in my career. I am very pro-vax actually except when it comes to this covid vaccine … We are currently allowing children 16, 17 years old to get this vaccine, and they were never studied in this trial… Never before in history have we given medications that were not FDA approved to people who were not initially studied in the trial. There were no trial patients under the age of 18… They're extrapolating the    data from adults down to children and adolescents. This is    not acceptable.   Children are not little adults. … Children have 99.997% survivability from the covid. Let me repeat that for you all to understand: 99.997%."[18]

Senator Hall: "Has there been another vaccine that had the high incidents of serious hospitalizations and deaths that this vaccine is now showing?

Dr. Farella: "Not to this extent. Not even close."

Sen. Hall:   "Any other vaccine would have been pulled from the market?"

Dr. Farella: "Absolutely."

Sen. Hall: "Have you seen any other vaccine that was put out for the public that  skipped the animal tests?"

---

[18] https://www.globalresearch.ca/no-vaccine-passports-texas-medical-doctors-testify-before-state-senate-oppose-mandatory-covid-shots/5744748

Dr. Farella: "Never before. Especially for children."

Sen. Hall: "…Folks I think that's important to understand here, that what we're talking about is the American people … **this is the test program**."

### (3)    21 U.S. Code § 360bbb–3(b), (c) and (e).

21 U.S. Code § 360bbb–3 governs the authorization of the use of medical products in emergencies.   Plaintiffs contend that the DHHS Secretary violated § 360bbb–3(b) when he declared an emergency, and therefore the EUAs are invalid.   Further, Plaintiffs contend that the Secretary violated § 360bbb–3(c), when he issued the EUAs for the COVID-19 vaccines, and therefore, on that basis additionally, the EUAs are invalid.  In this Motion, Plaintiffs ask only that the *status quo* be <u>maintained - that the EUAs not permit the use of the COVID-19 vaccines in the children under the age of 16,</u> and that no further expansion of the EUAs to children under the age of 16 be granted until after trial.

§ 360bbb–3(b) authorizes the DHHS Secretary to declare an emergency after making one or more of certain findings, which declaration is the necessary predicate for the issuance of any EUA, as follows:

*(b) Declaration of emergency or threat justifying emergency authorized use*

*(1) In general The Secretary may make a declaration that the circumstances exist justifying the authorization under this subsection for a product on the basis of—*

*(A) a determination by the Secretary of Homeland Security that there is a domestic emergency, or a*

*significant potential for a domestic emergency, involving a heightened risk of attack with a biological, chemical, radiological, or nuclear agent or agents;*

(B) *a determination by the Secretary of Defense that there is a military emergency, or a significant potential for a military emergency, involving a heightened risk to United States military forces, including personnel operating under the authority of title 10 or title 50, of attack with—*

    (i) *a biological, chemical, radiological, or nuclear agent or agents; or*

    (ii) *an agent or agents that may cause, or are otherwise associated with, an imminently life-threatening and specific risk to United States military forces;*

(C) **a determination by the Secretary that there is a public health emergency, or a significant potential for a public health emergency, that affects, or has a significant potential to affect, national security or the health and security of United States citizens living abroad, and that involves a biological, chemical, radiological, or nuclear agent or agents, or a disease or condition that may be attributable to such agent or agents;** *or*

(D) *the identification of a material threat pursuant to section 319F–2 of the Public Health Service Act [42 U.S.C. 247d–6b] sufficient to affect national security or the health and security of United States citizens living abroad.*

The DHHS Secretary declared an emergency pursuant to § 360bbb–3(b)(I)(C), after making the relevant finding. Plaintiffs aver and the facts set forth below demonstrate that the finding was made in error, without any real justification, and as such the EUAs for the COVID-19 vaccines are invalid.

§ 360bbb–3(c) sets forth the standards applicable to the issuance of any EUA, as follows:

*(c) Criteria for issuance of authorization. The Secretary may issue an authorization under this section with respect to the emergency use of a product only if, after consultation with the Assistant Secretary for Preparedness and Response, the Director of the National Institutes of Health, and the Director of the Centers for Disease Control and Prevention (to the extent feasible and appropriate given the applicable circumstances described in subsection (b)(1)), the Secretary concludes—*

*(1) that an agent referred to in a declaration under subsection (b) can cause a serious or life-threatening disease or condition;*

*(2) that, based on the totality of scientific evidence available to the Secretary, including data from adequate and well-controlled clinical trials, if available, **it is reasonable to believe that**—*

*(A) **the product may be effective** in diagnosing, treating, or preventing—*

*(i) such disease or condition; or*

*(ii) a serious or life-threatening disease or condition caused by a product authorized under this section, approved or cleared under this chapter, or licensed under section 351 of the Public Health Service Act [42 U.S.C. 262], for diagnosing, treating, or preventing such a disease or condition caused by such an agent; and*

*(B) **the known and potential benefits of the product**, when used to diagnose, prevent, or treat such disease or condition, **outweigh the known and potential risks of the product**, taking into consideration the material threat posed by the agent or agents identified in a declaration under subsection (b)(1)(D), if applicable;*

*(3) **that there is no adequate, approved, and available alternative** to the product for diagnosing, preventing, or treating such disease or condition;*

*(4) in the case of a determination described in subsection (b)(1)(B)(ii), that the request for emergency use is made by the Secretary of Defense; and*

*(5) that such other criteria as the Secretary may by regulation prescribe are satisfied.*

The balancing test required by § 360bbb–3(c)(2)(B) cannot be satisfied. Since the risk from COVID-19 to 12-15 year old children is statistically 0%, there is no real or material benefit to this age category of using these experimental vaccines.  At the same time, the risks of using any untested drug are always substantial, and, in this case, the injections are already proving to be dangerous, even on the basis of the false and/or misleading statistics promulgated by DHHS.

Further, the Secretary cannot meet the requirement in § 360bbb–3(c)(3) of demonstrating that there is no adequate, approved alternative treatment.  Below is a discussion of a number of treatments that are adequate and that are approved by a number of doctors.  Plaintiffs contend that the word "approved," which is not otherwise defined in the statute, should be interpreted to refer to approval by the medical community in the medical malpractice sense of "meeting the standard of care" applicable among similarly situated medical professionals.  Further, Plaintiffs contend that FDA approval for alternative COVID-19 treatments have been wrongfully withheld despite strong scientific evidence that many of these "alternative" treatments are safer and more effective than the current EUA products.

Part (e) of 21 U.S.C. § 360bbb–3(e) requires, as a condition of the EUAs, that the DHHS Secretary ensure that *both* health care professionals administering EUA products and those who are treated with the EUA

products are furnished with the following information, which is a minimum

threshold disclosure necessary in order to ensure the informed consent of

vaccine subjects:

(II)  of the significant known and potential benefits and risks of
the emergency use of the product, and of the extent to which such benefits and
risks are unknown; and

(III) of the alternatives to the product that are available, and of their
benefits and risks.

As discussed *infra*, the Secretary is not ensuring that these minimum

statutory disclosures are made. In fact, the DHHS and its sub-agencies

appear to be working actively to suppress information regarding the potential

dangers of these injections and alternative treatments, as opposed to

ensuring that health care professionals and vaccine subjects have the

information.  At the same time, state and federal government officials are

threatening the American public with a range of penalties should they

decline the vaccine, and incentives should they accept it. All of this vitiates

informed consent, especially as to children under 16 years of age. Expanding

the EUAs will only compound the harm.

### B.  Factual Context.

#### (1)  No Real Emergency.

In approximately January of 2020, the media began creating and

circulating news stories that seemed designed to generate panic, regarding a

new and deadly disease that could kill us all. This was odd given that the

estimated fatality rate at the time was between 2-4%. By contrast, tuberculosis has a fatality rate of approximately 10%, the original SARS virus had a fatality rate of approximately 9%, and the MERS virus had a fatality rate of approximately 30% - all had similar rates of spread.

The actual COVID-19 statistics present a very different picture than the one painted by the media - a fatality rate of 0.2% globally, which drops to 0.03% for persons under age 70, which is comparable to the yearly flu. Further, statistically, the fatality risk is limited to the elderly population.

Data from defendants confirm that there is no outsized nor unmanageable situation regarding COVID-19. The defendants admit the following through their public government portal: HealthData[19] and the COVID-19 Community Profile Report[20]:

USA Total:

• ER visits – 1.2% due to COVID (26 states <1%, highest is 3.1%)

• inpatients -- 4% due to COVID (Light Green – Low)

• ICU patients -- 9% due to COVID (Yellow -- Moderate)

• total hospitalizations -- 46 states ≤ 15 per 100,000 and 49 states ≤ 20

• "cases" – 9 per 100,000 per day

[19] https://healthdata.gov
[20] https://healthdata.gov/Health/COVID-19-Community-Profile-Report/gqxm-d9w9

The actual COVID-19 fatality numbers are vastly lower than those reported. On March 24, 2020, the DHHS changed the rules applicable to coroners and others responsible for producing death certificates and making "cause of death" determinations - **exclusively for COVID-19**. The rule change states that "COVID-19 should be reported on the death certificate for all decedents where the disease caused *or is assumed to have caused or contributed* to death." Many doctors have attested that permitting such imprecision on a legal document (death certificate) has never happened before in modern medicine. This results in reporting of deaths as caused by COVID-19, even when in fact deaths were imminent and inevitable for other pre-existing reasons and caused by comorbidities. In other words, people dying **with** COVID-19 are being reported as dying **from** COVID-19. DHHS statistics are now showing that 95% of deaths classed as "COVID-19 deaths" involve an average of four additional comorbidities. This misattribution of the cause of death undoubtably stems from the substantial government subsidies paid to incentivize such misreporting of COVID-19 deaths.

Similarly, the actual number of COVID-19 "cases" is far lower than the reported number. The signs, symptoms and other diagnostic criteria for COVID-19 are laughably broad. Applying the criteria, countless ailments can be classed as COVID-19, especially the common cold or ordinary seasonal flu. Compounding the problem, the DHHS authorized the use of the polymerase

chain reaction ("PCR") test as a diagnostic tool for COVID-19, with disastrous consequences.    The PCR tests are themselves experimental products, authorized by the FDA under separate EUAs.

A PCR test can only test for the presence of a fragment of the RNA of the SARS-CoV-2 virus, and literally, by itself, cannot be used to diagnose the COVID-19 disease. The RNA fragment detected may not be intact and may be dead, in which case it cannot cause COVID-19.   This is analogous to finding a car part, but not a whole car that can drive. Manufacturer inserts furnished with the PCR test products include disclaimers stating that the PCR tests should NOT be used to diagnose COVID-19. This is consistent with the warning issued by the Nobel Prize winning inventor of the PCR test that such tests are not appropriate for diagnosing disease.

Further, the way in which the PCR tests are administered guaranties an unacceptably high number of false positive results.  Cycle Threshold Value ("CT value") is essentially the number of times that a sample (usually from a nasal swab) is magnified or amplified before a fragment of viral RNA is detected. The CT Value is exponential, and so a 40-cycle threshold means that the sample is magnified around a trillion times.   The higher the CT Value, the less likely the detected fragment of viral RNA is intact, alive and infectious.

Virtually all scientists, including Dr. Fauci, agree that any PCR test run at a CT value of 35-cycles or greater is useless.   A study funded by the French government showed that even at 35-cycles, the false positivity rate is as high as 97%.   Despite this, a majority of the PCR tests for COVID-19 deployed under EUAs in the United States are run at 35-45 cycles in accordance with manufacturer instructions. Under the EUAs issued by the FDA, there is no flexibility to depart from the manufacturer's instructions and change the way in which the test is administered or interpreted.

There is, however, one GLARING exception to this standard.   THE CDC HAS STATED THAT ONCE A PERSON HAS BEEN VACCINATED, AND THEN AFTER VACCINATION THAT PERSON TESTS POSITIVE FOR COVID-19 USING A PCR TEST, THE CDC WILL ONLY "COUNT" THE POSITIVE RESULT AT 28 CYCLES OR LESS!   Why the difference? More recently, the CDC has announced it will no longer compile and report data showing the total number of vaccinated who subsequently contract COVID-19: "[We are] transitioning to reporting only patients with COVID-19 vaccine breakthrough infection that were hospitalized or died to help maximize the quality of the data collected."[21]   There appears to be an agenda to protect the myths about the vaccine, rather than the public.

---

[21] https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html

Ultimately, there is simply no objective evidence showing a public health emergency exists. On a national level, Plaintiffs are unaware of any intercounty requests for aid, or legitimately overwhelmed community health resources/hospitals. Plaintiffs also point out that the Cambridge dictionary defines the word emergency to mean, "something dangerous or serious, such as an accident, that happens suddenly or unexpectedly and needs fast action in order to avoid harmful results." COVID-19 has been with us for well over a year, and we know far more about the disease than we did at the outset. Most importantly, we can identify with precision the age segment of the population that is at risk, and it decidedly is NOT children under 16 who have a statistically zero percent chance of death from COVID-19.  If there is no emergency, then the EUAs should be invalidated entirely though, for purposes of this Motion, Plaintiffs only seek injunctive relief against the expansion of the EUAs to children under 16.

### (2)  Dangers of COVID-19 for Children Under 16 vs. Benefits/Dangers of Experimental Injection.

COVID-19 presents no threat to children under 16 statistically. The United States census counted more than 72 million people age 0-17.[22] As of 5/5/2021, according to the CDC, there have been only 282 deaths WITH (not

---

[22] https://www.census.gov/quickfacts/fact/table/US/PST045219 or https://datacenter.kidscount.org/data/tables/101-child-population-by-age-group#detailed/1/any/false/1729,37,871,870,573,869,36,868,867,133/62,63,64,6,4693/419,420

from) COVID-19 in children 0-17, representing 0.000392% of that age demographic. 179 of those deaths appear to have involved influenza, and likely would be characterized as influenza deaths rather than COVID-19 deaths under standard "cause of death" reporting rules. These statistics alone make it impossible for the DHHS Secretary to satisfy the balancing test required by § 360bbb–3(c)(2)(B), as a condition to issuing EUAs for these experimental vaccines.  Since the risk from COVID-19 to 12- to 15-year-old children is statistically 0%, there is no real or material benefit to this age category of using these experimental vaccines.  There is NO public interest in subjecting children to experimental vaccination programs, in order to protect them from a disease that simply does not threaten them.  Children are inherently incapable of providing informed consent. Neither the children, nor their parents, can possibly give informed consent to these experimental vaccines, since the DHHS Secretary has failed to make the even the minimum statutory disclosures regarding risks and alternative treatments, and at the same time they are targeted and pressured with incentives and penalties.

Given that there is no risk to children from the COVID-19 disease, *any* risk from the COVID-19 vaccines is too much under the law. What risks do these experimental vaccines carry?  Scientists and healthcare professionals all over the world are sounding the alarm and frantically appealing to the

FDA to halt the vaccines. They have made innumerable public statements, but for the purposes of this pleading we attach one recent, illustrative and dramatic statement.   57 top scientists and doctors are calling for an immediate end to all vaccine COVID-19 programs[23]. Other physician-scientist groups have made similar calls, among them: Canadian Physicians[24], Israeli People's Committee[25], Frontline COVID-19 Critical Care Alliance[26], World Doctors Alliance[27], Doctors 4 Covid Ethics[28], and America's Frontline Doctors[29].  These are healthcare professionals in the field who are seeing the catastrophic and deadly results of the rushed vaccines, and reputed Professors of Science and Medicine, including the physician with the greatest number of COVID-19 scientific citations worldwide.  We attach the authors, institutions and abstract here for the Court to understand the severity and urgency of the situation. They accuse the government of deviating from long-standing policy to protect the public. In the past, government has halted vaccine trials based on a tiny fraction – far less than 1% - of the number of unexplained deaths already recorded in these ongoing COVID-19 vaccine

---

[23] https://newsvoice.se/2021/05/57-scientists-study-covid-vaccinations/
[24] https://canadianphysicians.org/
[25] https://doctors4covidethics.medium.com/the-israeli-peoples-committee-report-of-adverse-events-related-to-the-corona-vaccine-april-2021-47891f17d452
[26] https://covid19criticalcare.com/
[27] https://worlddoctorsalliance.com/
[28] https://doctors4covidethics.medium.com/
[29] http://www.americasfrontlinedoctors.org/

trials![30] The scientists all agree that the spike protein (produced by the vaccines) *causes disease even without the virus*, which has motivated them to lend their imprimatur to, and risk their reputation and standing on, the following statement:

### 57   Top Scientists and Doctors: Stop All Covid Vaccinations.

*Roxana Bruno[1], Peter McCullough[2], Teresa Forcades i Vila[3], Alexandra Henrion-Caude[4], Teresa García-Gasca[5], Galina P. Zaitzeva[6], Sally Priester[7], María J. Martínez Albarracín[8], Alejandro Sousa-Escandon[9], Fernando López Mirones[10], Bartomeu Payeras Cifre[11], Almudena Zaragoza Velilla[10], Leopoldo M. Borini[1], Mario Mas[1], Ramiro Salazar[1], Edgardo Schinder[1], Eduardo A Yahbes[1], Marcela Witt[1], Mariana Salmeron[1], Patricia Fernández[1], Miriam M. Marchesini[1], Alberto J. Kajihara[1], Marisol V. de la Riva[1], Patricia J. Chimeno[1], Paola A. Grellet[1], Matelda Lisdero[1], Pamela Mas[1], Abelardo J. Gatica Baudo[12], Elisabeth Retamoza[12], Oscar Botta[13], Chinda C. Brandolino[13], Javier Sciuto[14], Mario Cabrera Avivar[14], Mauricio Castillo[15], Patricio Villarroel[15], Emilia P. Poblete Rojas[15], Bárbara Aguayo[15], Dan I. Macías Flores[15], Jose V. Rossell[16], Julio C. Sarmiento[17], Victor Andrade-Sotomayor[17], Wilfredo R. Stokes Baltazar[18], Virna Cedeño Escobar[19], Ulises Arrúa[20], Atilio Farina del Río[21], Tatiana Campos Esquivel[22], Patricia Callisperis[23], María Eugenia Barrientos[24], Karina Acevedo-Whitehouse[5],\**
*[1]Epidemiólogos Argentinos Metadisciplinarios. República Argentina.*
*[2]Baylor University Medical Center. Dallas, Texas, USA.*
*[3]Monestir de Sant Benet de Montserrat, Montserrat, Spain*
*[4]INSERM U781 Hôpital Necker-Enfants Malades, Université Paris Descartes-Sorbonne Cité, Institut Imagine, Paris, France.*
*[5]School of Natural Sciences. Autonomous University of Querétaro, Querétaro, Mexico.*

---

[30] https://www.lewrockwell.com/2021/05/no_author/highly-cited-covid-doctor-comes-to-stunning-conclusion-govt-scrubbing-unprecedented-numbers-of-injection-related-deaths/

[6]Retired Professor of Medical Immunology. Universidad de Guadalajara, Jalisco, Mexico.

[7]Médicos por la Verdad Puerto Rico. Ashford Medical Center. San Juan, Puerto Rico.

[8]Retired Professor of Clinical Diagnostic Processes. University of Murcia, Murcia, Spain

[9]Urologist Hospital Comarcal de Monforte, University of Santiago de Compostela, Spain.

[10]Biólogos por la Verdad, Spain.

[11]Retired Biologist. University of Barcelona. Specialized in Microbiology. Barcelona, Spain.

[12]Center for Integrative Medicine MICAEL (Medicina Integrativa Centro Antroposófico Educando en Libertad). Mendoza, República Argentina.

[13]Médicos por la Verdad Argentina. República Argentina. ´

[14]Médicos por la Verdad Uruguay. República Oriental del Uruguay.

[15]Médicos por la Libertad Chile. República de Chile.

[16]Physician, orthopedic specialist. República de Chile.

[17]Médicos por la Verdad Perú. República del Perú.

[18]Médicos por la Verdad Guatemala. República de Guatemala.

[19]Concepto Azul S.A. Ecuador.

[20]Médicos por la Verdad Brasil. Brasil.

[21]Médicos por la Verdad Paraguay.

[22]Médicos por la Costa Rica.

[23]Médicos por la Verdad Bolivia.

[24]Médicos por la Verdad El Salvador.

* Correspondence: Karina Acevedo-Whitehouse, karina.acevedo.whitehouse@uaq.mx

## 1.    Abstract.

Since the start of the COVID-19 outbreak, the race for testing new platforms designed to confer immunity against SARS-CoV-2, has been rampant and unprecedented, leading to emergency authorization of various vaccines. Despite progress on early multidrug therapy for COVID-19 patients, the current mandate is to immunize the world population as quickly as possible. The lack of thorough testing in animals prior to clinical trials, and authorization based on safety data generated during

*trials that lasted less than 3.5 months, raise questions regarding the safety of these vaccines. The recently identified role of SARS-CoV-2 glycoprotein Spike for inducing endothelial damage characteristic of COVID-19, even in absence of infection, is extremely relevant given that most of the authorized vaccines induce the production of Spike glycoprotein in the recipients. Given the high rate of occurrence of adverse effects, and the wide range of types of adverse effects that have been reported to date, as well as the potential for vaccine-driven disease enhancement, Th2-immunopathology, autoimmunity, and immune evasion, there is a need for a better understanding of the benefits and risks of mass vaccination, particularly in the groups that were excluded in the clinical trials. Despite calls for caution, the risks of SARS-CoV-2 vaccination have been minimized or ignored by health organizations and government authorities. We appeal to the need for a pluralistic dialogue in the context of health policies, emphasizing critical questions that require urgent answers if we wish to avoid a global erosion of public confidence in science and public health.*

AFLDS medico-legal researchers have analyzed the accumulated COVID-19 data in terms of the balancing test required by § 360bbb–3(c)(2)(B), and report as follows:

    1.    *Government Database (Defendant) Vaccine Adverse Event Reporting System (VAERS):*
        a.    *99% of all vaccine deaths this year are from COVID-19 injections (1% are from the other 100 vaccines)*
        b.    *The current reported number of vaccine deaths for Q1 2021 constitutes a 12,000% -25,000% increase in vaccine deaths vs. prior years*
        c.    *These statistics are based on the VAERS system*
            i.    *VAERS only captures 1-10% reactions for all vaccines*[31]

---

[31] https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf

       ii.     In **ten years** *(2009-2019) there were 1529 vaccine deaths. In the first **four months** of 2021 there have been over 4,000.*

       iii.     *Reporting of many adverse events from COVID-19 vaccines are siphoned away from public VAERS into a non-public database called V-Safe which contradicts Congressional intent in creating VAERS in 1986 which was to make vaccine adverse events easily known to the public.*

2. *The Spike Proteins created by the COVID-19 vaccines are risky:*

    a.   <u>Reproductive Health</u>*: Spike proteins are in the same family as the naturally occurring syncytin-1 and syncytin-2 reproductive proteins in sperm, ova, placenta.[32] Antibodies raised against spike protein might interact with the naturally occurring syncytin proteins, adversely affecting multiple steps in human reproduction. The manufacturers did not provide data on this subject despite knowing about this spike protein similarity on syncytin proteins for more than one year; there are now a very high number of pregnancy losses in VAERS[33] and worldwide reports of irregular vaginal bleeding without clear explanation.*

    b.   <u>Vascular Disease</u>*: Salk researchers in collaboration with the University of San Diego, published in Circulation Research that the spike proteins themselves damage vascular cells, causing strokes or many other vascular problems.[34] All the vaccines are causing clotting disorders (coagulopathy) in all ages.[35] The spike proteins are known to cause clotting that the body cannot fix. Brain thrombosis, thrombocytopenia.[36]*

    c.   <u>Autoimmune disease</u>*: The vaccines induce our cells to manufacture (virus-free) spike proteins. These spike proteins are then perceived to be foreign by the human immune system, initiating an immune response to fight them. While that is the intended therapeutic principle, it is also the case that any cell expressing spike proteins becomes a target for destruction by our own immune system. This is an auto-immune disorder and can*

---

[32] https://www.jennifermargulis.net/halt-covid-vaccine-research-scientist-urges-cdc/

[33] VAERS database 2900 miscarriages! Queried by author on April 23, 2021

[34] https://www.salk.edu/news-release/the-novel-coronavirus-spike-protein-plays-additional-key-role-in-illness/

[35] https://www.medrxiv.org/content/10.1101/2021.03.05.21252960v1.full

[36] https://b-s-h.org.uk/about-us/news/guidance-produced-by-the-expert-haematology-panel-ehp-focussed-on-vaccine-induced-thrombosis-and-thrombocytopenia-vitt/

affect virtually any organ in the body. It is likely that some proportion of spike protein will become permanently fused to long-lived human proteins and this will prime the body for prolonged autoimmune diseases. Autoimmune diseases can take years to show symptoms and many scientists are alarmed at giving young people such a trigger for possible autoimmune disease.

d.    _Spike proteins directly cause disease_: It is clear that spike proteins are not simple, passive structures which the virus uses to attach itself to cells. The spike protein is itself biologically active, even without the virus and these bind to our cells even more tightly causing harm to endothelial cells[37] which are throughout the entire human body, in blood tissue[38], in lung tissue.[39] The spike protein, being "fusogenic", promotes cells to adhere to one another, initiating blood coagulation – including in the brain. Spike proteins also cross the blood-brain-barrier, a sacrosanct space in medicine. This has never been done before in a vaccine and the neurological effects are unknown.[40]

e.    _Effect on the young_: The vaccines are more deadly or harmful to the young than the virus, and that is excluding the unknown future effects on fertility, clotting, and autoimmune disease. There is a statistically zero chance of death from SARS-CoV-2 under age 18 according to the CDC but there are reports of heart inflammation in young men[41] and at least one documented fatal heart attack of a healthy 15-year old boy in Colorado two days after his Pfizer shot.[42] The vaccines induce the cells of the recipient to manufacture trillions of spike proteins with the pathology described above. Because immune responses in the young and healthy are more vigorous than those in the old, paradoxically, the vaccines may thereby induce, in the very people least in need of assistance, a very strong immune

---

[37] https://www.biorxiv.org/content/biorxiv/early/2020/12/04/2020.12.04.409144.full.pdf

[38] https://www.salk.edu/news-release/the-novel-coronavirus-spike-protein-plays-additional-key-role-in-illness/

[39] https://medicalxpress.com/news/2021-04-sars-cov-spike-protein-lung.html

[40]https://scivisionpub.com/pdfs/covid19-rna-based-vaccines-and-the-risk-of-prion-disease-1503.pdf

[41] https://www.timesofisrael.com/israel-said-probing-link-between-pfizer-shot-and-heart-problem-in-men-under-30/

[42] VAERS database 1242573-1

response, including those which can damage their own cells and tissues as well as by stimulating blood coagulation.

f.      _Chronic Disease_: Healthy children whose birthright is decades of healthy life will instead face premature death or decades of chronic disease[43]. We cannot say what percentage will be affected with antibody dependent enhancement[44], neurological disorders[45], autoimmune disease[46] and reproductive problems[47], but it is a virtual certainty that this will occur.

g.      _Unknown Effects_: worldwide there are unexpectedly higher rates of death after receiving the vaccine.[48] Additionally, prior coronavirus and similar vaccines caused a phenomenon known as Antibody Dependent Enhancement (ADE) which is a paradoxically worse disease typically causing death or critical illness when the child or animal later encountered the virus in the wild. ADE is discovered during long term animal studies, and thus it is still an unknown risk.

h.      _Effect on society_: scientists are concerned that universal inoculation may create more virulent strains. This has been observed with Marek's Disease in chickens.[49] Due to vaccinating a large number of chickens who were not at risk of death, now all chickens must be vaccinated or they will die from a virus that was nonlethal prior to widespread vaccination. It is a serious concern that our current vaccination policy, vaccinating everyone instead of those at risk, will over time, exert the same evolutionary pressure toward more highly virulent strains.

3.    _Differences Between COVID Injections and Prior Vaccine Programs_:

a.      _Extreme Danger_: Based only upon the numbers reported to VAERS, these vaccines should have been pulled off the market almost immediately. "A typical new drug at about five deaths, unexplained death, we get a black-box warning, your listeners would see it on TV, saying it may cause death. And then at about

---

[43] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3335060/pdf/pone.0035421.pdf
[44] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3335060/
[45] https://pubmed.ncbi.nlm.nih.gov/22470453/
[46] https://pubmed.ncbi.nlm.nih.gov/25427992/
[47] https://www.pure.ed.ac.uk/ws/portalfiles/portal/28839692/The_risks_of_using_allogeneic_cell_lines_for_vaccine_production_the_example_of_Bovine_Neonatal_Pancytopenia.pdf
[48] AuthorAFLDS data
[49] https://www.jennifermargulis.net/halt-covid-vaccine-research-scientist-urges-cdc/

50 deaths it's pulled off the market."[50] In 1976 during the Swine Flu pandemic, the USA attempted to vaccinate 55 million Americans but when the shot caused 25 deaths, the program was pulled. The flu shot causes 20-30 deaths a year out of 195 million and there are now over 4,000 deaths out of about 100 million COVID-19 shots.[51]

b.   <u>Collusion to Censor</u>: The Associated Press, AFP; BBC, CBC/Radio-Canada, European Broadcasting Union (EBU), Facebook, Financial Times, First Draft, Google/YouTube, The Hindu, Microsoft, Reuters, Reuters Institute for the Study of Journalism, Twitter, The Washington Post, The New York Times all participate in the "Trusted News Initiative" which has agreed to not allow any news critical of the shots.[52] A Judge would not have to agree with one side or the other to recognize that s/he is likely not hearing the whole story when such an overwhelming majority of media/tech agree with their competitors on what is newsworthy.

c.   <u>Whistle Blowers</u>: There are innumerable reports on social media of individuals and groups of physicians and nurses coming forward reporting what they are directly observing. We must take such reports extremely seriously given the enormous personal cost to persons reporting.

i.   Dr. Charles Hoffe who defied a gag order on Moderna[53]

ii.   Dr. Shucharit Bhakdi who predicted the blood clotting problems [54]

iii.   Dr. James Todaro & The Lancet retraction[55]

iv.   Dr. David Brownstein who was cited by the FTC for using vitamins[56]

---

[50] https://leohohmann.com/2021/04/30/highly-cited-covid-doctor-comes-to-stunning-conclusion-govt-scrubbing-unprecedented-numbers-of-injection-related-deaths/
[51] https://leohohmann.com/2021/04/30/highly-cited-covid-doctor-comes-to-stunning-conclusion-govt-scrubbing-unprecedented-numbers-of-injection-related-deaths/
[52] https://www.bbc.com/news/entertainment-arts-55257814
[53] https://healthimpactnews.com/2021/canadian-doctor-defies-gag-order-and-tells-the-public-how-the-moderna-covid-injections-killed-and-permanently-disabled-indigenous-people-in-his-community/
[54] https://evidencenotfear.com/covid-vaccine-blood-clot-risk-was-known-ignored-buried-dr-sucharit-bhakdi/
[55] https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)31324-6/fulltext
[56] https://www.youtube.com/watch?v=a-79BFjzhj8&t=472s

v.      *Dr. Eric Nepute who was cited by the FTC for using Vitamin D[57]*

vi.     *Dr. Pierre Kory who was ridiculed for using ivermectin[58]*

vii.    *Dr. Joseph Mercola a victim of aggressive threats and cyberwarfare[59]*

viii.   *Frontline COVID-19 Critical Care Alliance[60]*

ix.     *America's Frontline Doctors[61]*

x.      *World Doctor Alliance[62]*

xi.     *The Great Barrington Declaration[63]*

xii.    *Pandemics Data and Analysis[64]*

xiii.   *Doctors 4 Covid Ethics[65]*

d.   <u>*Conflict of interest*</u>*: Consider that the J&J vaccine was paused for six clots but more than 4000 deaths due to Pfizer and Moderna has not resulted in a government pause. Note that the NIH is a co-owner of the Moderna patent. Note that Moderna and Pfizer (unlike J&J) plan to require an "update" once or twice annually.[66]*

There are several factors that reduce any purported benefit of the COVID-19 vaccines.   First, it is important to note that the Pfizer and Moderna EUA COVID-19 experimental injections were only shown to reduce symptoms – not block transmission.   For over a year now, these Defendants and state-level public health authorities have told the American public that

---

[57] https://www.ftc.gov/system/files/warning-letters/covid-19-letter_to_dap_eric_nepute.pdf

[58] https://www.newswise.com/coronavirus/dr-pierre-kory-president-of-the-flccc-alliance-testifies-before-senate-committee-on-homeland-security-and-governmental-affairs-looking-into-early-outpatient-covid-19-treatment

[59] https://articles.mercola.com/sites/articles/archive/2021/05/04/removing-articles-related-to-vitamin-d-c-and-zinc.aspx

[60] https://covid19criticalcare.com

[61] https://www.americasfrontlinedoctors.org

[62] https://worlddoctorsalliance.com

[63] https://gbdeclaration.org

[64] https://www.pandata.org

[65] https://doctors4covidethics.medium.com

[66] https://leohohmann.com/2021/04/13/cdc-pauses-johnson-johnson-injection-citing-rare-blood-clots-but-heres-what-youre-not-being-told/

SARS-CoV-2 can be spread by people who have none of the symptoms of COVID-19, therefore Americans must mask themselves, and submit to innumerable lockdowns and restrictions, even though they are not manifestly sick.  If that is the case, and these officials were not lying to the public, and asymptomatic spread is real, then what is the benefit of a vaccine that merely reduces symptoms? There isn't any.

Secondly, it appears that these Defendants either did lie about asymptomatic spread, or were simply wrong about the science.  The theory of asymptomatic transmission - used as the justification for the lockdown and masking of the healthy - was based *solely* upon mathematical modeling. This theory had no actual study participants, and no peer review.[67] The authors made the unfounded assumption that asymptomatic persons were "75% as infectious" as symptomatic persons. But in the real world, healthy false positives turned out to be merely healthy, and were never shown to be "asymptomatic" carriers of anything.[68] Studies have shown that PCR test-positive asymptomatic individuals do not induce clinical COVID-19 disease, not even in a family member with whom they share a home and extended proximity.  An enormous study of nearly ten million people in Wuhan, China showed that asymptomatic individuals testing positive for COVID-19 **never**

---

[67] https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707
[68] https://www.nytimes.com/2020/08/29/health/coronavirus-testing.html

infected others.[69]  Since asymptomatic individuals do not spread COVID-19, they do not need to be vaccinated.

### (3)  Lack of Informed Consent

Around the nation it appears that the requirements for informed consent are being completely ignored by our public health system and particularly by self-interested DHHS officials. Throughout the DHHS, we see the use of the "safe and effective" moniker to describe these unapproved injections. The fact of the matter is that if the manufacturers of the injections were saying these things they would very likely be breaking the law.

As noted above, 21 U.S.C. § 360bbb–3 requires truly informed consent be given to anyone that is being administered these injections. Because these biological agents are still being studied it is only proper to call them experimental, and so 45 CFR Part 46 also applies, and requires even more in the way of informed consent. The studies on these injections **ABSOLUTELY DO NOT SCIENTIFICALLY CONCLUDE THAT THEY ARE "SAFE AND EFFECTIVE"**. Rather, the EUAs themselves talk extensively about demographics that have not had any real testing and where administration of the injections would thus be completely experimental. Children under 16 are amongst these demographics.

---

[69] https://www.nature.com/articles/s41467-020-19802-w

In addition, comments made by pharmaceutical executives are misleading to the public. In promoting their efforts to expand the EUA to kids, they cite the reason that the vaccine has already been given safely to hundreds of millions of people. This is false and misleading in two ways. First, medically speaking, children are not simply short adults. Their organs are still developing, and in addition those organs must function perfectly for many decades ahead of them. Secondly, the scientific harms are long term (autoimmune, reproductive, neurologic) and thus it is wholly irrelevant how *many* persons have received the vaccine, rather the *duration* of the research is what is determinative.

Pursuant to 45 CFR Part 46, experimentation on children gives rise to a heightened duty of protection. Rather than ethically ensuring that they are providing truly informed consent before experimenting on children, the Defendants are doubling down on the safe and effective moniker and want to expand experimenting on children without them or their parents even realizing that it is happening!

Despite the fact that non-consensual medical experimentation on children constitutes crimes against humanity under international law, the DHHS seems to be intent on both hiding the fact that these injections are literally experimental on children, and actually supporting state and private

sector actors in their efforts to coerce individuals into unknowingly participating.

Further exacerbating this already concerning lack of informed consent for those receiving the COVID injections is the potential exposure of those who did not consent at all to receiving the vaccine. Page 67 of the Pfizer EUA application[70] describes the possibility of exposure of unvaccinated, <u>by the vaccinated</u>, through inhalation or skin contact. Pursuant to the referenced document, each person getting the experimental shot had to consent to the possibility of exposing pregnant women through inhalation or skin contact (pharmaceutical companies can only disclose actual, not purely speculative, risks). According to the document, a reportable safety event occurred if:

> *A female is found to be pregnant while being exposed or having been exposed to study intervention due to environmental exposure. Below are examples of environmental exposure during pregnancy:*
>
> > *A female family member or healthcare provider reports that she is pregnant after having been exposed to the study intervention by inhalation or skin contact.*

As the vaccines have been rolled out, there are worldwide reports of irregular and often very heavy vaginal bleeding in the unvaccinated who are near the vaccinated, even in post-menopausal women. These public reports

---

[70] https://cdn.pfizer.com/pfizercom/2020-11/C4591001_Clinical_Protocol_Nov2020.pdf

are scrubbed from the internet rapidly[71], however plaintiff AFLDS has also received innumerable emails from around the world with the same reports. It is well documented that the vaccinated have excessive bleeding and clotting disorders including vaginal bleeding, miscarriages, gastrointestinal bleeding and ITP.   Given that there is now the real-world observation[72] of what appears to be transmission of something from vaccinated to unvaccinated adults, we simply do not know what will happen to unvaccinated children sitting next to vaccinated children for eight hours every day.

"Self-disseminating vaccines[73]" is not a science fiction concept, rather it has been a research subject for years[74] if not decades.[75] The reportable safety event from the Pfizer application suggests that this type of vaccine is now a reality.  Self-disseminating vaccines are the most literal of violation of informed consent imaginable, and any expansion of the EUA to children under the age of 16 puts unvaccinated children at risk without meeting the informed consent requirements of either 21 U.S.C. § 360bbb–3 or 45 C.F.R. Part 46.

---

[71] https://www.lifesitenews.com/news/thousands-of-women-report-hemorrhaging- reproductive-dysfunction-miscarriage-after-corona-shots

[72] https://fromthetrenchesworldreport.com/bizarre-phenomenon-unvaccinated-getting-sick-being-around-the-covid-vaxxed/285650

[73] https://thebulletin.org/2020/09/scientists-are-working-on-vaccines-that-spread-like-a-disease-what-could-possibly-go-wrong/

[74] https://www.preemptproject.org/news/a-vaccine-that-could-spread-like-a-virus

[75] https://www.newscientist.com/article/mg24732960-100-we-now-have-the-technology-to-develop-vaccines-that-spread-themselves/

The legally required heightened levels of informed consent are not being obtained, and the necessary precautions for studies on children are simply not being considered. The requested TRO is necessary to ensure the Plaintiffs are not subjected to further public coercion to partake in this illegal experiment.

### (4) Suppression of Alternative Treatments & Conflicts of Interest.

Despite the misinformation being disseminated in the press – and, at times, by the Defendants – there are numerous alternative safe and effective treatments for COVID-19. Globally and in the United States, treatments such as Ivermectin, Budesonide & Dexamethasone, convalescent plasma and monoclonal antibodies, Vitamin D, Zinc, and Azithromycin are being used to great effect. While Dr. Anthony Fauci's NIH, which happens to have a financial stake in Moderna's COVID-19 vaccine[76], and others may downplay these treatments, the fact is that they have been used to great effect and have even resulted in a Nobel Prize nomination.[77]

The following alternative treatments are available for COVID-19:

---

[76] https://www.axios.com/moderna-nih-coronavirus-vaccine-ownership-agreements-22051c42-2dee-4b19-938d-099afd71f6a0.html, See also:
https://assets.documentcloud.org/documents/6935295/NIH-Moderna-Confidential-Agreements.pdf
[77] Dr. Vladimir 'Zev' Zelenko was nominated for the development of the "Zelenko COVID-19 Protocols" which include Hydroxychloroquine and zinc. Dr. Simone Gold, Founder of America's Frontline Doctors was also nominated.

1.      Ivermectin: NY judicial order[78], Yale University[79], South Africa[80], and forty[81] studies [82] and India[83]

2.      HCQ effective in 238 studies[84] worldwide including many peer reviewed in USA Detroit[85] multicountry[86] and doctor surveys show a majority[87] would use

3.      Budesonide[88]

4.      Dexamethasone[89]

5.      Vitamin D[90],

6.      Zinc[91]

7.      Azithromycin[92]

8.      Convalescent plasma/monoclonal antibodies[93]

9.      Colchicine[94]

---

[78] https://www.wkbw.com/news/coronavirus/judge-orders-hospital-to-treat-covid-patient-with-experimental-drug
[79] https://trialsitenews.com/top-yale-doctor-researcher-ivermectin-works-including-for-long-haul-covid/
[80] https://www.biznews.com/thought-leaders/2021/03/16/ivermectin-in-sa
[81] https://c19ivermectin.com
[82] https://journals.lww.com/americantherapeutics/fulltext/2021/00000/review_of_the_emerging_evidence_demonstrating_the.4.aspx
[83] https://www.lifesitenews.com/opinion/change-away-from-successful-treatments-due-to-big-pharma-pressure-likely-cause-of-covid-death-catastrophe-in-india
[84] https://c19hcq.com
[85] https://www.ijidonline.com/action/showPdf?pii=S1201-9712%2820%2930534-8
[86] https://www.sciencedirect.com/science/article/abs/pii/S0300289620305354
[87] 85% of global physicians recognized HCQ as at least partially effective in treating COVID-19, and more than half of the surveyed US physicians would take the drug or give it to family members early or even before onset of symptoms.
[88] https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(21)00160-0/fulltext
[89] https://www.nejm.org/doi/full/10.1056/NEJMoa2021436
[90] https://pubmed.ncbi.nlm.nih.gov/33487035/
[91] https://www.medicalnewstoday.com/articles/can-zinc-levels-predict-covid-19-severity
[92] https://www.medrxiv.org/content/10.1101/2020.12.29.20248975v1.full
[93] https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-monoclonal-antibodies-treatment-covid-19

10.    [Remdesivir][95]

11.    [Nitazoxanide/azithromycin][96]

While many of these treatments have been publicly maligned, they are all working in various capacities around the world and are all safer than the COVID-19 injections.[97] The highly publicized attacks on early treatments seem to be done in bad faith in many instances. For example, one study on HCQ overdosed study participants with 2.5x lethal amounts of the drug and then reported the deaths as though they were not a result of the 2.5x lethal overdose.[98] The 27 physician-scientist authors of the study were civilly indicted and criminally investigated and still JAMA did not retract the article.[99]

While plaintiffs make no allegations regarding legality or illegality of any of these conflicts of interest, they are numerous, now well publicized, and may create an incentive to suppress treatments while promoting

---

[94] [https://www.icm-mhi.org/en/pressroom/news/colchicine-reduces-risk-covid-19-related-complications](https://www.icm-mhi.org/en/pressroom/news/colchicine-reduces-risk-covid-19-related-complications)

[95] [https://www.fda.gov/news-events/press-announcements/fda-approves-first-treatment-covid-19](https://www.fda.gov/news-events/press-announcements/fda-approves-first-treatment-covid-19)

[96] [https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7192107/](https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7192107/)

[97] Most of the drugs listed here are part of the FDA Adverse Events Reporting System – FAERS – and have shown to be safe for many years.

[98] [https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2765499](https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2765499)

[99] [https://www.sciencemag.org/news/2020/06/it-s-nightmare-how-brazilian-scientists-became-ensnared-chloroquine-politics](https://www.sciencemag.org/news/2020/06/it-s-nightmare-how-brazilian-scientists-became-ensnared-chloroquine-politics)

experimental COVID-19 injections. Those conflicts are shown in a document attached hereto and incorporated herein with reference as Exhibit K.

Dr. Anthony Fauci is personally responsible for approving and granting NIAID and NIH monies for research responsible for the coronavirus spike proteins, as well as patents for coronavirus spike proteins. Dr. Fauci could have focused on treatments, including treatments he previously advised were beneficial (in SARS-CoV-1). Instead, Dr. Fauci directed the NIAID, NIH, Congress and the White House to develop vaccines, including Pfizer and Moderna vaccines where he has financial and professional ties.

The NIH Director stated the following in May, 2020: "We do have some particular stake in the intellectual property behind Moderna's coronavirus vaccine." In fact, NIH and Moderna signed a contract in December, 2019 that states "mRNA coronavirus vaccine candidates are developed and jointly owned by the two parties." [100],[101] And now Moderna is currently valued at $25 billion despite having no federally approved drugs on the market.

Further, on May 11, 2021, Senator Rand Paul asked Dr. Anthony Fauci under oath about the origins of SARS CoV-2 and the NIH and NIAID funding for Gain-of-Function research, and Dr. Fauci stated to the Senator and to all of Congress and to the American people stating that the NIH and NIAID did

---

[100] https://www.axios.com/moderna-nih-coronavirus-vaccine-ownership-agreements-22051c42-2dee-4b19-938d-099afd71f6a0.html
[101] https://www.economicclub.org/events/dr-francis-collins-chris-nassetta-and-mary-brady

not fund Gain-of-Function (making viruses more lethal) research when in fact, Plaintiffs' ongoing investigation and experts providing sworn declarations have revealed that he appears to have provided at least $60 million in funding.

(5)     **Suppression of the Fact that Alabama Has Reached Herd Immunity.**

The organization Physicians for Alabamans has concluded that Alabama has reached herd immunity, based upon evidence compiled by epidemiologist Dr. Suzanne Judd of the University of Alabama. Herd immunity is reached when a percentage of people have immunity to an infectious disease, thus reducing the wide-spread reach of the illness in the community.

An estimated 48% of Alabamans having contracted Covid-19, another 1.2 million Alabamans who are fully vaccinated, and another 400,000 Alabamans with partial immunity. These numbers establish the state's population has reached herd immunity. This assessment isn't based on these facts alone. The practical evidence is self-evident. We have averaged fewer than ten deaths a day over the past two to three months, we have had fewer than 50 hospitalizations a day over the past few weeks, and we have proven treatments going forward if others contract the virus. Based upon several

assessments last fall, we needed 50-72% herd immunity before protection could be expected.

### (6)    Preserving the Status Quo.

In this Motion, Plaintiffs seek relief only to the extent necessary to preserve the status quo by requesting immediate injunctive relief against any further expansion of the EUAs that would allow the administration of experimental COVID-19 injections to children under 16 years of age.

## IV.  LAW AND ANALYSIS

"The basis for injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506–07 (1959), quoted in Sampson v. Murray, 415 U.S. 61, 88 (1974); Grasso Enterprises, LLC v. Express Scripts, Inc., 809 F.3d 1033, 1039 (8th Cir. 2016); Odebrecht Const., Inc. v. Sec'y, Florida Dep't of Transp., 715 F.3d 1268, 1288 (11th Cir. 2013). However, the "decision to grant or deny … injunctive relief is an act of equitable discretion by the district court." eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

Under Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008) and FRCP 65, the standard for preliminary injunction is showing: 1) a strong likelihood of success on the merits; 2) the possibility of irreparable injury; 3) the balance of hardships in its favor; 4) the advancement of public interest. The Supreme Court also noted that as an "alternative" approach to

weighing these four factors: "a court may grant the injunction if the plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor," citing <u>Freecycle Network, Inc. v. Oey</u>, 505 F.3d 898, 902 (9th Cir.2007). *See also* <u>Earth Island II</u>, 442 F.3d at 1158; *Id.* at 677.

The 11th Circuit test has been distinguished to require the movant show: 1) substantial likelihood of success on the merits; 2) irreparable injury; 3) the threatened injury to the movant outweighs the damage the injunction may cause to the opposing party; and 4) the injunction would not be adverse to the public interest. <u>Siegel v. LePore</u>, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc); and <u>Jysk Bed'N Linen v. Dutta-Roy</u>, 810 F.3d 767, 774 (11th Cir. 2015).

While the burden of persuasion remains with the Plaintiffs, <u>O'Connor v. Kelley</u>, 2016 U.S. App. LEXIS 3683, at *10 (11th Cir. Feb. 29, 2016); <u>Jordan v. Fisher</u>, 2016 U.S. App. LEXIS 11734, at *4 (5th Cir. Feb. 10, 2016); <u>Ferring Pharm., Inc. v. Watson Pharm., Inc.</u>, 765 F.3d 205, 210 (3d Cir. 2014), the "burdens at the preliminary injunction stage track the burdens at trial." <u>Gonzales v. O Centro Espírita Beneficente Uniã do Vegetal</u>, 546 U.S. 418, 428–30 (2006); <u>LSSi Data Corp. v. Comcast Phone, LLC</u>, 696 F.3d 1114, 1123 n.11 (11th Cir. 2012). For purposes of a preliminary

injunction, this burden of proof can be shifted to the party opposing the injunctive relief after a *prima facie* showing and the movant should be deemed likely to prevail if the non-movant fails to make an adequate showing. Id.

In this case, the Plaintiffs have demonstrated, through their declarations and stated traumas and experiences, that they are facing a profound variety of irreparable harms. Each of them stands at great risk of profound loss and almost all of them stand at great risk of multiple and varied profound losses, *should the EUA experiment be further extended to younger children.* However, for each and every Plaintiff, and everyone that they represent in their person or profession, <u>nothing</u> whatsoever changes for the worse if the status quo is preserved.

In the following section, the Court will see clearly what has already been demonstrated beyond reasonable argument, that each prong of the four-part test tilts heavily in favor of the Plaintiffs. In this difficult moment, it is incumbent upon this Honorable Court to courageously protect and safely preserve the status quo, by granting the Temporary Restraining Order and keeping the Defendants from inflicting any more of their unsafe experiments upon the children of America. As Chief Justice Roberts has said:

[T]he Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States. But the Constitution also entrusts the protection of the people's rights to the

Judiciary—not despite  judges being shielded by life tenure, but because they are. Deference, though  broad, has its limits.

S. Bay United Pentecostal Church v. Newsom, 2021 U.S. LEXIS 758 * 4 (internal quotation marks omitted).

### A.    Four Part Test.

#### (1)    Likelihood of Success on the Merits:

Parties "are not required to prove their claim, but only to show that they [are] likely to succeed on the merits." Glossip v. Gross, 135 S. Ct. 2726, 2792 (2015); Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).

The Parties and the Claim are properly before this Court.  This Court exercises subject matter jurisdiction in accordance with the provisions of 28 U.S.C. § 1331, as this litigation involves multiple claims and issues arising under federal law. Subject matter jurisdiction also arises under 42 U.S.C. § 1983, as this litigation involves the deprivation of rights, protections, privileges and immunities secured by the U.S. Constitution.  Venue lies in this Court under 28 U.S.C. § 1391(e), since this is a civil action in which at least one Defendant is an officer or employee of the United States or an agency thereof acting in his official capacity, or an agency of the United States, no real property is involved, and one or more of the Plaintiffs reside in this judicial district.

Plaintiffs have standing to bring this litigation, as they are "adversely affected or aggrieved by agency action within the meaning of a relevant

statute."   5 U.S.C. § 702.     Plaintiffs (1) have suffered some actual or threatened injury, (2) the injury can fairly be traced to the challenged actions of the Defendants, and (3) the injury is likely to be redressed by a favorable decision of this Court.  N.H. Lottery Comm'n v. Rosen, 2021 U.S. App. LEXIS 1526 *15-17, quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).

Plaintiffs have demonstrated that the Defendants are in continuing, clear violation of the plain language of the federal law pursuant to which these claims are brought.    21 U.S.C. § 360bbb–3(c)(2)(B) requires the Secretary to satisfy a balancing test by demonstrating that "the known and potential benefits of [the COVID-19 vaccines], when used to diagnose, prevent, or treat such disease or condition, outweigh the known and potential risks of [the COVID-9 vaccines]."  As discussed above, the risk from COVID-19 to 12-15 year old children is statistically zero.  The risks of the untested experimental COVID-19 vaccines are substantial, and, in this case, as established by credible and expert medical testimony, the injections are already proving to be dangerous.   DHHS' own statistics substantiate its failure to meet the balancing test.

Further,  § 360bbb–3(c)(3) requires that "there is no adequate, approved, and available alternative to the [COVID-19 vaccines]."  Defendants cannot satisfy this requirement. A number of such alternatives are in fact adequate, approved and available, as discussed *supra*.  They are "approved"

in the sense that medical practitioners accept them as standard of care, and some of them have been "approved" by the FDA.  To the extent the FDA has withheld approval, it has done so wrongfully, against the backdrop of Defendants' conflicts of interest, despite strong scientific evidence that many of the alternatives are safer and more effective than the COVID-19 vaccines.

The truth is that several of the most successful treatments for COVID-19 have been studied more than almost any other drugs in the World, they have been demonstrated for many decades to be entirely safe and effective, prescribed safely to millions of patients, and their creators have been honored and lauded at the highest levels for their contribution to medicine. In short, these treatments are SO adequate and SO approved the World over, that they stand as the very antithesis to the pre-condition set forth in 21 U.S.C. § 360bbb–3(c)(3), which the Defendants are violating on an ongoing, formalized and more or less continuous basis.

§ 360bbb–3(e) requires, as a condition to the EUAs for the COVID-19 vaccines, that the DHHS Secretary ensure that both health care professionals and vaccine subjects have certain minimum information required in order to enable subjects to give their informed consent.  The Secretary has not satisfied this requirement.  Plaintiffs' Declarations attest to their lack of information and informed consent.

At the same time, public and private sector actors are deploying incentives and penalties designed to induce acceptance of the vaccine, further vitiating their voluntary, informed consent. The Governor of Ohio has just taken the shocking and unprecedented step of incentivizing Ohio residents to be injected with the experimental COVID-19 agents by offering entry into what amounts to a $1 million prize lottery. In addition, he offers one "lucky" youngster the chance to win a "free" four-year college scholarship.[102] Never mind that the winner may lack the life or health to enjoy their new fortune. In so doing, Ohio's Governor has crudely departed from the realm of voluntary, informed consent and has struck a grating blow against medical autonomy. It is no secret that many lack *or have yet to develop* the discipline to resist the lure of "easy money" and by turning the EUA into a high stakes lottery game, he has introduced a subtle, insidious form of coercion and duress. It is hard to imagine that he will be the last to erode voluntary, informed consent in such a way.

Plaintiffs further contend <u>and have substantiated</u> the fact that DHHS and its sub-agencies appear to be working with elements of major media and big tech to actively suppress the potential dangers of these injections in direct defiance of their statutory duty to ensure that people are fully informed about the potential dangers. Plaintiffs contend, with a solid evidentiary basis for

---

[102] https://news.yahoo.com/vaccinated-ohio-shot-1-million-221700404.html

doing so, that expanding the EUA to an even younger set of children <u>who are</u> <u>at no risk of harm from Covid-19</u>, will only further exacerbate this situation.

### (2)   Possibility of Irreparable Injury:

The Plaintiffs, as the moving party, must "demonstrate that irreparable injury is **likely** in the absence of an injunction." <u>Winter v. Nat.</u> <u>Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008) (emphasis added). Irreparable injury can be shown through the lens of 4 questions:

> 1) Is the type of injury actually irreparable;
> 2) Is it likely the movant will suffer this injury before a trial on the merits;
> 3) Are the defendant's actions the cause of the injury; and
> 4) is there an adequate alternative remedy for damages as opposed to the injunctive remedy at law?

Damage to an individual's or organization's reputation as a result of discharge may constitute  "irreparable injury". <u>Sampson v. Murray</u>, 415 U.S. 61, fn. 68 (1974) ("We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found."). AFLDS medical professionals are being coerced into providing a medical intervention using an EUA product that is untested, and neither safe nor effective. They are under immediate threat of concrete irreparable harm. Injuring their patients by knowingly subjecting them to these dangerous COVID-19 vaccines, in violation of their sacred oaths, would lead to litigation, threaten their employment and medical

licenses, and irreparably damage their reputations.  Refusing to harm their patients with the COVID-19 vaccines, and attempting to educate them about the risks of the vaccines, and the availability of alternatives, will lead to accusations of ethical violations, disciplinary actions by their licensing bodies, and highly publicized attacks, all of which would threaten their employment and medical licenses, and irreparably damage their reputations.  They are in an untenable, unsustainable bind.   "[T]he right to practice is [ ] a very precious part of the liberty of an individual physician or surgeon. It may mean more than any property. Such a right is protected from arbitrary infringement by our Constitution, which forbids any state to deprive a person of liberty or property without due process of law."   Barsky v. Board of Regents, 347 U.S. 442, 459 (1954) (Douglas J., dissenting).

ALFDS relies on the integrity of its collective reputation to engage in its critical mission as an entity. Any perceived loss of that professional standing through the erosion of its member physicians' reputations would harm its own reputation as a body, and cause irreparable harm of the type discussed in Sampson v. Murray, supra. AFLDS as an organization faces a higher degree of exposure to imminent irreparable injury because it has the cumulative exposure of its members. The younger the population to which additional EUA's apply, the more clear and present becomes its exposure for this type of irreparable harm. The bitter irony of the situation is, AFLDS

could well suffer irreparable damage to its reputation and be hamstrung in its critical mission when its only "crime" would have been to remain steadfastly true to its high calling, protecting its members' sacred oaths as physicians, and to the interests of its members' patients. There is a very real sense in which an injury to an honest reputation through the gaslighting and dishonesty of an organized and financially conflicted consortium comprised of pharmaceutical manufacturers who enjoy immunity from liability and are reaping astronomical profits and regulators with conflicts of interest failing to protect the American public, truly exacerbates that which is already irreparable.

Clearly, AFLDS is not the only Plaintiff subject to the imminent risk of irreparable harm suffered through loss of reputation. Dr. Roth spoke of the great personal cost that he suffers by simply entering this litigation as a named Plaintiff. To the extent that administrators where he practices medicine see things differently than he does, he has effectively targeted himself. His sense of duty and moral integrity left him no choice, but he faces a number of grave risks in the choices he will have to make should this extension of the EUA be permitted against the young children of his practice.

Plaintiffs ask this Court to recognize that for the Doctors and medical professionals in this matter, as well as many hundreds and thousands across our land, simply being forced into this untenable position by the unlawful

extension of an experiment that was never lawful in the first place, creates emotional, mental and psychological duress from which some may never recover, and which certainly therefore must be considered a form of life-changing, irreparable harm.

Dr. Jensen is in a similar situation. A few years ago he was honored as the physician of the year in his state. Now, remaining true to that which brought him the highest honors in his profession could cost him his reputation and potentially his livelihood. Clearly he will suffer irreparable harm, should the COVID-19 vaccine EUAs be extended to children.

Ellen Miller will suffer irreparable harm should the state remove her from her position as a trusted placement for at-risk children. Hers, too, is a high calling. Her sense of moral obligation to the young souls entrusted to her care requires her to protect them from dangerous, experimental COVID-19 vaccines that they do not need. Protecting the children she is bound to protect, might result in her removal.  The lives of the children she nurtures will be destabilized, and they will endure the trauma of losing parents for at least a second time.  Our cities are filled with parentless children who need mothers like Ellen Miller, who are willing to sacrifice their own comfort to extend their love and their home and their resources. If Mrs. Miller loses her ability to stand in the gap for America's at-risk children, the irreparable harm will spread to other families and children with effects into the future.

Matt Schweder and his minor daughter live in a jurisdiction that has been subjected to an aggressive COVID-19 lockdown that regularly involves police enforcement. Matt's daughter is already under pressure to accept the experimental COVID-19 vaccines and will face overwhelming pressure should the EUAs be extended to the 12-15 years of age group.

Jennifer Greenslade has an auto-immune disease which her minor child may well have inherited. This places her child at risk from the experimental COVID-19 vaccines. As Dr. Roth testified in his Sworn Declaration, even if her child is not auto-immune, she is still at greater risk of harm from the experimental injections because children's healthy immune systems have a stronger reaction to the experimental agents. Dr. Roth speaks as a medical expert and practicing physician who has watched COVID-19 vaccine-injured patients in his practice proceed to death, where he could do nothing to save them. Thus Ms. Greenslade's child may be too immune compromised to survive the COVID-19 injections or may be too robust to survive them. In either case, the COVID-19 vaccines expose her child to a significant risk of injury or death. Ms. Greenslade has witnessed the devastating impacts that the COVID-19 vaccines had on her auto-immune cousins, and fears the same consequences for her child. For a mother like Jennifer, simply extending the EUA to her child's age category creates irreparable mental and emotional harm.

Andrea McFarlane is a trauma/ICU nurse. Her boys are 10, 12 14 and 16. As a family, they are in the very center of the firestorm of imminent and irreparable harm. Andrea could lose her job, her reputation, or even her life. She could lose her boys. They could lose their health, suffering lifelong injury or trauma from the experimental injections if choice is removed. The boys will suffer the loss of friends, along with the good will of their teachers, coaches and friends for their conscientious stand against human experimentation that they are taking as a family. All of this harm can be averted entirely by simply preserving the status quo.

Plaintiffs have summarized *supra* the horrific adverse events, including both injury and death, caused by the COVID-19 vaccines as reported to VAERS. They have also presented evidence, extracted from Pfizer's EUA application, that at least that particular COVID-19 vaccine is self-disseminating, and may be spread by the vaccinated to the unvaccinated, including children, without their knowledge or informed consent. Individuals coerced into taking an experimental COVID-19 vaccine, without complete information as to risks and alternatives, and under the duress of incentives, penalties and extreme social pressure, and individuals effectively vaccinated without their knowledge and consent by a self-disseminating technology, and injured or killed as a result, have suffered irreparable injury. Garcia v. Google, Inc., 766 F.3d 929, 939 (9th Cir. 2014) (aff'd on rehearing en

banc, 786 F.3d 733 (9th Cir. 2015)("Death is an 'irremediable and unfathomable harm' … and bodily injury is not far behind.").

Dr. Roth has witnessed the death of patients caused by the COVID-19 vaccines. No vaccine in history has ever caused even a fraction of the deaths that are reported to have been caused by the COVID-19 vaccines.  Extending the EUA will increase those numbers, whereas preserving the *status quo* will have the effect of protecting the children within the target age group from a real and concrete risk of injury and death. Every Plaintiff with children or patients in the target age group stands to be immediately and irreparably harmed by the extension, and conversely protected by the preservation of the *status quo*.

Plaintiffs also note that withholding safe and effective alternative treatments constitutes an irreparable harm. <u>Henderson v. Bodine Aluminum, Inc., 70 F.3d 958, 961 (8th Cir. 1995)</u>.

### (3)   Balance of Hardships:

The balance of hardships test tilts decidedly in favor of the Plaintiffs. The Defendants can make no science-based argument that preserving the *status quo* will create any hardship for them or for the public.  It is possible that they can show a future monetary loss connected with the financial conflicts that are revealed and mentioned in this TRO, but those are precisely

the kind of hardships they may not rely upon to balance this prong of the test in their favor.

On the other hand, the Plaintiffs have established by credible and expert testimony and reference to CDC official numbers that the target age group faces no exposure to harm from COVID-19. Granting the TRO will preserve that status quo. The 12-15 year olds who are not being harmed by COVID-19 will continue to suffer no harm from COVID-19. If the EUA is extended, then the children in the target age group who are currently safe from the injury and death being visited upon the already vaccinated to a degree that departs dramatically from recorded experience with all other vaccines, will immediately begin to suffer that injury and death within their own population.

Further, the logic for the COVD-19 vaccines breaks down when one considers the Defendants' theory of asymptomatic spread.  For over a year now, these Defendants and state-level public health authorities have told the American public that SARS-CoV-2 can be spread by people who have none of the symptoms of COVID-19. If that is the case, then a vaccine that merely reduces symptoms yields no benefits - the virus spreads anyway.  If that is not the case, and asymptomatic spread is not real, then asymptomatic individuals do not need to be vaccinated with a vaccine that neither prevents infection with SARS-CoV-2 nor prevents its transmission.

(4)    Advancement of the Public Interest:

The Supreme Court has stated that a motion for pretrial injunctive relief must show "that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "[T]he court should weigh the public interest in light of the likely consequences of the injunction. Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence." Id.; see also Courthouse News Service v. Brown, 908 F.3d 1063, 1068 (7th Cir. 2018) ("court must ask whether the preliminary injunction is in the public interest, which entails taking into account any effects on non-parties").

Plaintiffs have demonstrated, using the Defendants, own data, that COVID-19 presents no statistically significant mortality risk to children under the age of 16.  Thus these children do not benefit from the COVID-19 vaccines, and the public has no interest in extending the EUAs to this age category.

However, the American public does have an immediate and overwhelming interest in ensuring that its public health establishment, laboring under financial conflicts of interest, subject to extreme political pressure, and insulated from scrutiny by unprecedented censorship, does not repeat the errors of Tuskegee and Guatemala, and commit new human rights crimes.  The public has an overwhelming interest in ensuring that children

under the age of 16 are not subjected to non-consensual human medical experimentation in the COVID-19 vaccine rollout.

WHEREFORE, for all of the foregoing reasons, Plaintiffs respectfully request that the Court grant the relief requested herein, preserving the *status quo* by enjoining the very recent without notice extension of the EUA for the Pfizer-BioNTech COVID-19 Vaccine to the 12-15 year-old age group, and enjoining further extensions of the EUAs to children under the age of 16 until such time as these issues have been litigated and resolved at trial.

Respectfully submitted this 19th day of May, 2021.


/s/ *Lowell H. Becraft, Jr.*
Lowell H. Becraft, Jr.
Attorney for Plaintiffs
ASB 5005-F66L
403C Andrew Jackson Way
Huntsville, AL 35801
Phone: 256-533-2535
becraft@hiwaay.net


/s/ *Thomas Renz*
Thomas Renz
(Ohio Bar ID: 98645)
1907 W. State St. #162
Fremont, OH 43420
Phone: 419-351-4248
Email: renzlawllc@gmail.com
Attorney for Plaintiffs
*(Admission Pending Pro Hac Vice)*

/s/ *Joey Gilbert*
Joey Gilbert Law
405 Marsh Avenue
Reno, Nevada 89509
Phone: 775-210-1501
joey@joeygilbertlaw.com
Attorney for Plaintiffs
*(Admission Pending Pro Hac Vice)*

/s/ *Michael A. Hamilton*
Michael A. Hamilton
(KY Bar No. 89471)
HAMILTON & ASSOCIATES
1067 N. Main St, PMB 224
Nicholasville, KY 40356
Tel. 859-655-5455
Attorneys for Plaintiffs
*(Admission Pending Pro Hac Vice)*

/s/ *F.R. Jenkins*
F. R. Jenkins
(Maine Bar No. 004667)
Meridian 361 International Law
Group, PLLC
97A Exchange Street, Suite 202
Portland, ME 04101
Tel. (866) 338-7087
Attorney for Plaintiffs
(*Admission Pending Pro Hac Vice*)

/s/ *Robert J. Gargasz*
Robert J. Gargasz
(Ohio Bar ID: 0007136)
1670 Cooper Foster Park Rd.
Lorain, Ohio 44053
Phone: (440) 960-1670
Email: rjgargasz@gmail.com
Attorney for Plaintiffs
*(Admission Pending Pro Hac Vice)*

/s/ *Joseph S. Gilbert*
Joseph S. Gilbert
(Nevada Bar No. 9033)
Joey Gilbert & Associates, Ltd
 D/B/A Joey Gilbert Law
405 Marsh Avenue
Reno Nevada 89509
Telephone: 775-284-7700
Attorney for Plaintiffs
*(Admission Pending Pro Hac Vice)*

/s/ *N. Ana Garner*
N. Ana Garner
Garner Law Firm
1000 Cordova Place #644
Santa Fe, NM 87505
Tel: 505.930-5170
Attorney for Plaintiffs
*(Admission Pending Pro Hac Vice)*