FILED
2021 Jun-10  PM 02:52
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| AMERICA'S FRONTLINE DOCTORS; and | ) | |
| | ) | |
| JOEL WOOD, RPH; and | ) | |
| | ) | |
| BRITTANY GALVIN; and | ) | |
| | ) | |
| ELLEN MILLER,<br>Individually and as Guardian of<br>3 Minor Siblings; and | ) ) ) | |
| | ) | |
| AUBREY BOONE; and | ) | |
| | ) | |
| JODY SOBCZAK,<br>Individually and as Father of<br>2 Minor Children; and | ) ) ) | Civil Action No.<br>2:21-cv-00702-CLM |
| | ) | |
| DEBORAH SOBCZAK,<br>Individually and as Mother of<br>2 Minor Children; and | ) ) ) | **COMPLAINT** |
| | ) | |
| SNOW MILLS; and | ) | **Jury Trial Demanded** |
| | ) | |
| JENNIFER MCCRAE, RN; and | ) | |
| | ) | |
| ANGELLIA DESELLE; and | ) | |
| | ) | |
| KRISTI SIMMONDS; and | ) | |
| | ) | |
| VIDIELLA, A/K/A SHAWN SKELTON; and | ) | |
| | ) | |
| SALLY GEYER; and | ) | |
| | ) | |
| MARIA MEYERS; and | ) | |
| | ) | |
| KARI HIBBARD; and | ) | |
| | ) | |
| JULIE ROBERTS, RN; and | ) | |
| | ) | |
| AMY HUNT; and | ) | |
| | ) | |
| RICHARD KENNEDY, individually and as<br>Administrator of the Estate of his mother Dovi | ) ) | |

Sanders Kennedy; and                                    )
                                                        )
ESTATE OF DOVI SANDERS KENNEDY, by                      )
and through its Administrator Richard Kennedy; and      )
                                                        )
LYLE BLOOM,                                             )
Individually and as Father of                           )
2 Minor Children; and,                                  )
                                                        )
JULIE BLOOM,                                            )
Individually and as Mother of                           )
2 Minor Children; and                                   )
                                                        )
ANDREA MCFARLANE, RN,                                   )
Individually and as Mother of                           )
4 Minor Children; and                                   )
                                                        )
JENNIFER GREENSLADE,                                    )
Individually and as Mother of                           )
2 Minor Children; and                                   )
                                                        )
STEVEN M. ROTH, MD,                                     )
Individually; and                                       )
                                                        )
MATT SCHWEDER,                                          )
Individually and as Father of                           )
a Minor Child.                                          )
                                                        )
                    Plaintiffs,                         )
                                                        )
           vs.                                          )
                                                        )
XAVIER BECERRA, Secretary of the U.S.                   )
Department of Health and Human Services, in his         )
official and personal capacities, DR. ANTHONY           )
FAUCI, Director of the National Institute of            )
Allergies and Infectious Diseases, in his official and  )
personal capacities, DR. JANET WOODCOCK,                )
Acting Commissioner of the Food and Drug                )
Administration, in her official and personal            )
capacities, U.S. DEPARTMENT OF HEALTH                   )
AND HUMAN SERVICES, the FOOD AND                        )
DRUG ADMINISTRATION, the CENTER FOR                     )
DISEASE CONTROL AND PREVENTION,                         )
NATIONAL INSTITUTE OF HEALTH,                           )
NATIONAL INSTITUTE OF ALLERGIES AND                     )

INFECTIOUS DISEASES, and JOHN AND JANE    )
DOES I-V.    )
    )
            Defendants.    )
_____    )

## COMPLAINT[1]

## I. NATURE OF THE CASE

1.      On February 4, 2020, Alex M. Azar, II, the then serving Secretary of the Department of Health and Human Services ("DHHS"), exercising his authority under Section 546 of the Food, Drugs and Cosmetics Act, 21 U.S.C. § 360bbb-3, declared that the SARS-Cov-2 virus created a "public health emergency" that had a "significant potential to affect national security" (the "Emergency Declaration").

2.      Based on the Declaration, the DHHS Secretary's designee, the Commissioner of the Food and Drug Administration ("FDA"), issued a series of Emergency Use Authorizations ("EUA") under § 360bbb-3.  EUAs allow medical products that have not been fully tested and approved by the FDA to be sold to American consumers, in order to meet the exigencies of an emergency.  Initially, the EUA medical products included various polymerase chain reaction ("PCR") tests marketed as COVID-19 diagnostic tools.  Later, EUAs (collectively, the "Vaccine EUAs") were issued for the so-called "Pfizer-BioNTech COVID-19 Vaccine,"[2] "Moderna COVID-19 Vaccine"[3] and the "Johnson & Johnson (Janssen) COVID-19 Vaccine"[4]  (collectively, the "Vaccines").[5]

---

[1] Plaintiffs filed a Motion for Temporary Restraining Order on May 19, 2021 (ECF 1).  The Court denied the Motion on May 24, 2021 (ECF 3).
[2] Issued December 11, 2020.  *See* https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine.

3. The Emergency Declaration and the Vaccine EUAs were the keys that unlocked the profit potential of the COVID-19 crisis. They enabled the Vaccine manufacturers to open the door to the vast American market, enter and reap billions of dollars in profit by exploiting the fears of the American people. In the first quarter of 2021 alone, Pfizer has earned $3.5 billion, and Moderna has earned $1.7 billion, in revenues generated from the sale of their respective EUA Vaccines. Plaintiffs' investigation has revealed that the Defendants appear to have numerous disclosed and undisclosed conflicts-of-interest that should deeply trouble any reasonable observer concerned about the integrity of the EUA process. For instance, Defendant the National Institutes of Health ("NIH") appears to be a co-creator and co-owner of the intellectual property in the "Moderna COVID-19 Vaccine."

4. The Vaccines are unapproved, inadequately tested, experimental and dangerous biological agents that have the potential to cause substantially greater harm than the SARS-CoV-2 virus and the COVID-19 disease itself. According to data extracted from the Defendants' Vaccine Adverse Events Reporting System ("VAERS"), 99% of all deaths attributed to vaccines in the first quarter of 2021 are attributed to the COVID-19 Vaccines, and only 1% are attributed to all other vaccines. The number of vaccine deaths reported in the same period constitutes a 12,000% to 25,000% increase in vaccine deaths, year-on-year. The Vaccines appear to be linked to a range of profoundly

---

[3] Issued December 18, 2020. *See* https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/moderna-covid-19-vaccine.

[4] Issued February 27, 2021. *See* https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/janssen-covid-19-vaccine.

[5] For the sake of clarity of reference, Plaintiffs are using the names given to the Pfizer and Moderna EUA medical products by their manufacturers and the Defendants. However, Plaintiffs reject the highly misleading use of the term "vaccine" to describe the Pfizer and Moderna EUA medical products, since they are not vaccines within the settled meaning of the term and instead are more precisely described as a form of genetic manipulation.

serious medical complications, among them myocarditis, miscarriage, irregular vaginal bleeding, clotting disorders, strokes, vascular damage and autoimmune disease. Meanwhile, Pfizer, Moderna and Janssen enjoy statutorily conferred immunity from liability for any harm caused by their experimental products.

5.       The Vaccine EUAs are unlawful on multiple different grounds and must be terminated immediately.  First, the Emergency Declaration upon which they are all based was unjustified.  As Plaintiffs allege in detail and will show at trial with expert medical and scientific evidence, including the Defendants' own data and studies, there is not now, and there never has been, a *bona fide* "public health emergency" due to the SARS-Cov-2 virus or the disease COVID-19.  Virtually all of the PCR tests were calibrated to produce false positive results, which has enabled the Defendants and their counterparts in state governments to publish daily reports containing seriously inflated COVID-19 "case" and "death" counts that grossly exaggerate the public health threat. Even assuming the accuracy of these counts, we now know that COVID-19 has a fatality rate far below that originally anticipated - 0.2% globally, and 0.03% for persons under the age of 70.  According to the CDC, 95% of "COVID-19" deaths involve at least four additional co-morbidities.

6.       The DHHS Secretary has failed to satisfy the "criteria for issuance" of the EUAs set forth in § 360bbb-3(c).  The Vaccines are not effective in diagnosing, treating or preventing COVID-19.  Absolute Risk Reduction ("ARR") is a critical measure of the impact of a medical intervention, reached by comparing outcomes in a treated group with outcomes in an untreated group in a randomized controlled trial.  The NIH has published a study that indicates the ARR for the Pfizer-BioNTech COVID-19 Vaccine is just 0.7%,

and the ARR for the Moderna COVID-19 Vaccine is 1.1%.  The benefits of the Vaccines when used to diagnose, prevent or treat COVID-19, do not outweigh the risks of these experimental agents.  This is particularly so for children, for whom COVID-19 presents 0% risk of fatality statistically.  There are multiple adequate, approved and available alternative products that have been used safely and effectively for decades.  For example, the evidence suggests that Ivermectin consistently has an ARR that far exceeds that of the Vaccines.[6]

7.      The DHHS Secretary has failed to meet the "conditions of authorization" mandated by § 360bbb-3(e)(1)(A).  Healthcare professionals administering the Vaccines and Vaccine subjects alike are being deprived of basic information regarding the nature and limitations of the EUAs, the known risks of the Vaccines and the extent to which they are unknown, available alternative products and their risks and benefits, and the right to refuse the Vaccines.  Not only is this information not being presented, it is being actively suppressed.  There is no reliable system for capturing and reporting all adverse events associated with the Vaccines. The Defendants have created a new reporting system dedicated to the Vaccines parallel to VAERS, and Plaintiffs have been unable to obtain any information from this system.

8.      At the same time, the American public, desperate for a return to normalcy following a year of relentless psychological manipulation through fear-messaging regarding SARS-CoV-2/COVID-19 and associated unprecedented deprivations of their constitutional and human rights, are being told in a carefully orchestrated public messaging campaign that the Vaccines are "safe and effective" and a "passport" back to

---

[6] *See* https://c19ivermectin.com.

the freedoms they once enjoyed.  Dissenting medical opinion is systematically censored.
Private sector employers and all levels of government are offering dramatic incentives to
accept the Vaccines, and jarring penalties for refusing them.  In these conditions, it is not
possible for Vaccine subjects to give voluntary informed consent to the Vaccines, and the
"warp speed" rollout of these dangerous, untested biological agents to the American
population constitutes non-consensual human experimentation in violation of customary
international law.

9.     Plaintiffs are healthcare professionals whose rejection of the Vaccines and
promotion of alternative products has resulted in the termination of their employment or
the suspension of their professional license, or has placed them in an untenable ethical
bind that interferes with their ability to practice their chosen profession and threatens
their livelihood and employment; parents and children under extreme pressure to accept
the Vaccines; and the Estate and loved ones of an elderly woman whose life was cut short
after she received a Vaccine, without having given voluntary, informed consent; and a
number of individuals seriously injured by a Vaccine, without having given voluntary,
informed consent.

10.     As a threshold matter, Plaintiffs are asking the Court to scrutinize, under
the authority of Home Building and Loan Association v. Blaisdell, 290 U.S. 398 (1934)
and Chastleton Corp. v. Sinclair, 264 U.S. 543 (1924), whether the exigencies that justify
a declaration of a "public health emergency" under § 360bbb-3(b) exist, and to declare
that since they do not exist, the DHHS Secretary's declaration of a public health
emergency and repeated renewals thereof are unlawful, and the Vaccine EUAs which are
based on the "public health emergency" are also unlawful.

11.     Plaintiffs are seeking additional declaratory relief including *inter alia* determinations that the Defendants have violated § 360bbb-3(c) by failing to meet the criteria for issuing the Vaccine EUAs, that they have violated § 360bbb-3(e) by failing to establish and maintain the conditions for the EUAs, that they have violated customary international law by engaging in non-consensual human medical experimentation, and that they have violated 45 CFR Part 46 by failing to implement protections for human subjects in medical experimentation. They are also asking the Court to enjoin *inter alia* the enforcement of the challenged declaration of a "public health emergency" and further renewals thereof, enforcement of the Vaccine EUAs and further extensions of the Vaccine EUAs to children under the age of 16.  Finally, the Vaccine-injured Plaintiffs are seeking civil money damages from the Defendants' key officials.

## II.  THE PARTIES

Plaintiffs

12.     AMERICA'S FRONTLINE DOCTORS ("AFLDS") is a non-partisan, not-for-profit organization of hundreds of member physicians that come from across the country, representing a range of medical disciplines and practical experience on the front lines of medicine. AFLDS' programs focus on a number of critical issues including:

- Providing Americans with science-based facts about COVID-19;
- Protecting physician independence from government overreach;
- Combating the "pandemic" using evidence-based approaches without compromising Constitutional freedoms;
- Fighting medical cancel culture and media censorship;
- Advancing healthcare policies that protect the physician-patient relationship;
- Expanding COVID-19 treatment options for all Americans who need them; and
- Strengthening the voices of front-line doctors in the national healthcare conversation.

8

13.     AFLDS' core beliefs, shared by each of its member health care professionals, include the following:

- That the American people have the right to accurate information using trusted data derived from decades of practical experience, not politicized science and Big Tech-filtered public health information.

- That critical public health decision-making should take place away from Washington and closer to local communities and the physicians that serve them. They are steadfastly committed to protecting the physician-patient relationship.

- That front-line and actively practicing physicians should be incorporated into the nation's healthcare policy conversation.

- That safe and effective, over-the-counter COVID preventative and early treatment options should be made available to all Americans who need them. They reject mandatory government lockdowns and restrictions not supported by scientific evidence. They support focused care for the nation's at-risk population, including seniors and the immune-compromised.

14.     AFLDS, through its member physicians, is deeply committed to maintaining the physician-patient relationship in the face of government encroachment.

15.     Each of AFLDS' member physicians is also deeply committed to the guiding principle of medicine, "FIRST, DO NO HARM". They take gravely their ethical obligations to their patients. It is axiomatic that a physician's duty is to his or her patient.

16.     AFLDS has recommended that the experimental Covid-19 vaccines be prohibited for use in the under-20 age category, and strongly discouraged for use in the healthy population above the age of 20 through the age of 69. These recommendations have two sound and broadly scientific foundations upon which they are based. First, there is the undeniable fact that the Covid-19 vaccines are experimental and either lack clinical testing or have presented serious risks for young people in the 12 to 15 age group.  The risks and safety evidence based upon such trials as there are, cannot justify the use of

these vaccines in younger persons. Because AFLDS has taken the science-based position that it is unethical even to advocate for Covid-19 vaccine administration to persons under the age of 50, its and its membership cannot administer it or support any agency that attempted to do so for juvenile persons in the 12 to 15 age category.

17.    It should be noted here that AFLDS is NOT against vaccines generally as a class of medical interventions. It has praised the speedy progress of the vaccine development program. It has taken care to ensure clarity in its position regarding support of the proper use of approved vaccines and the proper application of emergency use authorizations. It holds sacrosanct the relationship between doctor and patient where truly informed decisions are to be made, taking into consideration all of the factors relating to the patients' health, risks, co-morbidities and circumstances.

18.    Given these considerations it would be grossly unethical and therefore impossible for AFLDS members to stand idly by while their patients and their patients' families are subjected to the imminent risk of experimental COVID-19 vaccine injections being administered to minor children. If the EUAs are allowed to stand unrestrained and extended to young children in the 12-to-15-year age group, AFLDS member physicians will be forced into further untenable positions of unresolvable conflict between their ethical and moral duties to their patients, and the demands of many of the hospitals in which they work. AFLDS is aware of doctors around the Country to whom this has already been done and who have lost their medical licenses and/or their jobs over these issues.

19.    Many of AFLDS member physician's employers subscribe to and follow the recommendations of the American Medical Association ("AMA"). In a special

meeting in November of 2020, the AMA's Council on Ethical and Judicial Affairs, updated a previously published Ethics Opinion in the AMA Code of Medical Ethics as opinion 8.7, "Routine Universal Immunization of Physicians."

20.     In this updated opinion, the astonishing position was taken that not only do physicians have an ethical and moral obligation to inject themselves with the experimental COVID-19 vaccination, but they also have an ethical duty to encourage their patients to get injected with the experimental COVID-19 vaccination. The ethics opinion repeatedly uses the phrase "safe and effective" as a descriptor for the experimental COVID-19 vaccination. The AMA's ethics opinion goes on to state that institutions may have a responsibility to require immunization of all staff!

21.     "Physicians and other health care workers who decline to be immunized with a safe and effective vaccine, without a compelling medical reason, can pose an unnecessary medical risk to vulnerable patients or colleagues," said AMA Board Member Michael Suk, MD, JD, MPH, MBA. "Physicians must strike an ethical balance between their personal commitments as moral individuals and their obligations as medical professionals."

22.     The ethical opinion adopted by the AMA House of Delegates says that doctors:

> have an ethical responsibility to encourage patients to accept immunization when the patient can do so safely, and to take appropriate measures in their own practice to prevent the spread of infectious disease in health care settings.  Physician practices and health care institutions have a responsibility to proactively develop policies and procedures for responding to epidemic or pandemic disease with input from practicing physicians, institutional leadership, and appropriate specialists. Such policies and procedures should include robust infection-control practices, provision and required use of appropriate protective equipment, and a process for making appropriate immunization readily available to staff.

> *During outbreaks of vaccine-preventable disease for which there is a safe, effective vaccine, institutions' responsibility may extend to requiring immunization of staff.*

23.     It is clear from this ethics opinion that AFLDS member physicians would be considered by their employers to be both morally and ethically bound by a duty to encourage 12–15-year-old minors to receive the experimental COVID-19 vaccination injection.

24.     The AMA even offers a "COVID-19 vaccine script for patient inquiries". Despite being styled as a script for inquiries, the script clearly intends for phone messages and office websites to lead with the following message for every caller, not simply those who wish to inquire about vaccines.   The proposed script reads: "We are encouraging our patients to receive the COVID-19 vaccine when it is available and offered to them."

25.     To the extent that the AFLDS member physicians either lack control of their office website or telephone system or are simply unaware of the message that has been placed there absent their knowledge and consent, the member physicians will have been forced unwittingly into an utterly untenable position.   Such would create an unresolvable conflict for the member physicians, and deep confusion for their patients, who would thereby be receiving irreconcilable and contradictory messages from the same office.

26.     To illustrate just how unresolvable these conflicts are, it is necessary to consider the massive power of big pharmaceutical companies over the institutions who employ the physicians and the ease with which a physician's career can be destroyed through widely unregulated reporting which opens an investigation that can and often does render the physician virtually unemployable. Not only do physicians have to choose

between their ethical obligations to their patient to do no harm and their current job; the reality is that many of them will be choosing between their patients and their medical career.

27.     It is critical to point out that for AFLDS member physicians, the practice of medicine is not simply a job. Neither is it merely a career. Rather, it is a sacred trust. It is a true high calling that often requires a decade or more of highly focused sacrificial dedication to achieve. The depth and the horror of the bind that this ethics opinion places the member physicians of AFLDS in, simply cannot be overstated.

28.     To grasp the irreparable nature of the harm they face, one must consider the ease with which even an anonymous report can be made that may injure or haunt a physician's career. The National Physicians Database ("NPDB") was created by Congress with the intent of providing a central location to obtain information about practitioners. However, as Darryl S. Weiman, M.D., J.D. pointed out, the "black mark of a listing in the NPDB may not accomplish what the law was meant to do; identify the poor practitioner." Weiman goes on to point out that "It is the threat of a NPDB report which prevents the open discussion, fact-finding, and broad-based analysis and problem solving which was the intent of the meaningful peer-review of the HCQIA."

29.     The gross imbalance of equities between an individual physician and the various large institutions and pharmaceutical companies which exert tremendous sway over his or her professional calling has many physicians fearful of pushing back against such ethical binds as have been described above. Many physicians have a family and medical school debts to consider and should never be forced into such a bitter double bind.

30.     The types of harm the AFLDS member physicians are inevitably subjected to by this extension of the EUAs to inject 12–15-year-old minors with the experimental COVID-19 vaccine is truly irreparable. Such harm strikes at the moral and ethical underpinnings of their calling as a physician and drives irreparable wedges into the sacred doctor-patient relationship that cannot be healed and certainly cannot be addressed with monetary damages.   None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

31.     JOEL WOOD, RPH, of Berkshire, New York, is a licensed registered pharmacist who was named an essential worker, and who worked throughout the entire Covid-19 pandemic for Kinney Drugs Corporation.

32.     Joel personally administered over 500 COVID-19 Vaccines to adults through his employment with Kinney Drugs Corporation, beginning in January 2021. When Joel first began to administer the Vaccines, he was under the impression that these Vaccines were necessary to get us through this awful time in history.

33.     As time went on, Joel started to be concerned more with what the Vaccines were doing to people, and he started to change his opinion. As a pharmacist, Joel is trained to assess the risk of treatment against the risk of the disease state. Through his research into the experimental COVID-19 Vaccines, Joel learned that the risks associated with the injection outweigh the risks associated with contracting COVID-19. In Joel's professional opinion regarding people below the age of 65, the risks associated with the Vaccines outweigh the risks associated with getting COVID-19. COVID-19 poses almost no health risk to any healthy individual under the age of 50.

34.     There is no long-term data regarding possible benefits of the experimental Vaccines. Even with the experimental Vaccines, you can still transmit and become infected with the virus. Coronaviruses has been around for decades; they are part of what causes the common cold. The vaccination site where Joel worked did not ensure full informed consent. Joel has personal knowledge that his former employer, as well as other COVID-19 vaccination sites around the country, are not ensuring study participants give full informed consent as defined in the Code of Federal Regulations §46.116 General Requirements for Informed Consent. In fact, no one can give proper informed consent for the COVID-19 Vaccines, because the package inserts are blank.

35.     Joel heard from many staff members and patients that they did not know that the Vaccine was not FDA approved. He personally observed staff administering this Vaccine while not disclosing to people that it is not an FDA-approved Vaccine. How many people would get the shot if they knew they could still get and spread COVID- 19? While Joel was administering the Vaccines, he observed many people coming in to get the shot only because they believed the shot would be required to get back to "normal life," -- take the mask off, attend a wedding or attend a sports game.

36.     When Joel became aware that the EUA had been extended to include administration of the Vaccine to children ages 12 to 15, he felt compelled to take a stand. On May 5, 2021, Joel placed an anonymous call to the Kinney Drugs ethics line in order to express deep concern over two issues: Vaccine shedding and the experimental injection of youth.

37.     On May 9, 2021, Joel followed up by sending a letter via email expressing the concerns raised in his telephone call and advising his employer that he would contact

OSHA if he did not receive a response. In his letter, Joel inquired about what Kinney Drugs would be doing to address the safety concern of Vaccine shedding in the workplace. The Pfizer Trial Investigational Protocol, 1 at page 67, addresses "environmental exposure" or Vaccine shedding. He also inquired about the lack of patient safety and informed consent he had observed, his issues with many staff members and patients not knowing the shots were **not** FDA approved, and staff administering the shot while failing to advise people the shot is not FDA approved.

38.     On May 10, 2021, when Joel's communication with Kinney Drugs was unanswered, he sent an email complaint to OSHA. In his Complaint, he expressed his concern with exposure and his knowledge of vaccine shedding. Joel expressed his concern that there are no long-term studies for the experimental vaccines and his conviction that staff working in retail pharmacies are exposed to vaccine spike protein shedding as described in the Pfizer Trial Investigational Protocol.

39.     On May 11, 2021, Joel received a response from OSHA which stated: "At this time OSHA has no standards or jurisdiction when it comes to COVID-19 concerns or complaints." Joel was additionally provided with phone numbers for the New York Governor, the New York State COVID-19 Hotline, and the New York City COVID-19 Violations Hotline.

40.     On May 12, 2021, Joel had a verbal discussion with his boss after being advised by human resources that no accommodation was going to be made to address his concerns and that he would be required to give shots to kids. Joel's boss gave him until May 14, 2021 to decide whether he would give the shots. On May 14, 2021, Joel verbally advised his boss that he had a legal right under religious moral, and ethical concerns to

not provide a service. He advised his boss that he could not ethically administer the experimental Vaccines to adolescents, nor could he ethically administer the Vaccines without providing informed consent. Joel further advised his boss that it is not possible to provide full informed consent as the Vaccine manufacturer's package inserts are blank, and there is no long-term data. Joel's boss explained that in that case he would be terminated. Joel was then fired from his job.

41.     According to the Nuremberg Code, voluntary consent is absolutely essential to medical experimentation. The Vaccines are medical experimentation. It has been Joel's professional opinion based on direct observation that his former employer, along with other Vaccine clinics has failed, and continue to fail to provide proper informed consent for the Vaccine.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

42.     BRITTANY GALVIN, of Tampa, Florida, is Vice President of Sales for a professional employer organization, and the primary breadwinner for her family. She is a 35-year-old wife and mother of three children.  She has a history of Rheumatoid Arthritis, diagnosed four years ago, in remission for a couple of years.   Before the COVID injections, she did not take any regular medications.

43.     Before the spring of 2020, she traveled extensively for work.  Just prior to the reporting of the COVID outbreak in the United States, when she returned from Las Vegas in late February of 2020, she got extremely sick. The Urgent Care doctor she saw told her there was no way she could have COVID because she had not been to China.

Between March and June 2020, she was tested at least ten times for COVID-19.  None of these tests were positive.  However, she was sick for almost three months.

44.     By June of 2020, Brittany had become extremely ill.  She went to the ER and was transferred to Advent Carrollwood Hospital where she was admitted to a Covid unit for 6 days as "positive" for COVID-19.  She never saw positive test results.  On the first day of her hospital admission, she was treated with Hydroxychloroquine.  By the third day she had improved significantly. Nothing helped before the Hydroxychloroquine. Several months later, she had a positive antibody test.

45.     Brittany experienced tremendous pressure to get "vaccinated" so she requested a medical exemption from the shot from her rheumatologist.  However, she was advised by his assistant that they were recommending that all patients get the injections.  She was further advised that her doctor would not provide a recommendation against the shot, but that instead, he would write a letter stating she should get the shot. This incident was extremely alarming to Brittany.

46.     After her doctor failed to support her medically, and needing to get back to work, Brittany reluctantly took the first Moderna injection on March 28, 2021.  Within 4-5 hours of receiving the shot, she experienced chills all over her body and felt terrible. She felt unsteady and when she walked it felt like her legs were moving through wet cement.

47.     She received her second Moderna injection on May 4, 2021, at her local Publix pharmacy.  She filled out a form that asked me if she had a prior autoimmune disease.  She checked the box on the form indicating that she had, and that she would

need to be seen by a pharmacist.  No pharmacist saw her and she reluctantly accepted the injection.

48.     A couple of days after the shot metal started sticking to her body.  Brittany had learned more about the shots and was alarmed.  She asked the pharmacist why he provided shots with a blank package insert and he could not tell her what was in the shots.

49.     On May 22, 2021, about 13 days after her second shot, Brittany seized up unable to walk, and fainted on the floor.  Her head was tingling and her ears were hot. She had a terrible headache. Coming to, she was able to call 911.  By the time paramedics arrived, her body had fully seized up.  She was transported to Memorial Hospital of Tampa by ambulance where the staff asked her immediately if she had had the COVID shot, which ones, and when.  She overheard a conversation at that emergency room that alerted her that similar side effects were coming into the hospital regularly.   She overheard hospital staff talking about seeing a lot of heart conditions, chest pains, and leg numbness from the COVID shots.

50.     At Memorial Hospital, the hospital staff took x-rays with a spoon stuck to her body. In fact, the MRI technician tried it, and the spoon stuck to him as well.

51.      She was ultimately released with the reason for admission in her chart noted as "anxiety."

52.     A few days later, on May 25, 2021, she was admitted to the emergency room at Advent Carrollwood Hospital in Tampa, Florida for the same symptoms: unsteadiness, numbness, tingling, headaches, nausea, chest pain.  The next day she was

released, and her chart noted that she was admitted for "anxiety."  After this hospital stay, she made a report to VAERS.

53.     On May 30, 2021, Brittany was again admitted to Advent Carrollwood Hospital. She was there fighting for her life as of, June 8, 2021. She has undergone multiple tests, including without limitation blood tests, neurology tests, brain MRIs, and a spinal tap.  The hospital was prepared to release her with another diagnosis of "anxiety" when her neurology team arrived in her room with results from her lumbar puncture.  Her neurologist advised her that her problems arose from the COVID shot.  He also advised her that she was not the first patient he has seen with these problems. He then diagnosed her with Guillain Barre Syndrome, Acute Neuropathic POTS, pericarditis, gastroparesis and aseptic meningitis and, as she was told, made a report to VAERS.

54.     As of June 8, 2021, Brittany has a very stiff neck and her head pain is extreme.  She cannot use the bathroom unassisted.  She is experiencing pressure in her head like her brain is swollen.  She has recently been running a fever and throwing up. She is getting worse, not better.  Her family and husband need her.

55.     Brittany feels very strongly about using her experience to warn and help others so this does not happen to them.  She posted her experiences on Instagram at @brit_galvin.  Her videos have been censored on social media.

56.     When Brittany took the COVID-19 experimental injections, she did not know they were experimental and not approved by the FDA.  She was highly confused by the media asserting that they were "safe and effective."

57.     Brittany believes the COVID-19 vaccines should all be immediately pulled from use.  She stands strong in her conviction to make a difference with her life by

stopping these experimental injections.   None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was known to this Plaintiff prior to sustaining Vaccine injury, and none was supplied by the Defendants or as a result of their efforts.

58.     ELLEN MILLEN, a resident of Huntsville, Alabama, is the Guardian of three siblings ages 5, 4 and 4. These children have been entrusted to her by Child Protective Services and she is responsible for making medical decisions for them. Ellen has obtained a medical exemption for vaccines and neither she nor their biological parents wish the children to receive the experimental COVID-19 vaccination. Ellen stands not only for the children currently in her care but for those who may be placed in her care in the future. She stands for her 22-year-old son and four other children who are unable to stand for themselves in opposing the application of the experimental COVID-19 vaccination to children of all ages who are at NO statistical risk of death from COVID-19. Ellen knows that the children in her care will face overwhelming pressure to receive the experimental COVID-19 vaccination injection from friends, parents of friends, sports organizations, summer camps, schools and colleges. The fear and pressure that this fragile at-risk population of children will be subjected to if the requested injunctive relief is not granted is greater than that which is often faced by children from intact nuclear families. The nature of their placement outside of their home and away from their biological family leaves them particularly susceptible to the pressures and the fear mongering that they will receive from peers and authority figures. The harm that they will undergo emotionally, mentally, and/or physiologically is precisely the type of harm considered irreparable by the law in this case. The trauma that is created in this type

of a situation will quite likely be carried for life, and no monetary damage award can possibly erase the effects. Ellen recently watched an interview with the mother of a young man named Everest Romney. Everest was a healthy top-level athlete. Everest took the injection, followed by his father and his pregnant mother, who each took a vaccine in the same day. One took the Pfizer injection and the other took the Moderna injection. Everest and his father were hospitalized within days with blood clots on their brain. Ellen is terrified that something similar or worse will happen to her family.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

59.    AUBREY BOONE, of Lubbock, Texas, is 39 years old and studying to be a colon hydro-therapist. She also works as a caregiver for her retired father, who is a disabled Veteran and unable to care for himself due to service-related injuries and significant cognitive decline. Additionally, she is the single mother of two minor children ages twelve and sixteen. She has always been healthy and had no medical problems prior to being injected with the experimental agents in the Covid-19 "vaccine".

60.    Aubrey took the first Moderna shot on March 18, 2021, and the second shot on April 15, 2021. She registered for the vaccine appointment online and showed up at Lubbock Civic Center with her father. When she arrived, staff searched for her name on the roster, where it happened to appear twice. Her identification was never checked, nor was her father's. They then were escorted to a table and asked only if they were getting the first or second shot.

61.     The first shot was given by an EMT. He told Aubrey that it was the first shot, and she should experience no side effects. They were not at any time provided with disclosures, papers or directives. They were only provided a proof of vaccine card.

62.     Aubrey cannot attest to the position of the person who administered the second shot, because the woman giving the shot did not wear a uniform. Aubrey and her father were once again only asked if it was the first or second shot. This time, they were asked which brand of shot we had received. The woman giving Aubrey the injection told her she may get a fever and if it persists to go to the emergency room. Once again, Aubrey and her father were never given any paperwork on the actual vaccine and never warned of potential side effects.

63.     After the shot Aubrey became extremely ill very quickly. Within 12 hours she had a fever of 103, severe migraine, unbearable body aches, stomach issues, and what seemed to be arthritic pain in every joint on her body. The fever lasted four days, but the severe migraine continued for 17 days. Aubrey became so ill that she could barely function. During the first four days, she had someone assist her by bringing her items that she needed. This person became terribly ill with the same symptoms she was experiencing, within 24 hours of contacting her.

64.     Aubrey was never informed that she could get this sick from the vaccine. She could not function for 17 days and this was extremely difficult for her. If she would have known that she was going to become that sick with the vaccine she would have been able to make a somewhat informed decision for herself, and for her family that depends solely on Aubrey's care. Aubrey heard that the experimental injection is going to be given to children aged 12 to 15 and she believes that is wrong. She does not want her

children to get this experimental Covid-19 vaccine injection. Aubrey felt enormous pressure to get vaccinated. She believes the pressure on children is even stronger. Children are not old enough to be pressured about their health decisions and they are not old enough to make a potentially life changing medical decision.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was known to this Plaintiff prior to sustaining Vaccine injury, and none was supplied by the Defendants or as a result of their efforts.

65.     JODY SOBCZAK, of Huntsville, Alabama, is the father of two minor children ages 15 and 17. Jody has researched the experimental COVID-19 vaccines and fiercely opposes their use in healthy children of any age. He knows that his own children are placed at immediate and irreparable risk of harm by extending the EUAs for the experimental COVID-19 Vaccines to adolescents. Jody recently watched a video showing an interview of a young woman named Alicia Smith.  Ms. Smith is a 34-year-old hair stylist who has uncontrollable essential tremors and facial palsy since she received her COVID-19 shot on April 15, 2021. She took the vaccine because a lot of her clients pressured her into it and she did not want to lose clients. Ms. Smith's story is heartbreaking. The doctors are telling her that it is an anxiety problem. She does not know if she will ever be able to work as a hairstylist again. It is very upsetting to Jody that this young woman trusted the shot was safe, even though she really did not want to get it. She has now been adversely affected in a serious and possibly permanent way. She is a grown woman, and she succumbed to pressure to take the shot. Teens are far more susceptible to peer pressure than adults, and Jody is afraid for his own children, absent the relief requested. People simply do not know any better and they are trusting the drug

companies and the government. Jody is well aware that there are safe and effective alternative treatments readily available, and he adamantly opposes the suppression of those treatments in favor of experimental and potentially life-threatening agents. None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

66.     DEBORAH SOBCZAK is the wife of JODY SOBCZAK, and the mother of minor children ages 15 and 17. The allegations in the preceding paragraph are incorporated herein by reference. None of the adverse information that this Plaintiff has discovered about the Vaccine was supplied by the Defendants or as a result of their efforts.

67.     SNOW MILLS, of Lubbock, Texas, is a 49-year-old grandmother with no serious health issues prior to the experimental COVID-19 vaccine injection. Snow took the first dose of the experimental Moderna injection on March 8, 2021, after registering online with a CVS Pharmacy. When she arrived at CVS on March 8, she checked in on her phone. She then went inside, checked in with someone, and proceeded to a table to receive the injection. She was not provided with any information about side effects or warnings whatsoever. Later that evening she started feeling very achy and sick to her stomach.

68.     Approximately two weeks after the shot Snow contracted a fever and a large knot appeared at the injection site for about four days. On April 4, 2021, Snow received the second Moderna shot. She dreaded it because of the terrible reaction she had

with the first vaccine. Several hours after the second injection, Snow began to experience horrible flu-like symptoms that kept her bed-ridden for two days.

69.     At no time was Snow ever given any information about risks or side effects of the experimental COVID-19 Vaccine injection before or after they were administered to her. Snow strongly objects to the COVID-19 shots being given to children. There is no way to know the risks to young people, with their entire lives ahead of them. Snow is mentally and emotionally distressed at the thought of any child, who is statistically at no risk of death or serious injury, going through the awful side effects she experienced.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was known to this Plaintiff prior to sustaining Vaccine injury, and none was supplied by the Defendants or as a result of their efforts.

70.     JENNIFER MCCRAE, RN, of Wichita, Kansas, is an RN working at a county health department vaccination clinic. For many years she did transfusion therapy for patients and therefore she has extensive experience with the process of informed consent. Jennifer is deeply concerned that COVID-19 vaccination sites around the country, such as the one where she works, are also not providing study participants full informed consent as defined in the 45 CFR §46.116, General Requirements for Informed Consent. Jennifer finds this extremely troubling given that legal guardians are enrolling children as young as 12 years old in the COVID-19 vaccination clinical trial without understanding they are participating in a clinical trial. According to the guidance provided by DHHS:

> Informed consent is a process, not just a form. Information must be presented to enable persons to voluntarily decide whether or not to

*participate as a research subject. It is a fundamental mechanism to ensure respect for persons through provision of thoughtful consent for a voluntary act. The procedures used in obtaining informed consent should be designed to educate the subject population in terms that they can understand. Therefore, informed consent language and its documentation (especially explanation of the study's purpose, duration, experimental procedures, alternatives, risks, and benefits) must be written in "lay language", (i.e., understandable to the people being asked to participate). The written presentation of information is used to document the basis for consent and for the subjects' future reference. The consent document should be revised when deficiencies are noted or when additional information will improve the consent process.*

71.     Jennifer's opinion as a medical professional with extensive experience studying and providing informed consent to those who are being asked to participate in clinical trials, is that her clinic is providing the experimental COVID-19 experimental Vaccine injections in direct violation of 45 CFR §46.116, General Requirements for Informed Consent.  When a vaccine recipient walks into the clinic they are asked a few simple screening questions. They are not counseled by any staff member about risk vs benefits of participating in this clinical trial. Many believe the vaccines are fully FDA approved and that this Vaccine is mandatory or will be soon. Many have even asked Jennifer if they need to have their vaccination card on them at all times. Jennifer interprets this at minimum as a lack of understanding, but also as coercion.

72.     A Vaccine recipient is given the manufacturer's information sheet at check in but is not asked if they understand what they are reading. If that person does not speak English as a first language and/or cannot read at an adequate reading level to comprehend the information they are not receiving informed consent. Additionally, no one assesses a Vaccine recipient's level of understanding at any part of the process. The manufacturer's information sheet is not informed consent. For example, it does not contain any information about the individual's risk. For a patient aged 12 to 15, it is relevant risk

information that a person under age 18 has statistically zero percent chance of death from COVID-19.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

73.     ANGELLIA DESELLE, of Marrero, Louisiana, was a surgery center manager until the devastating health effects of the experimental COVID-19 Vaccine injection changed her life forever and cost her that job. As an essential worker, Angelia worked throughout the entire Covid-19 pandemic. Before January 5, 2021, she was a healthy 45-year-old woman with absolutely no health issues. She did not take any regular medications. However, she took the experimental Pfizer Vaccine on January 5, 2021, because she was exposed to COVID-19 regularly at work and did not want to endanger her aging parents. She drove herself to the vaccination center during her lunch hour on Tuesday, January 5, 2021. Within 2 hours of receiving the shot, Angelia got a severe headache, and the headache has not gone away since.

74.     On Wednesday, January 6, 2021, Angelia slept for 15 hours straight when she got home from work.

75.     On Thursday morning, January 7, 2021, she woke up and felt very dizzy, and almost passed out. However, she took Ibuprofen and went on to work.

76.     By Friday night, January 8, 2021, Angelia was having problems with her legs. At about 11:30 PM, she got out of bed and could not feel or use her left leg. Initially, she just thought it would pass and went back to bed.

77.     By Saturday morning, January 9, 2021, she could not use either of her legs and could not walk unassisted. About two hours later, she started having full-body

convulsions. Her husband took her to the emergency room, and she was admitted to Ochsner Medical Center, where a hospitalist came in to see her. He told her, "Ms. Desselle, I heard you were coming. I know what is going on and I know this is the vaccine. We are going to research this until we figure it out." That doctor never came into Angelia's room again and that was the last time she ever saw him. She was in Ochsner Medical Center Hospital for five days. She was never treated for convulsions, nor was any testing done for convulsions or seizures. Her spine was studied, and an MRI was done. The hospital documented her problems on discharge as "bilateral leg weakness."

78.     Angelia's severe health problems have persisted for five months and not only continue unabated, but have grown worse, as detailed below. She has been shuffled from doctor, to doctor, to doctor. She has seen numerous neurologists. Unfortunately, all her testing has taken place at the same hospital where she was administered the experimental vaccine injection. The last five months have been a nightmare for Angelia. She has neurological issues, as well as memory loss and brain fog. As manager of a surgery center, Angelia was very sharp and could think fast and easily make decisions. The mental acuity she possessed before receiving the experimental injection is gone. In addition, Angelia's job is gone. Gone as well is her ability to drive along with the ability to go out in public for fear of a convulsion starting.

79.     Angelia recently testified in support of Louisiana State Bill 498 which makes it illegal to discriminate against unvaccinated people and keeps the vaccine off the required list of immunizations for the upcoming school year. Her testimony helped the bill pass through the House. She then testified in front of the State Senate via written

statement and video. She was unable to attend in person because she has a new problem with her vision, preliminarily diagnosed as a detached retina.

80. When the experimental COVID-19 injection was administered, Angelia had no idea it was experimental and NOT approved by the FDA. Her employer provided her with a "Covid-19 Vaccine Consent Form" which appeared to be merely a standard consent form for the "Inactivated Seasonal Influenza Vaccine" with the word "influenza" replaced with "COVID-19." The form does not address potential neurological problems or any of the health issues she has experienced since she was injected. None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was known to this Plaintiff prior to sustaining Vaccine injury, and none was supplied by the Defendants or as a result of their efforts.

81. KRISTI SIMMONDS, of Bakersville, North Carolina, was a healthy 40-year-old, who worked as a Registered Nurse and Clinical Manager for a home health agency prior to January 20, 2021. The only pre-existing conditions she had prior to receiving the experimental Vaccine were related to Barrett's Esophagus and acid reflux. Believing that the experimental injection was an approved vaccine, Kristi only accepted the injection to encourage her clinicians by showing them it was safe. She received the COVID-19 Vaccine at her local health department. When she arrived at her appointment, after her name was confirmed to be on the list, she was simply asked if she wanted the Vaccine in the right or left arm. She signed a document that was presented as a "consent" but was not provided a copy. Kristi is familiar with consent documents and recalls that the consent mentioned flu-like symptoms and a potential for anaphylaxis. It contained no

warning of neurological risks. She was never informed the Vaccine was merely approved under an EUA and was not approved by the FDA.

82.    Kristi received the experimental Moderna Vaccine on Tuesday, January 19, 2021. Two days later, she went to the emergency room for swelling in her mouth and throat. She was given Benadryl, Tylenol, and a steroid, which she took round the clock, every four hours, for five days.

83.    The following Tuesday, January 26, 2021, Kristi returned to work where she experienced severe fatigue and exhaustion together with unusual difficulty concentrating. That evening, after work, Kristi went straight to bed and immediately started having convulsions. Her entire body drew up into a fetal position with her hands and feet distorted and curled in. She was rushed to a local emergency room, where she was discharged with no diagnosis or change in condition. Her sister immediately drove me to another emergency room, where she received the same response. She was advised that the hospitals did not know what was happening and to follow up with neurology.

84.    This cycle repeated continuously for over 3 months. The neurologist and her primary care physician were unable to diagnose the cause of her convulsions, or the cause of other conditions which were developing. Her primary care physician verbalized a concern that the Vaccine has caused autoimmune disorders. Between January 26, 2021, and May 21, 2021, Kristi experienced up to 16 convulsions a day.

85.    Kristi has battled these terrible convulsions, body tremors, memory loss, fatigue, brain fog, and pain for almost half a year. Although some conditions have partially relented, new debilitating conditions continue to present. Since the injection, in her desperate quest for medical help, Kristi has been to six different Emergency Rooms,

two different neurologists, and has seen her primary care physician numerous times. Kristi used to ride a Harley Davidson motorcycle for enjoyment, but now she cannot even drive a car. She was terminated from her job on April 28, 2021 and lost her medical insurance and benefits.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was known to this Plaintiff prior to sustaining Vaccine injury, and none was supplied by the Defendants or as a result of their efforts.

86.    VIDIELLA, A/K/A SHAWN SKELTON, of Oakland City, Indiana, has been a Certified Nursing Assistant ("CAN") for 25 years. As an essential worker, Shawn worked throughout the entire Covid-19 pandemic. Prior to January 4, 2021, Shawn was a healthy 42-year-old woman with no underlying health conditions. She took no medication except Effexor (75mg- 1x day).

87.    On Jan 4, 2021, she was at work at Good Samaritan Nursing Home and Rehabilitation owned by American Senior Communities (ASC). Her employer was holding a "vaccine" clinic that day. Personnel from CVS pharmacy came in to administer the Vaccines. Corporate representatives were on site attempting to coerce staff into getting injected. Shawn was approached five times that day and pressured to accept the experimental injection. Her employer further coerced staff with the offer of a $50.00 bonus for "getting vaccinated", and the promise that everyone "vaccinated" would be entered into a raffle to win $500, if 70% of staff, or more, were injected.

88.    The last time Shawn was approached on January 4, 2021, she was told "Shawn, you are the biggest patient care advocate here. I can't believe you aren't going to take the shot to protect the residents you care so much about!" At 1:45 PM, Shawn

relented to the pressure and guilt and accepted the experimental Vaccine that changed her life forever. The next day, Shawn experienced flu-like symptoms, which worsened as the day progressed. On January 6, 2021, she was barely able to lift her head from her pillow and called in sick. By mid-morning, her tongue began to spasm out of control at a resting state so severely that her teeth rubbed it raw. That afternoon she called her primary care physician, who recommended Benadryl and Pepcid, and called in a prescription for some oral steroids.

89.     On January 7, 2021, Shawn woke up in full-body convulsions. She was rushed by ambulance to the Emergency Room. The ER doctor slammed her hand into the side of the bed, told her she was having a panic attack, and instructed her to settle down. Her husband immediately took her to another hospital in Evansville, Indiana. This second ER doctor stated that she was clearly experiencing a Vaccine injury and advised her not to take the second dose. He discharged her with a diagnosis of coarse tremors from the vaccine and advised her to follow up with a neurologist. That was the first and only time she was advised that she had suffered a Vaccine injury.

90.     In her desperate and unsuccessful quest for medical help, Shawn visited five emergency rooms as far away from her home as Vanderbilt in Nashville, Tennessee. Doctors suggested a variety of different problems including psychogenic movement disorder, convulsion disorder, panic attack, PTSD, and even stress.

91.     On January 11, 2021, she was finally admitted into Deaconess Gateway Neurology. She was examined by a psychologist before she was permitted to be seen by a neurologist, who ordered an MRI. The MRI was deemed normal, and Shawn was discharged. Her full-body convulsions continued without ceasing for 12 days.

92.     Shawn currently experiences tremors and uncontrollable body movements almost daily. She experiences convulsions several times a week and sometimes several times a day. In mid-May 2021, her convulsions progressed until she was gripped by six seizures in a single day. Since receiving the experimental injection, Shawn also suffers from severe headaches, high blood pressure and must now take multiple medications a day. She can no longer drive. Her primary care physician has deemed her unable to work and that her condition could persist for years. She was denied worker's compensation and then fired from her job. Shawn is currently being treated experimentally by doctors who cannot provide her with a diagnosis.

93.     She knows she is not the only victim of the experimental Vaccines, suffering deeply, injured beyond comprehension. Hundreds of people reached out to her for help since she went public with her story. She speaks to COVID-19 Vaccine victims every day with symptoms similar to her, and no medical diagnosis.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was known to this Plaintiff prior to sustaining Vaccine injury, and none was supplied by the Defendants or as a result of their efforts.

94.     SALLY GEYER, of Muskegon, Michigan, is the grandmother of ten grandchildren ages 18, 16, 12, 12, 11, 9, 9, 6, 6 and 5. She is keenly aware of a Vaccine incident of one of her grandchildren as witnessed by his mother, her daughter. About 7 years ago, when Sally's grandson was about 18 months old, he received the polio/pneumococcal vaccine. That same night he started to bang his head repeatedly on the floor, something he had never done before. As a result of this extremely disturbing incident, Sally and her daughter have educated themselves on many of the adverse

reactions with vaccines and the alarming number of new vaccines that the CDC recommends each year. Sally has strong objections to the experimental COVID-19 Vaccine for children, as well as to it being forced on people of any age. It has not been studied long enough and children are at virtually no risk of dying from COVID-19.

95.     As a mother and grandmother, Sally is truly terrified of the futures her grandchildren now face. The testing for the Vaccines was not adequate, and nobody knows what this medical experiment may do to children, who have long lives ahead of them. Sally has faced extreme social pressure to take the experimental injection herself, despite the fact that she is an adult able to make my own decisions. Children are susceptible to peer pressure and authority and are also not old enough to make their own decisions about participating in an experimental, risky clinical trial. Sally is further aware and deeply concerned by the fact effective and safe treatments are available to treat COVID-19, which have been kept from people in order to roll out the experimental COVID-19 Vaccine injections.   None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

96.     MARIA MEYERS, of Traverse City, Michigan, is the mother of two boys, ages 6 and 8 years old. When her first born received his polio/pneumococcal vaccine at 18 months old, he spiked a fever of 102.5 for 2.5 days. After the fever finally broke, he started banging his head on the hardwood floor as hard as he could and did not stop until Maria grabbed him. He did not cry after this head banging incident. Head banging continued a few more times over the next week. Maria never gave him another vaccine. She opposes emergency use authorizations of the experimental COVID-19 injections for

people of any age. Even more strongly, she opposes emergency use authorizations for children and adolescents ages 12-15 and older. She believes her children face substantial risk of harm if emergency use of the experimental COVID-19 Vaccine injections is extended to adolescents. From her own studies, she is aware that the experimental Vaccines have not been studied long enough and that children are at no statistical risk of dying from COVID-19. Nobody knows what could happen to young people, who have long lives ahead of them, if they are experimented on with these untested and experimental agents. Furthermore, Maria believes there could be effective and safe treatments available to treat COVID-19 and strongly opposes suppression of those treatments in favor of using untested, experimental and potentially life-threatening agents. She has serious concerns that these medical experiments will be mandated, which means the loss of medical privacy for her and her boys. Maria believes it should remain her informed choice to decide whether or not to take a Vaccine, after being fully informed about the risks and benefits.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

97.    KARI HIBBARD, of North Shores, Michigan, is a Transplant Call Coordinator/Preservationist. She works for a heart and lung transplant program. She receives, reviews, and screens all donor organ offers to help determine whether or not it is a good organ for the intended recipient. Since the experimental Vaccines received EUA, Kari has witnessed that multiple donors have died from a stroke within days or weeks of receiving the Vaccine. Her heart is broken for families losing loved ones to these experimental agents, especially as she knows they are being told it is safe and 95%

effective. Kari believes that they are being lied to because the Vaccines have efficacy with respect to minimizing symptoms, not at stopping transmission of COVID-19.

98.     Kari is painfully aware that people are not being provided with information about the terrible risks connected with these medical experiments, nor are they informed that these "vaccine" manufacturers have been granted immunity from liability. The experimental agents have been subjected to no long-term safety studies, yet disturbingly, people are now being told it is safe for 12- to 15-year-olds and pregnant women.

99.     Kari has two boys, ages 9 and 11. She is terrified her children will eventually be required to get the Vaccine in order to attend public school. She is deeply disturbed at the implications of forcing dangerous medical experiments on children who face no risk of death from COVID-19, or on adults who have a 99.97% chance at recovering from COVID-19, if they get it. She is disturbed that the Vaccines are fraudulently presented to people as a means of protecting others when they cannot stop transmission. She is aware that thousands who are considered "fully vaccinated" are still getting Covid. She is deeply concerned for her transplant recipients who are being advised to get the Vaccine even though it has never been tested on the immuno-compromised. She is deeply concerned for all the young children and what this could possibly do to their reproductive systems. As a medical professional, she is concerned that in the future we are going to face an increase in childhood auto-immune disorders and cancer.

100.     Kari believes that our rights to choose what is best for our bodies are being deliberately stripped away though a campaign of lies and misinformation.

101.    Kari's nephew once experienced a vaccine reaction that was so alarming his mother stopped giving vaccines to him and his younger brother. Kari also has a vaccine injured niece who is on the autism spectrum, but high functioning. This vaccine injured niece just allowed herself to be injected with the Vaccine because she was told it is a vaccine that would help protect her father who is going through chemotherapy.  Kari believes informed consent and medical health freedom have been ignored.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

102.    JULIE ROBERTS, RN, of Niles, Michigan, works for a physician service for homebound people. She works primarily in triaging phone calls. Her organization is involved in scheduling and administering COVID-19 Vaccines. Julie is also the grandmother of three boys ages 4, 7 and 8. As a concerned grandparent, a medical professional and citizen, she deeply opposes EUAs of the experimental COVID-19 Vaccines for any age of the population. It makes her especially ill to see EUAs granted for children and adolescents ages 12 to 15. She believes that her own grandchildren and their young peers are at dire risk.

103.    As a medical professional, she knows very well that the experimental COVID-19 Vaccines have been rushed out without enough time to study them. Children have a 100% chance of living through COVID-19. Nobody knows what could happen to young people, who have long lives ahead of them, if they are experimented on with these untested experimental agents.

104.    She has heard about a lot of injuries and deaths from the COVID-19 Vaccines and personally experienced a horrifying situation at work recently. She examined an elderly woman who had received the COVID-19 Vaccine sometime at the end of February or the beginning of March, 2021. Julie recalls that the woman was one of the first recipients to have received both of the 2-part Pfizer Vaccine from the organization where she works. Julie assessed her on a Friday because she had not been feeling well. When Julie examined her, she did not present emergent. She was weak but alert and conversing without any problems. Her lung sounds were good. Julie was a bit concerned that she could not get an accurate oxygen reading but the woman was in no respiratory distress during the visit and had a history of being difficult to get readings from. Her husband stated that he had noticed that she had been having some difficulty breathing at times. Julie texted the woman's provider about medications and advised her husband to take her to the ER if needed. When Julie came into work that following Monday, she was told that the woman's husband had her taken to the ER that Sunday but she died, testing positive for COVID and having multiple pulmonary emboli. Julie was shocked that she had pulmonary emboli, and also shocked that the woman tested positive after already receiving the Vaccine. Julie conducted research and discovered that the experimental Vaccine can affect the pulmonary lining. Julie became convinced that the woman passed away as a result of the Vaccine.

105.    Julie had to give one of the experimental COVID-19 Vaccines to an elderly woman who was not alert. The woman's daughter had insisted she receive the Vaccine when she moved into a nursing home. Julie did not want to give the injection but was in the area of the nursing home and accepted the assignment. Julie felt terrible doing

it and afterward. Julie would refuse to give the Vaccine to a young person, and never wants to give another one to anybody. Julie's adult son in Maryland was bullied into taking the vaccine by his employer. After he received the Vaccine, he told Julie he would not have done it, but felt it was necessary to get back into the office.

106.    The truly eye-opening moment for Julie came when her research led her to discover that in order to obtain an EUA for a Vaccine, there has to be no treatment available. As a medical professional, Julie is aware that there are multiple effective and safe treatments for COVID-19. Julie cannot understand why harmful and experimental injections are being pushed so strongly in favor of the safe, effective and readily available treatments. Julie has never witnessed anything so disturbing in her nursing career.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

107.    AMY HUNT, of Grand Rapids, Michigan, is a mother of two minor children ages 11 and 13. As a mother, she opposes EUAs of experimental COVID-19 Vaccines for any age of the population. In our current climate, she is very hesitant to allow her children to be involved in activities where they may be subjected to pressure to take the Vaccine. She worries that their summer camp will try to require the Vaccine. She recently watched a podcast that depicted a teenage boy with injuries he had received from the COVID-19 Vaccine. The boy was shaking uncontrollably. The video made impacted her deeply with incredibly sadness for that boy who had his whole life ahead of him, and fear for her own children. She firmly believes her children are at dire risk if EUA is granted to allow medical experimentation on adolescents through these COVID-19

Vaccines. There is no circumstance under which Amy will allow her children to receive the experimental COVID-19 Vaccine.

108.    Amy knows that there has not been proper testing for the experimental COVID-19 Vaccine. She knows that no other vaccination ever created was introduced into humans until after extensive animal testing. Amy also discovered that animal testing was initiated with these experimental Vaccines, but the animals died. Now, she has learned, the VAERS data says there are more adverse reactions to this injection than in the previous 20 years combined for all vaccinations. Amy wonders how many thousands of deaths it will take before the Vaccines are taken off the market. In doing extensive research about the COVID Vaccine, Amy has learned that children have a 100% chance of living through COVID-19.   None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

109.    RICHARD KENNEDY is a resident of Dallas, Louisiana. His mother Dovi Sanders Kennedy lived in an assisted living facility called Savannah Grand in Bossier City, Louisiana. She was 89 years old and in good health, until she was killed by the experimental COVID-19 Vaccine that was forced on her despite a direct refusal of the Vaccine by her Guardian. Richard visited his mom on Christmas Day, December 25, 2020, one month before her birthday, and she looked great. Like always she was in a great mood. She was reading her Bible. The next time Richard visited his mom was on January 25, 2021. It was her birthday and Richard, with his youngest daughter, visited her around 10:00 am. As soon they walked in Richard sensed something was not right. His mom was always smiling and in good spirits and never complained about anything. On

this day, however, she had her comforter curled up on one side of her in a way that Richard had never seen before, and she just did not look right. But it was her birthday so Richard and his daughter did what they could to cheer her up. They took several pictures and stayed with her for a little over an hour.

110.    Richard later learned through another resident's daughter that the facility, Savannah Grand, had made it mandatory for all residents to get the experimental Covid-19 Vaccine and that the first dose was given on January 25. Richard's older brother, who is their mother's medical decision maker, informed Richard that Savannah Grand contacted him and asked about giving his mother the experimental Covid-19 Vaccine and he told them not to. They administered the experimental Covid-19 Vaccine anyway.

111.    Richard took pictures on his mom's birthday and was disturbed at her sad face, and the way she was holding her right arm and the heavy bruising on her neck in the lymph node area.  His Mom was paralyzed on her left side from a stroke 20 years ago. She had some movement, but she always used her right hand to do everything. Looking at the pictures taken on her birthday Richard noticed she was not using her right hand and that it was tightened up almost closed. She was clearly in pain from getting the shot on her right side. She was trying to hold on to a cup cake with her index finger on her left side, the side that she had little movement on.

112.    Richard's mother had a bit of Alzheimer's, so he believes she did not know what was going on when they gave her the Vaccine. She certainly could not have given informed consent. But she was in pain and bruised heavily on the right side, which Richard did not discover until after she died when he began to examine his pictures of her. His mom was administered a second dose of the Vaccine on February 22, 2021,

according to another resident's daughter. Richard and his brother, their mom's guardian, were never told that their mother received the Vaccine, on either the first or second dosage. Richard next visited his mother on February 1 or 2, and again on February 7. He spent a few hours with her on the February 7, and it was clear to Richard that she was not the same person anymore.

113.    On March 1, Richard's brother called him around 6:00 PM and told him that their mother was almost dead. Stunned, Richard rushed to the home where their mother was in bed near death. Curiously, however, her heart rate was normal. They stayed with their mother until 9:00 PM that night on Monday and were told she would not make it until Tuesday.

114.    Richard could not understand how this happened to her so quickly. His mother had no underlying medical problems with internal organs and her heart was beating fine but she was laying there dehydrated and unable not talk. Nevertheless, his mother was never taken to the hospital. She did survive that night and Richard spent most of the day Tuesday, March 2 sitting beside her bed holding her hand. The staff had already written up a death certificate. She died on March 5.   None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was known to this Plaintiff prior to his mother sustaining Vaccine injury, and none was supplied by the Defendants or as a result of their efforts.

115.    ESTATE OF DOVI SANDERS KENNEDY, is represented by its Administrator Richard Kennedy.   The allegations of the preceding paragraph are incorporated herein by reference.   None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was

known to this Plaintiff prior to sustaining Vaccine injury, and none was supplied by the Defendants or as a result of their efforts.

116.     LYLE BLOOM, of Huntsville, Alabama, is the father of two children ages 10 and 16, and the father of one young adult aged 21. Lyle has researched the Vaccines and fiercely opposes their use in healthy children of any age. Lyle recently watched the podcast interview where Robert F. Kennedy Jr. interviewed the mother of a young man named Everest Romney. Everest was a healthy top-level athlete from Utah. Everest took the Vaccine, followed by his father and his pregnant mother, who each took a Vaccine the same day. One took the Pfizer Vaccine and the other took the Moderna Vaccine. Everest and his father were hospitalized within days with blood clots on their brain. Lyle is afraid of what will happen to his own children if the Vaccine experiments are not stopped immediately.

117.     Lyle knows that his own children are placed at immediate and irreparable risk of harm by the extension of the Vaccine EUAs to adolescents. Lyle is well aware that there are safe and effective alternative treatments readily available, and he adamantly opposes the suppression of those treatments in favor of experimental and potentially life-threatening agents.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

118.     JULIE BLOOM, of Huntsville, Alabama, is the wife of Lyle Bloom and the mother of their two children ages 10 and 16, and the mother of their young adult aged 21. The allegations of the preceding paragraph are incorporated by reference.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of

the information about alternatives, was supplied by the Defendants or as a result of their efforts.

119.   ANDREA MCFARLANE, RN, of Huntsville, Alabama, currently works as a trauma/ICU nurse at Vanderbilt. She is the mother of 4 children, 10, 12, 14 and 16. As a nurse Andrea has seen tremendous pressure placed on staff to get the experimental COVID-19 Vaccines. Even medical staff that have had COVID-19 are pressured relentlessly to take the experimental Vaccines. It is well known among the staff that taking the experimental Vaccines will leave you sick for days, and they accommodate for the expected sick reactions in their staffing plans. Andrea is also in school and as a student she is pressured and incentivized to get vaccinated. As a mother, Andrea knows only too well the tremendous pressure her boys will be under to get vaccinated. They will be under social and school pressure and Andrea deeply fears for their safety. She has studied the Vaccines. She knows that they are experimental and that they have proven harmful in many cases. She knows that her children are not at risk from COVID-19 and believes it should be illegal and that it is immoral to give an experimental and untested Vaccine to children who are not at risk. She believes that if the relief sought herein is not granted, not only will her children be at grave risk of irreparable harm, but she will be subjected to pressure in her profession to comply with an immoral policy. The AMA, through an updated ethics opinion, has already opined that medical institutions will likely have an obligation to require that their staff get injected with the Vaccines. When this happens, Andrea will be unable to work because she will not follow a policy that she believes is immoral.  None of the adverse information that this Plaintiff has discovered

about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

120.    JENNIFER GREENSLADE, of Remlap, Alabama, has an autoimmune disorder for which she takes medicine on a daily basis. She has researched the Vaccines and is aware that to take them would be to inject herself with an unknown agent that is largely unstudied, but which carries risk to anyone with an autoimmune disease. She fears deeply for her own health and the health of her children, ages 9 and 12. The type of disease she has can be hereditary and nobody knows how it might interact with her children's health, whereas COVID-19 itself poses no risk of death to her children whatsoever.

121.    Jennifer has two cousins who did allow themselves to be injected with the Vaccines. They were both healthy prior to the injection. They became extremely ill after being injected and spent weeks on the brink of death in the ICU. They are now out of the ICU but neither of them can walk and they require care from their children. This type of Vaccine related injury constitutes irreparable harm. Her cousins were in good health and now they are unable to walk even though they survived the initial onslaught of the vaccine related sickness. Jennifer's health is not strong and her children may have inherited her autoimmune disorder. If they are pressured or mandated to take the Vaccine and experience reactions similar to Jennifer's cousins' reactions, she and her children might not survive. For a mother of two small children, it is a stark and terrifying concern to think that they may be killed or paralyzed or that she may be rendered unable to care for them or worse.  None of the adverse information that this Plaintiff has discovered

about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

122.    STEVEN M. ROTH, MD, of Alabama, has been a practicing emergency medicine physician for 13 years. As part of his practice, Dr. Roth sees patients of all ages. He is aware of the risks and benefits of these investigational agents as well as the current vaccine schedule for other diseases. Based on the most recent numbers from the CDC from May 5, 2021, anyone under the age of 18 has statistically no risk of dying of Covid-19.

123.    Dr. Roth has not seen a COVID-19 patient in many months, but he is currently seeing many patients come to the emergency department as post-COVID-19 Vaccine patients. All of said patients came in with COVID-19 like symptoms that occurred within 48 hours of the Vaccine. All said patients required hospital admission. Several of said patients progressed to death, caused by the Vaccine.

124.    Dr. Roth's concern is that based upon what he is seeing in the community, and because of the schools asking that students take the experimental COVID-19 Vaccines and putting obstacles around those who do not take it, young people are being pressured to take an experimental Vaccine, and many are succumbing to that pressure. This is deeply disturbing to Dr. Roth, because it is universally known that children statistically do not die from COVID-19 and given that children have a very strong immune system, they are more likely than adults to have an over-reaction to the Vaccine. This means that there is not only no benefit, but also an increased risk for children who receive the Vaccine. Also, with all prior viruses and vaccines, it has been accepted in the medical community that natural immunity is superior to vaccination, and there is no basis

to believe that would be different with SARS-CoV-2. Because of these factors, it is not preferable to give the Vaccine even if it was definitely safe, which these are not.

125.    In addition, Dr. Roth is extraordinarily concerned that there have been no animal studies, nor long-term studies, of the COVID-19 Vaccines, especially since prior coronavirus vaccines all caused death in the animals subjected to them.

126.    Dr. Roth is aware of many thousands of physicians who agree with him, but who are under great pressure to say nothing. Dr. Roth has chosen to speak out now, at great personal cost to himself, because the alternative is unbearable. Dr. Roth could not live with himself if he stood by and allowed these experimental Vaccines to be inflicted upon children universally, resulting in death and destruction over the years. He considers it immoral and unconscionable that this experimental therapy will be given to children. Not only are children not at risk of death from COVID-19, but they are also not mini-adults. Their organs are still forming, and they are even more vulnerable than adults to developing auto-immune disease in this situation.

127.    Dr. Roth would be deeply and directly affected by a change in FDA guidelines regarding Vaccines for young people, and as a result he is imploring this Court to grant the relief requested herein, and to prevent the use of these Vaccines in children. In addition to the direct threat of irreparable harm posed to Dr. Roth's young patients, an additional unwelcome consequence of using coercion to mandate or pressure the participation of healthy young people who are statistically at no risk, is the risk of sharply reducing the public trust in all vaccines. This would also create what can only be described as irreparable harm to the public generally.  None of the adverse information

that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

128.    MATT SCHWEDER, of Lexington, Kentucky, is the father of one minor daughter, age 15, and an adult son, age 25. Matt's son is in the Advanced Nurse Practitioner Program at Vanderbilt University. Matt's daughter is an active student and plays soccer for her high school. Matt has, until recently, coached girls select soccer for a number of years and he is very aware of the extraordinary power of peer pressure in the life of young adolescents. Matt's daughter is subjected to a barrage of peer pressure regarding vaccinating, which is a constant source of conversation for her friends, who have been taught to fear that which should hold no fear.

129.    In addition, her school system bombards her with weekly emails, pressuring and shaming her and her family into allowing themselves to be experimented on with the experimental Vaccines. The pressure is so intense that one of Matt's daughter's friends was forced to take the Vaccine by his own mother, against his will, at the age of 16, and Matt's daughter had to undergo the trauma of knowing that her friend had become part of this dangerous human experiment even though he was adamantly opposed to doing so. Matt has conducted his own research into COVID-19, and he is well aware that children under the age of 18 have a 0% chance statistically of dying from COVID-19.  Matt knows that safe and effective treatments for COVID-19 are available and he fiercely opposes the suppression of these treatments in favor of using untested and potentially life-threatening agents against children who are not at risk. As a father, Matt has witnessed the growing concern his son has, that his school or potential employer might decide to make the experimental agents mandatory, which would put his education

to waste.  None of the adverse information that this Plaintiff has discovered about the Vaccines, and none of the information about alternatives, was supplied by the Defendants or as a result of their efforts.

<u>Defendants</u>

130.    Defendants are federal agencies, sub-agencies and federal officials.

131.    Defendant XAVIER BECERRA ("Secretary Becerra") is the current Secretary of Defendant the U.S. Department of Health and Human Services.  He is being sued in his official and personal capacities.

132.    Defendant DR. ANTHONY FAUCI ("Dr. Fauci") is the current Director of Defendant National Institute of Allergies and Infectious Diseases, a federal sub-agency of the Department of Health and Human Services.  He is being sued in his official and personal capacities.

133.    Defendant DR. JANET WOODCOCK ("Dr. Woodcock") is the current Acting Commissioner of the Food and Drug Administration, a federal sub-agency of the Department of Health and Human Services.  She is being sued in her official and personal capacities.

134.    Defendant U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ("DHHS") is a federal agency.

135.    Defendant FOOD AND DRUG ADMINISTRATION ("FDA") is a federal sub-agency of DHHS.

136.    Defendant CENTER FOR DISEASE CONTROL AND PREVENTION ("CDC") is a federal sub-agency of DHHS.

137.    Defendant NATIONAL INSTITUTE OF HEALTH ("NIH") is a federal sub-agency of DHHS.

138.    Defendant NATIONAL INSTITUTE OF ALLERGIES AND INFECTIOUS DISEASES ("NIAID") is a federal sub-agency of DHHS.

139.    JOHN AND JANE DOES I - V, are as yet unknown agencies and individuals who violated the law and harmed Plaintiffs.

140.    The Defendants have coordinated, collaborated, planned and conspired, each with the others, and aided and abetted, the unlawful actions described herein.

### III.  JURISDICTION, VENUE, STANDING

141.    This Court exercises subject matter jurisdiction under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States.

142.    This Court also exercises subject matter jurisdiction in accordance with 28 U.S.C. § 1361, which grants to district courts original jurisdiction "of any action to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  Defendants owe a duty to Plaintiffs to comply faithfully with § 360bbb-3 and 45 CFR Part 46, the provisions of which are intended to protect them.

143.    This Court has the authority to the requested declaratory relief under 28 U.S.C. § 2201, and the requested injunctive relief under 28 U.S.C. § 1343(a).

144.    This Court is the appropriate venue for this litigation pursuant to 28 U.S.C. § 1391(e)(1) since the Defendants are officers or employees of the United States acting in an official capacity or under color of legal authority, and agencies of the United States, at least one Plaintiff resides in this District, and real property is not involved.

145.    The Administrative Procedures Act ("APA") provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.  Further:

> [t]he reviewing court shall -
>
>> (2) hold unlawful and set aside agency action, findings, and conclusions found to be -
>>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not  in accordance with law;
>>> (B) contrary to constitutional right, power, privilege, or immunity;
>>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right

5 U.S.C. § 706.

146.    Plaintiffs satisfy the "case-or-controversy" requirement of Article III of the Constitution and have standing to sue because they:

> [have] suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Sproule v. United States FDA, 2018 U.S. Dist. LEXIS 62507 at *7 (S.D.Fl. 2018) (quoting Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist., 647 F.3d 1296, 1302 (11th Cir. 2011)).

## IV.  STATEMENT OF FACTS

**A.  The Emergency Use Authorization Framework**

Basis for DHHS Secretary's Declaration of Emergency

147.    § 360bbb–3(b) authorizes the DHHS Secretary to declare a "public health emergency" justifying the emergency use of unapproved medical products, in relevant part as follows (emphasis added):

> (b)    *Declaration of emergency or threat justifying emergency authorized use*
>> *(1) In General.  The Secretary may make a declaration that the circumstances exist justifying the authorization under this subsection for a product on the basis of—*
>>> *[  ]*
>>> *(C) a determination by the Secretary that there is a public health emergency, or a significant potential for a public health emergency, **that affects, or has a significant potential to affect, national security** or the health and security of United States citizens living abroad, and that involves a biological, chemical, radiological, or nuclear agent or agents, or a disease or condition that may be attributable to such agent or agents;*

148.    The DHHS Secretary declared a "public health emergency" pursuant to § 360bbb–3(b)(1)(C) on February 4, 2020, after making the relevant finding.  Plaintiffs contend and the facts set forth below demonstrate that the finding was made in error, without any real justification, since there is no bona fide underlying public health emergency, and as such the EUAs for the Vaccines are unlawful.

<u>Criteria for Issuance of Emergency Use Authorization</u>

149.    Once the DHHS Secretary has declared a public health emergency, § 360bbb–3(c) authorizes him to issue EUAs "only if" certain criteria are met, in relevant part as follows (emphasis added):

> (c) *Criteria for issuance of authorization. The Secretary may issue an authorization under this section with respect to the emergency use of a product **only if**, [  ] the Secretary concludes -*
>> *(1) that an agent referred to in a declaration under subsection (b) can cause **a serious or life threatening disease or condition**,*
>> *(2)  that, based on the totality of scientific evidence available to the Secretary, including **data from adequate and well-controlled clinical trials**, if available, **it is reasonable to believe that**—*

> (A) **the product may be effective** in diagnosing, treating, or preventing—
>> (i) such disease or condition; or
>>
>> (ii) a serious or life-threatening disease or condition caused by a product authorized under this section, approved or cleared under this chapter, or licensed under section 351 of the Public Health Service Act [42 U.S.C. 262], for diagnosing, treating, or preventing such a disease or condition caused by such an agent; and
>
> (B) **the known and potential benefits of the product**, when used to diagnose, prevent, or treat such disease or condition, **outweigh the known and potential risks of the product**, taking into consideration the material threat posed by the agent or agents identified in a declaration under subsection (b)(1)(D), if applicable;
>
> (3) that there is **no adequate, approved, and available alternative** to the product for diagnosing, preventing, or treating such disease or condition;

150. Plaintiffs contend and the facts set forth below demonstrate that the Secretary has not met and cannot meet the criteria for issuing EUAs for the Vaccines.

Conditions of Authorization

151. Once an EUA has been issued, § 360bbb–3(e) obligates the Secretary to establish such conditions on an authorization as are necessary to ensure that both healthcare professionals and consumers receive certain minimum required information, in relevant part as follows (emphasis added):

> (e) Conditions of authorization
>> (1) Unapproved Product
>>> (A) **Required** conditions. With respect to the emergency use of an unapproved product, the Secretary [    ] **shall** [    ] establish [  ]:
>>>> (i) Appropriate conditions **designed to ensure** that health care professionals administering the product are informed -
>>>>> (I) that the Secretary has authorized the **emergency use** of the product;
>>>>>
>>>>> (II) of the **significant known and potential benefits and risks** of the emergency use of

the product, and of the extent to which such benefits and risks are known; and

(III) of the **alternatives** to the product that are available, and of their benefits and risks.

(ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed -

(I) that the Secretary has authorized the **emergency use** of the product;

(II) of the **significant known and potential benefits and risks** of the emergency use of the product, and of the extent to which such benefits and risks are known; and

(III) of the **option to accept or refuse** administration of the product, of the consequences, if any, of refusing administration of the product, and of the **alternatives** to the product that are available, and of their benefits and risks.

(iii) Appropriate conditions for the **monitoring and reporting of adverse events** associated with the emergency use of the product.

152.    Plaintiffs contend and the facts set forth below demonstrate that the Secretary has failed to satisfy the conditions for authorization, because he has not ensured that healthcare professionals and Vaccine subjects are properly informed.

**B.  The Vaccine EUAs are Unlawful - There is No Underlying Emergency**

153.    In approximately January of 2020, the media began creating and circulating news stories that seemed designed to generate panic, regarding a new and deadly disease that could kill us all. This was odd given that the estimated fatality rate at the time was between 2-4%. By contrast, tuberculosis has a fatality rate of approximately 10%, the original SARS virus had a fatality rate of approximately 9%, and the MERS virus had a fatality rate of approximately 30% - all had similar rates of spread.

154.    The actual COVID-19 statistics present a vastly different picture than the one painted by the media - a fatality rate of 0.2% globally, which drops to 0.03% for

persons under age 70, which is comparable to the yearly flu.  Further, statistically, the fatality risk is limited to the elderly population.  The Defendants' own data published through publicly accessible government portals[7] establishes that there is no public health emergency due to SARS-CoV-2 and COVOD-19:

| United States Totals | |
|---|---|
| COVID-19 Emergency Room Visits | 1.2% are due to COVID-19 (In 26 states, COVID-19 accounts for less than 1% of ER visits.  The highest percentage is 3.1%). |
| COVID-19 Inpatients | 4% of all inpatients are due to COVID-19 |
| COVID-19 ICU Patients | 9% of all ICU are due to COVID-19 |
| COVID-19 Hospitalizations | 15 per 100,000 or less in 46 states, and 20 per 100,000 or less in 49 states |
| COVID-19 "Cases" | 9 per 100,000 per day |

155.    The actual COVID-19 fatality numbers are vastly lower than those reported.  On March 24, 2020, the DHHS changed the rules applicable to coroners and others responsible for producing death certificates and making "cause of death" determinations - **exclusively for COVID-19**. The rule change states that "COVID-19 should be reported on the death certificate for all decedents where the disease caused *or is assumed to have caused or contributed* to death."  Many doctors have attested that permitting such imprecision on a legal document (death certificate) has never happened before in modern medicine. This results in reporting of deaths as caused by COVID-19, even when in fact deaths were imminent and inevitable for other pre-existing reasons and caused by co-morbidities.   In other words, people dying **with** COVID-9 are being reported as dying **from** COVID-19.  DHHS statistics are now showing that 95% of

---

[7] See, e.g., https://healthdata.gov and https://healthdata.gov/Health/COVID-19-Community-Profile-Report/gqxm-d9w9

deaths classed as "COVID-19 deaths" involve an average of four additional co-morbidities.

156.    Substantial government subsidies paid for reported COVID-19 deaths undoubtedly fuel this misattribution of the cause of death.  Former CDC Director Robert Redfield acknowledged this perverse financial incentive in sworn Congressional testimony on COVID-19: "I think you're correct in that we've seen this in other disease processes too, really in the HIV epidemic, somebody may have a heart attack, but also have HIV – the hospital would prefer the classification for HIV because there's greater reimbursement."

157.    Dr. Genevieve Briand of John Hopkins University published a study demonstrating that the overall death rate in the United States has remained the same, despite the deaths attributed to COVID-19.  Dr. Briand analyzed federal CDC data for 2018 and 2020 and found that nationwide deaths from causes other than COVID-19, decreased by the same amount that COVID-19 deaths increased, raising the presumption that deaths from these other causes have been characterized as COVID-19 deaths.  There are no excess deaths due to COVID-19.

158.    Similarly, the actual number of COVID-19 "cases" is far lower than the reported number.  The signs, symptoms and other diagnostic criteria for COVID-19 are laughably broad.  Applying the criteria, countless ailments can be classed as COVID-19, especially the common cold or ordinary seasonal flu. Compounding the problem, the DHHS authorized the use of the polymerase chain reaction ("PCR") test as a diagnostic tool for COVID-19, with disastrous consequences.  The PCR tests are themselves experimental products, authorized by the FDA under separate EUAs.  Test manufacturers

use disclaimers like this in their product manuals: "[t]he FDA has not determined that the test is safe or effective for the detection of SARS-Co-V-2."

159.    A PCR test can only test for the presence of a fragment of the RNA of the SARS-CoV-2 virus, and literally, by itself, cannot be used to diagnose the COVID-19 disease. The RNA fragment detected may not be intact and may be dead, in which case it cannot cause the disease COVID-19.  This is analogous to finding a car part, but not a whole car that can be driven. Manufacturer inserts furnished with PCR test products include disclaimers stating that the PCR tests should NOT be used to diagnose COVID-19. This is consistent with the warning issued by the Nobel Prize winning inventor of the PCR test that such tests are not appropriate for diagnosing disease.

160.    Further, the way in which the PCR tests are administered guaranties an unacceptably high number of false positive results.  Cycle Threshold Value ("CT value") is essentially the number of times that a sample (usually from a nasal swab) is magnified or amplified before a fragment of viral RNA is detected. The CT Value is exponential, and so a 40-cycle threshold means that the sample is magnified around a trillion times. The higher the CT Value, the less likely the detected fragment of viral RNA is intact, alive and infectious.

161.    Virtually all scientists, including Dr. Fauci, agree that any PCR test run at a CT value of 35-cycles or greater is useless.   Dr. Fauci has stated:

> ***What is now evolving into a bit of a standard is that if you get a cycle threshold of 35 or more that the chances of it being replication competent are miniscule***...*We have patients, and it is very frustrating for the patients as well as for the physicians...somebody comes in and they repeat their PCR and it's like 37 cycle threshold...you can almost never culture virus from a 37 threshold cycle. So I think if somebody does come in with 37, 38, even 36, you gotta say, you know, it's dead nucleotides, period." In other words, it is not a COVID-19 infection.*

A study funded by the French government showed that even at 35-cycles, the false positivity rate is as high as 97%.  Despite this, a majority of the PCR tests for COVID-19 deployed under EUAs in the United States are run at cycles seemingly guaranteed to produce false positive results. Under the EUAs issued by the FDA, there is no flexibility to depart from the manufacturer's instructions and change the way in which the test is administered or interpreted. The chart below shows that all major PCR tests in use in the United States are run at cycles of 35 or higher.

| Manufacturer | Manufacturer's Recommended Cycle Threshold |
|---|---|
| Xiamen Zeesan SARS-CoV-2 Test Kit (Real-time PCR) | 45 cycles |
| Opti Sars CoV-2 RT-PCR Test | 45 cycles |
| Quest SARS-CoV-2rRT-PCR Test | 40 cycles |
| CDC 2019-Novel Coronavirus Real Time (RT-PCR Diagnostic Panel) Test | 40 cycles |
| Wren Labs COVID-19 PCR Test | 38 cycles |
| LabCorp COVID-19 RT-PCR Test | 35 cycles |

162.    There is, however, one GLARING exception to this standard.  THE CDC HAS STATED THAT ONCE A PERSON HAS BEEN VACCINATED, AND THEN AFTER VACCINATION THAT PERSON TESTS POSITIVE FOR COVID-19 USING A PCR TEST, THE CDC WILL ONLY "COUNT" THE POSITIVE RESULT AT 28 CYCLES OR LESS!   Why the difference?  More recently, the CDC has announced it will no longer compile and report data showing the total number of vaccinated who subsequently contract COVID-19: "[We are] transitioning to reporting only patients with COVID-19 vaccine breakthrough infection that were hospitalized or died to help

maximize the quality of the data collected."[8]  There appears to be an agenda to protect the myths about the vaccine, rather than to protect the public.

163.    The Defendants and their counterparts in state governments used the specter of "asymptomatic spread" - the notion that fundamentally healthy people could cause COVID-19 in others - to justify the purported emergency.  But there is *no credible scientific evidence* that demonstrates that the phenomenon of "asymptomatic spread" is real.  On the contrary, on June 7, 2020, Dr. Maria Von Kerkhov, head of the WHO's Emerging Diseases and Zoonosis Unit, told a press conference that from the known research, asymptomatic spread was "very rare."  "From the data we have, it still seems to be rare that an asymptomatic person actually transmits onward to a secondary individual." She added for emphasis: "it's very rare."    Researchers from Southern Medical University in Guangzhou, China, published a study in August 2020 concluding that asymptomatic transmission of COVID-19 is *almost non-existent*.  "Asymptomatic cases were least likely to infect their close contacts," the researchers found. A more recent study involving nearly 10 million residents of Wuhan, China found that there were no - zero - positive COVID-19 tests amongst 1,174 *close contacts* of asymptomatic cases, *indicating the complete absence of asymptomatic transmission*.

164.    On September 9, 2020, Dr. Fauci was forced to admit in an official press conference:

> [E]ven if there is some asymptomatic transmission, in all the history of respiratory borne viruses of any type, asymptomatic transmission has never been the driver of outbreaks.  The driver of outbreaks is always a symptomatic person, even if there is a rare asymptomatic person that might transmit, an epidemic is not driven by asymptomatic carriers.

---

[8] https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html

165.    Ultimately, there is simply no objective evidence to support the Secretary's finding - the necessary legal predicate for unleashing dangerous experimental medical interventions on the American public - that a true public health emergency exists. On a national level, Plaintiffs are unaware of any inter-country requests for aid, or legitimately overwhelmed community health resources or hospitals. The Cambridge dictionary defines the word "emergency" to mean "something dangerous or serious, such as an accident, that happens suddenly or unexpectedly and needs fast action in order to avoid harmful results." COVID-19 has been with us for well over a year, and we know far more about the disease than we did at the outset. Most importantly, we can identify with precision the discrete age segment of the population that is at potential risk. In particular, children under 18 statistically have a zero percent chance of death from COVID-19. If there is no emergency, then the EUAs should be invalidated entirely.

## C.  The Vaccine EUAs are Unlawful - The Vaccines are Not Effective in Diagnosing, Treating or Preventing SARS-CoV-2 or COVID-19

166.    Some countries with the highest rates of Vaccine injection are facing a surge of COVID-19 deaths and infections. Uruguay endured the highest COVID-19 death rate in the world per capita for weeks, even though it had one of the world's most successful vaccination drives. Other highly vaccinated countries like Bahrain, Maldives, Chile and Seychelles, experienced the same surge.

167.    CDC data shows that deaths and hospitalizations for COVID-19 infection have tripled among those who have already received the full recommended dosage of the Vaccines in the United States in the past month. Deaths from COVID-19 in those who have received the recommended dosages of the Vaccines increased from 160 as of April 30, 2021 to 535 as of June 1, 2021.

168.   CDC data shows that a total of 10,262 SARS-CoV-2 "breakthrough infections" of those who have already received the full recommended dosage of the Vaccines were reported to the CDC from 46 states and territories between January 1, 2021 and April 30, 2021.  Meanwhile, a study published by the renowned Cleveland Clinic in Ohio indicates that natural immunity acquired through prior infection with COVID-19 is stronger than any benefit conferred by a Vaccine, rendering vaccination unnecessary for those previously infected.

169.   In studying the effectiveness of a medical intervention in randomized controlled trials (often called the gold standard of study design), the most useful way to present results is in terms of Absolute Risk Reduction ("ARR").  ARR compares the impact of treatment by comparing the outcomes of the treated group and the untreated group.  In other words, if 20 out of 100 untreated individuals had a negative outcome, and 10 out of 100 treated individuals had a negative outcome, the ARR would be 10% (20 - 10 = 10).  **According to a study published by the NIH, the ARR for the Pfizer Vaccine is a mere 0.7%, and the ARR for the Moderna Vaccine is only 1.1%.**

170.   From the ARR, one can calculate the Number Needed to Vaccinate ("NNV"), which signifies the number of people that must be injected before even one person benefits from the vaccine.  The NVV for the Pfizer Vaccine is 119, meaning that 119 people must be injected in order to observe the reduction of a COVID-19 case in one person.  The reputed journal the *Lancet* reports data indicating that the NVV may be as high as 217.  The NVV to avoid hospitalization exceeds 4,000.  The NVV to avoid death exceeds 25,000.

171.    There are several factors that reduce any purported benefit of the COVID-19 Vaccines.  First, it is important to note that the Vaccines were only shown to reduce symptoms – not block transmission.  For over a year now, these Defendants and state-level public health authorities have told the American public that SARS-CoV-2 can be spread by people who have none of the symptoms of COVID-19, therefore Americans must mask themselves, and submit to innumerable lockdowns and restrictions, even though they are not manifestly sick.  If that is the case, and these officials were not lying to the public, and asymptomatic spread is real, then what is the benefit of a vaccine that merely reduces symptoms? There isn't any.

172.    Secondly, it appears that these Defendants either did lie about asymptomatic spread or were simply wrong about the science.  The theory of asymptomatic transmission - used as the justification for the lockdown and masking of the healthy - was based *solely* upon mathematical modeling. This theory had no actual study participants, and no peer review.  The authors made the unfounded assumption that asymptomatic persons were "75% as infectious" as symptomatic persons. But in the real world, healthy false positives turned out to be merely healthy, and were never shown to be "asymptomatic" carriers of anything. Studies have shown that PCR test-positive asymptomatic individuals do not induce clinical COVID-19 disease, not even in a family member with whom they share a home and extended proximity.  An enormous study of nearly ten million people in Wuhan, China showed that asymptomatic individuals testing positive for COVID-19 **never** infected others.  Since asymptomatic individuals do not spread COVID-19, they do not need to be vaccinated.

**D. The Vaccine EUAs are Unlawful - The Known and Potential Risks of the Vaccines Outweigh the Known and Potential Benefits**

The "Pfizer-BioNTech COVID-19 Vaccine" and the "Moderna COVID-19 Vaccine" are Novel Gene Therapy Technology, Not Vaccines

173.    The CDC defines a "vaccine" as: "A product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease. Vaccines are usually administered through needle injections but can also be administered by mouth or sprayed into the nose."[9] The CDC defines "immunity" as: "Protection from an infectious disease. If you are immune to a disease, you can be exposed to it without becoming infected."[10]

174.    However, the "Pfizer-BioNTech COVID-19 Vaccine" and the "Moderna COVID-19 Vaccine" do not meet the CDC's own definitions.  They do not stimulate the body to produce immunity from a disease.  They are a synthetic fragment of nucleic acid embedded in a fat carrier that is introduced into human cells, not for the purpose of inducing immunity from infection with the SARS-CoV-2 virus, and not to block further transmission of the virus, but in order to lessen the symptoms of COVID-19. No published, peer-reviewed studies prove that the "Pfizer-BioNTech COVID-19 Vaccine" and the "Moderna COVID-19 Vaccine" confer immunity or stop transmission.

175.    Further, the "Pfizer-BioNTech COVID-19 Vaccine" and the "Moderna COVID-19 Vaccine" are not "vaccines" within the common, lay understanding of the public.  Since vaccines were first discovered in 1796 by Dr. Edward Jenner, who used cowpox to inoculate humans against smallpox, and called the process "vaccination" (from the Latin term *vaca* for cow), the public has had an entrenched understanding that a vaccine is a microorganism, either alive but weakened, or dead, that is introduced into the

---

[9] https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm. Retrieved 4/9/2021 at 11:00 AM
[10] https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm. Retrieved 4/9/2021 at 11:00 AM

human body in order to trigger the production of antibodies that confer immunity from the targeted disease, and also prevent its transmission to others. The public are accustomed to these traditional vaccines and understand them.

176. The public are fundamentally uninformed about the gene therapy technology behind the "Pfizer-BioNTech COVID-19 Vaccine" and the "Moderna COVID-19 Vaccine." No dead or attenuated virus is used. Rather, instructions, via a piece of genetic code ("mRNA") are injected into your body that tell your body how to make a certain "spike protein" that is purportedly useful in attacking the SARS-CoV-2 virus.

177. By referring to the "Pfizer-BioNTech COVID-19 Vaccine" and the "Moderna COVID-19 Vaccine" as "vaccines," and by allowing others to do the same, the Defendants knowingly seduce and mislead the public, short-circuit independent, critical evaluation and decision-making by the consumers of these products, and vitiate their informed consent. Meanwhile, this novel technology is being deployed in the unsuspecting human population for the first time in history.

Inadequate Testing

178. The typical vaccine development process takes between 10 and 15 years and consists of the following sequential stages - research and discovery (2 to 10 years), pre-clinical animal studies (1 to 5 years), clinical human trials in four phases (typically 5 years). Phase 1 of the clinical human trials consists of healthy individuals and is focused on safety. Phase 2 consists of additional safety and dose-ranging in healthy volunteers, with the addition of a control group. Phase 3 evaluates efficacy, safety and immune response in a larger volunteer group, and requires two sequential randomized controlled

trials. Phase 4 is a larger scale investigation into longer-term safety.  Vaccine developers must follow this process in order to be able to generate the data the FDA needs in order to assess the safety and effectiveness of a vaccine candidate.

179.     This 10–15-year testing process has been abandoned for purposes of the Vaccines.  The first human-to-human transmission of the SARS-CoV-2 virus was not confirmed until January 20, 2020, and less than a year later both mRNA Vaccines had EUAs and for the first time in history this novel mRNA technology was being injected into millions of human beings.  As of June 7, 2021, 138 million Americans, representing 42% of the population, have been fully vaccinated.

180.     All of the stages of testing have been compressed in time, abbreviated in substance, and are overlapping, which dramatically increases the risks of the Vaccines. Plaintiffs' investigation indicates that Moderna and Pfizer designed their Vaccines in only two days.  It appears that pharmaceutical companies did not independently verify the genome sequence that China released on January 11, 2020.  It appears that the Vaccines were studied for only 56 days in macaques, and 28 days in mice, and then animal studies were halted.  It appears that the pharmaceutical companies discarded their control groups receiving placebos, squandering the opportunity to learn about the rate of long-term complications, how long protection against the disease lasts and how well the Vaccines inhibit transmission.  A number of studies were deemed unnecessary and not performed prior to administration in human subjects, including single dose toxicity, toxicokinetic, genotoxicity, carcinogenicity, prenatal and postnatal development, offspring, local tolerance, teratogenic and postnatal toxicity and fertility.  The American public has not

been properly informed of these dramatic departures from the standard testing process, and the risks they generate.

181.    AFLDS medico-legal researchers have analyzed the accumulated COVID-19 Vaccine risk data, and report as follows:

Migration of the SARS-CoV-2 "Spike Protein" in the Body

182.    The SARS-CoV-2 has a spike protein on its surface. The spike protein is what allows the virus to infect other bodies.  It is clear that the spike protein is not a simple, passive structure. The spike protein is a "pathogenic protein" and a toxin that causes damage. The spike protein is itself biologically active, even without the virus. It is "fusogenic" and consequently binds more tightly to our cells, causing harm.  If the purified spike protein is injected into the blood of research animals, it causes profound damage to their cardiovascular system, and crosses the blood-brain barrier to cause neurological damage. If the Vaccines were like traditional *bona fide* vaccines, and did not leave the immediate site of vaccination, typically the shoulder muscle, beyond the local draining lymph node, then the damage that the spike protein could cause might be limited.

183.    However, the Vaccines were authorized without any studies demonstrating where the spike proteins traveled in the body following vaccination, how long they remain active and what effect they have.  A group of international scientists has recently obtained the "biodistribution study" for the mRNA Vaccines from Japanese regulators. The study reveals that unlike traditional vaccines, this spike protein enters the bloodstream and circulates throughout the body over several days post-vaccination.  It accumulates in a number of tissues, such as the spleen, bone marrow, liver, adrenal

glands and ovaries.  It fuses with receptors on our blood platelets, and also with cells lining our blood vessels. It can cause platelets to clump leading to clotting, bleeding and heart inflammation. It can also cross the blood-brain barrier and cause brain damage.  It can be transferred to infants through breast milk.  The VAERS system includes reports of infants suckling from vaccinated mothers experiencing bleeding disorders in the gastrointestinal tract.

184.   These risks have not been adequately studied in trials, or properly disclosed to healthcare professionals or Vaccine subjects.

Increased Risk of Death from Vaccines

185.   The government operated VAERS database is intended to function as an "early warning" system for potential health risks caused by vaccines.  It is broadcasting a red alert.  Of the 262,000 total accumulated reports in VAERS, only 1772 are not related to COVID-19.  The database indicates that the total reported vaccine deaths in the first quarter of 2021 represents a 12,000% to 25,000% increase in vaccine deaths, year-on-year.  In ten years (2009-2019) there were 1529 vaccine deaths, whereas in the first quarter of 2021 there have been over 4,000.   Further, 99% of all reported vaccine deaths in 2021 are caused by the COVID-19 Vaccines, only 1% being caused by the numerous other vaccines reported in the system.  It is estimated that VAERS only captures 1% to 10% of all vaccine adverse events.

186.   These risks have not been adequately studied in trials, or properly disclosed to healthcare professionals or Vaccine subjects.

Reproductive Health

187.    The mRNA Vaccines induce our cells to manufacture (virus-free) "spike proteins." The "spike proteins" are in the same family as the naturally occurring syncytin-1 and syncytin-2 reproductive proteins in sperm, ova and placenta.  Antibodies raised against the spike protein might interact with the naturally occurring syncytin proteins, adversely affecting multiple steps in human reproduction. The manufacturers did not provide data on this subject despite knowing about the spike protein's similarity to syncytin proteins for more than one year.  There are now a remarkably high number of pregnancy losses in VAERS, and worldwide reports of irregular vaginal bleeding without clear explanation.  Scientists are concerned that the Vaccines pose a substantial risk to a woman's reproductive system. This increased risk of sterility stems from an increased concentration of the spike proteins in various parts of the reproductive system after vaccination. Not enough is known to determine the risk of sterility, but it is beyond question that the risk is increased.

188.    Since Plaintiffs filed their Motion for Temporary Restraining Order in this case, new evidence has emerged that further confirms the risk.  A leaked Pfizer document (below) exposes that Pfizer Vaccine nanoparticles accumulate in the ovaries at an extraordinarily high rate, in concentrations orders of magnitude higher than in other tissues. Billions of aggressive spike proteins are accumulating in very delicate ovarian tissues, the one place in the human body where females carry a finite number of fertile eggs.

SARS-CoV-2 mRNA Vaccine (BNT162, PF-07302048)
2.6.5 薬物動態試験の概要表

**2.6.5.5B.  PHARMACOKINETICS: ORGAN DISTRIBUTION CONTINUED**                    Test Article: [

| Sample | Total Lipid concentration (µg lipid equivalent/g [or mL]) (males and females combined) | | | | | | | % |
|---|---|---|---|---|---|---|---|---|
| | 0.25 h | 1 h | 2 h | 4 h | 8 h | 24 h | 48 h | 0.25 h |
| Lymph node (mandibular) | 0.064 | 0.189 | 0.290 | 0.408 | 0.534 | 0.554 | 0.727 | -- |
| Lymph node (mesenteric) | 0.050 | 0.146 | 0.530 | 0.489 | 0.689 | 0.985 | 1.37 | -- |
| Muscle | 0.021 | 0.061 | 0.084 | 0.103 | 0.096 | 0.095 | 0.192 | -- |
| Ovaries (females) | 0.104 | 1.34 | 1.64 | 2.34 | 3.09 | 5.24 | 12.3 | 0.001 |
| Pancreas | 0.081 | 0.207 | 0.414 | 0.380 | 0.294 | 0.358 | 0.599 | 0.003 |
| Pituitary gland | 0.339 | 0.645 | 0.868 | 0.854 | 0.405 | 0.478 | 0.694 | 0.000 |
| Prostate (males) | 0.061 | 0.091 | 0.128 | 0.157 | 0.150 | 0.183 | 0.170 | 0.001 |
| Salivary glands | 0.084 | 0.193 | 0.255 | 0.220 | 0.135 | 0.170 | 0.264 | 0.003 |
| Skin | 0.013 | 0.208 | 0.159 | 0.145 | 0.119 | 0.157 | 0.253 | -- |
| Small intestine | 0.030 | 0.221 | 0.476 | 0.879 | 1.28 | 1.30 | 1.47 | 0.024 |
| Spinal cord | 0.043 | 0.097 | 0.169 | 0.250 | 0.106 | 0.085 | 0.112 | 0.001 |
| Spleen | 0.334 | 2.47 | 7.73 | 10.3 | 22.1 | 20.1 | 23.4 | 0.013 |
| Stomach | 0.017 | 0.065 | 0.115 | 0.144 | 0.268 | 0.152 | 0.215 | 0.006 |
| Testes (males) | 0.031 | 0.042 | 0.079 | 0.129 | 0.146 | 0.304 | 0.320 | 0.007 |
| Thymus | 0.088 | 0.243 | 0.340 | 0.335 | 0.196 | 0.207 | 0.331 | 0.004 |
| Thyroid | 0.155 | 0.536 | 0.842 | 0.851 | 0.544 | 0.578 | 1.00 | 0.000 |
| Uterus (females) | 0.043 | 0.203 | 0.305 | 0.140 | 0.287 | 0.289 | 0.456 | 0.002 |
| Whole blood | 1.97 | 4.37 | 5.40 | 3.05 | 1.31 | 0.909 | 0.420 | -- |
| Plasma | 3.97 | 8.13 | 8.90 | 6.50 | 2.36 | 1.78 | 0.805 | -- |
| Blood:Plasma ratio[a] | 0.815 | 0.515 | 0.550 | 0.510 | 0.555 | 0.530 | 0.540 | -- |

PFIZER CONFIDENTIAL
Page 7

189.    Each baby girl is born with the total number of eggs she will ever have in her entire life. Those eggs are stored in the ovaries, and one egg is released each month of a normal menstrual cycle. When there are no more eggs, a woman stops menstruating. The reproductive system is arguably the most delicate hormonal and organ balance of all our systems. The slightest deviation in any direction and infertility results. Even in 2021, doctors and scientists do not know all the variables that cause infertility.

190.    There is evidence to support that the vaccine could cause permanent autoimmune rejection of the placenta. Placental inflammation resulting in stillbirths mid-pregnancy (second trimester) is seen with COVID-19 and with other similar coronaviruses. There is a case report of a woman with a normally developing pregnancy

who lost the otherwise healthy baby at five months during acute COVID-19. The mother's side of the placenta was very inflamed. This "infection of the maternal side of the placenta inducing acute or chronic placental insufficiency resulting in miscarriage or fetal growth restriction was observed in 40% of pregnant women with similar coronaviruses." The mRNA Vaccines may instigate a similar reaction as the SARS-CoV-2 virus. There is a component in the vaccine that could cause the same autoimmune rejection of the placenta, but indefinitely. Getting COVID-19 has been associated with a high risk of mid mid-pregnancy miscarriage because the placenta fails. The mRNA Vaccines may have precisely the same effect, however, not for just the few weeks of being sick, but forever. Repeated pregnancies would keep failing - mid-pregnancy.

191.    On December 1, 2020, a former Pfizer Vice President and allergy and respiratory researcher, Dr. Michael Yeadon, filed an application with the European Medicines Agency, responsible for approving drugs in the European Union, seeking the immediate suspension of all SARS-CoV-2 Vaccines, citing *inter alia* the risk to pregnancies. As of April 26, 2021, the VAERS database contains over 3,000 reports of failed pregnancies associated with the Vaccines.

192.    These risks have not been adequately studied in trials, or properly disclosed to healthcare professionals or Vaccine subjects.

Vascular Disease

193.    Salk Institute for Biological Studies researchers in collaboration with the University of San Diego, published in the journal *Circulation Research* that the spike proteins themselves damage vascular cells, causing strokes and many other vascular problems. All the vaccines are causing clotting disorders (coagulopathy) in all ages. The

spike proteins are known to cause clotting that the body cannot fix, such as brain thrombosis and thrombocytopenia.

194.    These risks have not been adequately studied in trials, or properly disclosed to healthcare professionals or Vaccine subjects.

Autoimmune Disease

195.    The spike proteins are perceived to be foreign by the human immune system, initiating an immune response to fight them. While that is the intended therapeutic principle, it is also the case that any cell expressing spike proteins becomes a target for destruction by our own immune system. This is an autoimmune disorder and can affect virtually any organ in the body. It is likely that some proportion of spike protein will become permanently fused to long-lived human proteins and this will prime the body for prolonged autoimmune diseases. Autoimmune diseases can take years to show symptoms and many scientists are alarmed at giving young people such a trigger for possible autoimmune disease.

196.    These risks have not been adequately studied in trials, or properly disclosed to healthcare professionals or Vaccine subjects.

Neurological Damage

197.    The brain is completely unique in structure and function, and therefore it requires an environment that is insulated against the rest of the body's functioning. The blood-brain-barrier exists so the brain can function without disruption from the rest of the body. This is a complex, multi-layered system, using several mechanisms that keeps nearly all bodily functions away from the brain. Three such systems include: very tight junctions between the cells lining the blood vessels, very specific proteins that go

between, and unique enzymes that alter substances that do go through the cells. Working together, the blood-brain-barrier prevents almost everything from getting in. Breaching it is generally incompatible with life.

198.    Most unfortunately, the COVID-19 Vaccines - unlike any other vaccine ever deployed - are able to breach this barrier through various routes, including through the nerve structure in the nasal passages and through the blood vessel walls. The resulting damage begins in the arterial wall, extends to the supporting tissue outside the arteries in the brain, and from there to the actual brain nerve cells inside. The Vaccines are programmed to produce the S1 subunit of the spike protein in every cell in every Vaccine recipient, but it is this subunit that causes the brain damage and neurologic symptoms. Elderly persons are at increased risk for this brain damage.

199.    COVID-19 patients typically have neurological symptoms including headache and loss of smell and taste, as well as brain fog, impaired consciousness, and stroke.  Researchers have published a paper in the *Journal of Neurological Sciences* correlating the severity of the pulmonary distress in COVID-19 with viral spread to the brain stem, suggesting direct brain damage, not just a secondary cytokine effect. It has been shown recently by Dr. William Banks, professor of Internal Medicine at University of Washington School of Medicine, that the S1 subunit of the spike protein - the part of the SARS-CoV-2 virus that produces the COVID-19 disease and is in the Vaccines - can cross the blood brain barrier.  This is even more concerning, given the high number of ACE2 receptors in the brain (the ACE2 receptor is that portion of the cell that allows the spike protein to connect to human tissue). Mice injected with the S1 subunit of the spike protein developed direct damage to the perivascular tissue. In humans, viral spike protein

was detected in the brain tissues of COVID-19 patients, but not in the brain tissues of the controls. Spike protein produces endothelial damage.

200. There are an excessive number of brain hemorrhages associated with COVID-19, and the mechanism suggests that it is the spike protein that is responsible. The federal government's VAERS database shows a dramatic increase in adverse event reporting of neurological damage following injection with the Vaccine.

| Year | **Dementia** (Reports following injection with Vaccine) | **Brain Bleeding** (Reports following injection with Vaccine) |
|---|---|---|
| 2000 | 4 | 7 |
| 2010 | 0 | 17 |
| 2015 | 0 | 17 |
| 2018 | 21 | 31 |
| 2019 | 11 | 17 |
| 2020 | 12 → (43) | 4 → (11) |
| 2021 | 17 → (251) | 0 → (258) |

201. While the full impact of these Vaccines crossing the blood-brain barrier is unknown, they clearly put vaccinated individuals at a substantially increased risk of hemorrhage, neurological damage, and brain damage as demonstrated by the increased instances of such reporting in the VAERS system.

202. These risks have not been adequately studied in trials, or properly disclosed to healthcare professionals or Vaccine subjects.

Effect on the Young

203. The Vaccines are more deadly or harmful to the young than the virus, and that is excluding the unknown future effects on fertility, clotting, and autoimmune disease. Those under the age of 18 face statistically zero chance of death from SARS-CoV-2 according to data published by the CDC, but there are reports of heart

inflammation - both myocarditis (inflammation of the heart muscle) and pericarditis (inflammation of the lining outside the heart) - in young men, and at least one documented fatal heart attack of a healthy 15-year-old boy in Colorado two days after receiving the Pfizer Vaccine.  The CDC has admitted that "[s]ince April 2021, increased cases of myocarditis and pericarditis have been reported in the United States after the mRNA COVID-19 vaccination (Pfizer-BioNTech and Moderna), particularly in adolescents and young adults."

204.    The Vaccines induce the cells of the recipient to manufacture trillions of spike proteins for an undetermined amount of time with the pathology described above, whereas naturally occurring COVID-19 comes and goes.  The spike protein is the same.  The increased risk comes from reprogramming the cells to permanently create the spike protein at potentially high levels.  Because immune responses in the young and healthy are more vigorous than those in the old, paradoxically, the vaccines may thereby induce, in the very people least in need of assistance, a very strong immune response, including those which can damage their own cells and tissues, including by stimulating blood coagulation.

205.    These risks have not been adequately studied in trials, or properly disclosed to healthcare professionals or Vaccine subjects.

Chronic Disease

206.    Healthy children whose birthright is decades of healthy life will instead face premature death or decades of chronic disease. We cannot say what percentage will be affected with antibody dependent enhancement, neurological disorders, autoimmune disease and reproductive problems, but it is a virtual certainty that this will occur.

207.    These risks have not been adequately studied in trials, or properly disclosed to healthcare professionals or Vaccine subjects.

Antibody Dependent Enhancement

208.    Antibody Dependent Enhancement ("ADE") occurs when SARS-CoV-2 antibodies, created by a Vaccine, instead of protecting the vaccinated person, cause a more severe or lethal case of the COVID-19 disease when the person is later exposed to SARS-CoV-2 in the wild. The Vaccine *amplifies* the infection rather than *preventing* damage. It may only be seen after months or years of use in populations around the world.

209.    This paradoxical reaction has been seen in other vaccines and animal trials. One well-documented example is with the Dengue fever vaccine, which resulted in avoidable deaths.   Dengue fever has caused 100-400 million infections, 500,000 hospitalizations, and a 2.5% fatality rate annually worldwide.   It is a leading cause of death in children in Asian and Latin American countries.  Despite over 50 years of active research, a Dengue vaccine still has not gained widespread approval in large part due to the phenomenon of ADE.  Vaccine manufacturer Sanofi Pharmaceutical spent 20 years and nearly $2 billion to develop the Dengue vaccine and published their results in the *New England Journal of Medicine*, which was quickly endorsed by the World Health Organization. Vigilant scientists clearly warned about the danger from ADE, which the Philippines ignored when it administered the vaccine to hundreds of thousands of children in 2016.  Later, when these children were exposed in the wild, many became severely ill and 600 children died.  The former head of the Dengue department of the Research Institute for Tropical Medicine (RITM) was indicted in 2019 by the Philippines

Department of Justice for "reckless imprudence resulting [in] homicide," because he "facilitated, with undue haste," Dengvaxia's approval and its rollout among Philippine schoolchildren.

210.    ADE has been observed in the coronavirus setting. The original SARS-CoV-1 caused an epidemic in 2003. This virus is a coronavirus that is reported to be 78% similar to the current SARS-CoV-2 virus which causes the disease COVID-19. Scientists attempted to create a vaccine. Of approximately 35 vaccine candidates, the best four were trialed in ferrets. The vaccines appeared to work in the ferrets. However, when those vaccinated ferrets were challenged by SARS-CoV-1 in the wild, they became extremely ill and died due to what we would term a sudden severe cytokine storm. The reputed journals *Science*, *Nature* and *Journal of Infectious Diseases* have all documented ADE risks in relation to the development of experimental COVID-19 vaccines. The application filed by Dr. Yeadon with the European Medicines Agency on December 1, 2020 also cites to the risk from ADE. ADE is discovered during long-term animal studies, to which the Vaccines have not been subjected.

211.    These risks have not been adequately studied in trials, or properly disclosed to healthcare professionals or Vaccine subjects.

Vaccine-Driven Disease Enhancement in the Previously Infected

212.    Scientists have noted an immediately higher death rate worldwide upon receiving a Vaccine. This is generally attributed to persons having recently been infected with COVID-19. The FDA states that many persons receiving a Vaccine have COVID-19. A person who previously had SARS-CoV-2, and then receives a Vaccine, mounts an antibody response to the Vaccine that is between 10 and 20 times stronger than the

response of a previously uninfected person.  The antibody response is far too strong and overwhelms the Vaccine subject. With a typical vaccine, the body trains itself how to respond to a disease because of exposure to a dead or weakened version of the pathogen. The Vaccines by contrast actually reprogram the body and, in doing so, can escalate the individual's response to levels that place them at risk. Medical studies show severe Vaccine side effects in persons previously infected with COVID-19.  Groups of scientists are demanding improved pre-assessment due to vaccine-driven disease enhancement in the previously infected.

213.   These risks have not been adequately studied in trials, or properly disclosed to healthcare professionals or Vaccine subjects.

<u>More Virulent Strains</u>

214.   Scientists are concerned that universal inoculation may create more virulent strains.  This has been observed with Marek's Disease in chickens. A large number of chickens not at risk of death were vaccinated, and now all chickens must be vaccinated or they will die from a virus that was nonlethal prior to widespread vaccination. The current policy to pursue universal vaccination regardless of risk may exert the same evolutionary pressure toward more highly virulent strains.

215.   These risks have not been adequately studied in trials, or properly disclosed to healthcare professionals or Vaccine subjects.

<u>Blood Supply</u>

216.   Presently, the vaccinated are permitted to donate their spike protein laden blood into the blood supply, which projects all of the risks discussed *supra* onto the general population of unvaccinated blood donees.

217.    Scientists and healthcare professionals all over the world are sounding the alarm and frantically appealing to the FDA to halt the vaccines. They have made innumerable public statements. 57 top scientists and doctors from Central and South America are calling for an immediate end to all vaccine COVID-19 programs. Other physician-scientist groups have made similar calls, among them: Canadian Physicians, Israeli People's Committee, Frontline COVID-19 Critical Care Alliance, World Doctors Alliance, Doctors 4 Covid Ethics, and Plaintiff America's Frontline Doctors.  These are healthcare professionals in the field who are seeing the catastrophic and deadly results of the rushed vaccines, and reputed professors of science and medicine, including the physician with the greatest number of COVID-19 scientific citations worldwide.  They accuse the government of deviating from long-standing policy to protect the public. In the past, government has halted vaccine trials based on a tiny fraction – far less than 1% - of the number of unexplained deaths already recorded.  The scientists all agree that the spike protein (produced by the vaccines) *causes disease even without the virus*, which has motivated them to lend their imprimatur to, and risk their reputation and standing on, these public objections.

218.    Notwithstanding all of these risks and uncertainties, the federal government is orchestrating a nationwide media campaign, funded with $1 billion, to promote the Vaccines.  The President has lent his voice to the campaign: "The bottom line is this: I promise you they are safe. They are safe. And even more importantly, they are extremely effective. If you are vaccinated, you are protected."

**E.  The Vaccine EUAs are Unlawful - There are Adequate, Approved and Available Alternatives**

219.    Despite the misinformation being disseminated in the press – and, at times, by the Defendants – there are numerous alternative safe and effective treatments for COVID-19.

220.    These alternatives are supported by over 300 studies, including randomized controlled studies. Tens of thousands of physicians have publicly attested, and many have testified under oath, as to the safety and efficacy of the alternatives. Globally and in the United States, treatments such as Ivermectin, Budesonide, Dexamethasone, convalescent plasma and monoclonal antibodies, Vitamin D, Zinc, Azithromycin, Hydroxychloroquine, Colchicine and Remdesivir are being used to great effect, and they are safer than the COVID-19 Vaccines.[11]

221.    Doctors from the Smith Center for Infectious Diseases and Urban Health and the Saint Barnabas Medical Center have published an *Observational Study on 255 Mechanically Ventilated COVID Patients at the Beginning of the USA Pandemic*, which states: "Causal modeling establishes that weight-adjusted HCQ [Hydroxychloroquine] and AZM [Azithromycin] therapy improves survival by over 100%."

222.    Observational studies in Delhi and Mexico City show dramatic reductions in COVID-19 case and death counts following the mass distribution of Ivermectin. These results align with those of a study in Argentina, in which 800 healthcare professionals received Ivermectin, while another 400 did not. Of the 800, not a single person contracted COVID-19, while more than half of the control group did contract it.  Dr. Pierre Kory, a lung specialist who has treated more COVID-19 patients than most doctors, representing a group of some of the most highly published physicians in the world, with over 2,000

---

[11] Numerous studies can be reviewed here: https://c19early.com (last visited June 7, 2021).

peer reviewed publications among them, testified before the U.S. Senate in December 2020.  He testified that based on 9 months of review of scientific data from 30 studies, Ivermectin obliterates transmission of the SARS-CoV-2 virus and is a powerful prophylactic (if you take it, you will not contract COVID-19). Four large randomized controlled trials totaling over 1500 patients demonstrate that Ivermectin is safe and effective as a prophylactic.  In early outpatient treatment, three randomized controlled trials and multiple observational studies show that Ivermectin reduces the need for hospitalization and death in statistically significant numbers.  In inpatient treatment, four randomized controlled trials show that Ivermectin prevents death in a statistically significant, large magnitude.  Ivermectin won the Nobel Prize in Medicine in 2015 for its impacts on global health.

223.    Inexplicably, the Defendants never formed or assigned a task force to research and review existing alternatives for preventing and treating COVID-19. Instead, the Defendants and others set about censoring both concerns about the Vaccines, and information about safe and effective alternatives.

**F.  The Vaccine EUAs are Unlawful - Information is Being Suppressed, and Healthcare Professionals and Vaccine Subjects are Not Properly Informed**

224.    The Associated Press, Agence France Press, British Broadcasting Corporation, CBC/Radio-Canada, European Broadcasting Union (EBU), Facebook, Financial Times, First Draft, Google/YouTube, The Hindu Times, Microsoft, Reuters, Reuters Institute for the Study of Journalism, Twitter, The Washington Post and The New York Times all participate in the "Trusted News Initiative" which has agreed to not allow any news critical of the Vaccines.

225.   Individual physicians are being censored on social media platforms (e.g., Twitter, Facebook, Instagram, TikTok), the modern day "public square."   Plaintiff AFLDS has recorded innumerable instances of social media deleting scientific content posted by AFLDS members that runs counter to the prevailing Vaccine narrative, and then banning them from the platform altogether as users.   Facebook has blocked the streaming of entire events at which AFLDS Founder Dr. Simone Gold has been an invited guest, prior to her uttering a word.   Other doctors have been banned for posting or tweeting screenshots of government database VAERS.   YouTube censored the testimony of undersigned counsel Thomas Renz, Esq. before the Ohio legislature.

226.   The censorship also extends to medical journals.   In an unprecedented move, the four founding topic editors for the *Frontiers in Pharmacology* journal all resigned together due to their collective inability to publish peer reviewed scientific data on various drugs for prophylaxis and treatment of COVID-19.

227.   Dr. Philippe Douste-Blazy, a cardiology physician, former France Health Minister, 2017 candidate for Director of the WHO and former Under-Secretary-General of the United Nations, described the censorship in chilling detail:

> *The Lancet* boss said "Now we are not going to be able to, basically, if this continues, publish any more clinical research data, because the pharmaceutical companies are so financially powerful today and are able to use such methodologies, as to have us accept papers which are apparently, methodologically perfect but in reality, which manage to conclude what they want to conclude." … one of the greatest subjects never anyone could have believed … I have been doing research for 20 years in my life. I never thought the boss of *The Lancet* could say that. And the boss of the *New England Journal of Medicine* too. He even said it was "criminal" - the word was used by him. That is, if you will, when there is an outbreak like the COVID-19, in reality, there are people … us, we see "mortality" when you are a doctor or yourself, you see "suffering." And there are people who see "dollars" - that's it.

82

228.    In many instances, highly publicized attacks on early treatment alternatives seem to be done in bad faith. For example, one study on Hydroxychloroquine overdosed study participants by administering a multiple of the standard prescribed dose, and then reported the resulting deaths as though they were not a result of the overdose. The 27 physician-scientist authors of the study were civilly indicted and criminally investigated, and still the Journal of the American Medical Association has not retracted the article.

### G.  The Vaccine EUAs are Unlawful - Inadequate System for Monitoring and Reporting Vaccine Adverse Events

229.    VAERS was established in 1986 in order to facilitate public access to information regarding adverse events potentially caused by vaccines.   Uniquely for COVID-19, the CDC has developed a parallel system called "V-Safe."  V-Safe is an app on a smart phone which people can use to report adverse events.  Plaintiffs' investigation indicates that vaccine subjects who are provided with written information are given the V-Safe contact information.  Plaintiffs cannot access V-Safe data, since it is controlled exclusively by the CDC.  Plaintiffs are concerned that the information in V-Safe exceeds that in VAERS, in terms of volume and kind, defying Congressional intent in creating VAERS.

### H.  Non-Consensual Human Experimentation and Informed Consent

#### Customary International Law Ban on Non-Consensual Human Experimentation

230.    Customary international law applies directly to the United States and its agencies and instrumentalities.  It is well established that customary international law includes a norm that prohibits non-consensual human medical experimentation. Abdullahi v. Pfizer, 562 F.3d 163, 174-188 (2nd Cir. 2009).

231.    In August 1947, an International Military Tribunal ("IMT") sitting in Nuremberg, Germany convicted 15 Nazi doctors for crimes against humanity for conducting medical experiments without the consent of their subjects.   "Among the nonconsensual experiments that the tribunal cited as a basis for their convictions were **the testing of drugs for immunization against malaria, epidemic jaundice, typhus, smallpox and cholera**." Id. at 178 (quoting United States v. Brandt, 2 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 181-182 (1949) (emphasis added). The Nuremberg Code was created as part of the IMT's judgment, and it helps to define the contours of the customary international law norm.  Its first Principle is that **"[t]he voluntary consent of the human subject is absolutely essential."**   Id. at 179 (emphasis added).   The Code elaborates on the Principle as follows:

> *This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, over-reaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision.*

232.    The Nuremberg Code contains other principles relevant here, for example that "[t]he experiment should be such as to yield fruitful results for the good of society, unprocurable by other methods or means of study, and not random or unnecessary" (Principle 2), and "[t]he experiment should be [ ] designed and based on the results of animal experimentation" (Principle 3), and "[t]he degree of risk to be taken should never exceed that determined by the humanitarian importance of the problem" (Principle 6).

233.    The Nuremberg Code has been adopted and amplified by numerous international declarations and agreements, including the World Medical Association's Declaration of Helsinki, the guidelines authored by the Council for International Organizations of Medical Services, Art. 7 of the International Covenant on Civil and Political Rights, the International Covenant on Human Rights, the Universal Declaration on Bioethics and Human Rights, and others.

234.    "The history of the norm in United States law demonstrates it has been firmly embedded for more than 45 years and [  ] its validity has never been seriously questioned by any court." Id. at 182.

<u>Federal Regulations and the Requirement of Voluntary, Informed Consent</u>

235.    Federal Regulations relating to the protection and informed consent of human subjects further implement aspects of this norm and are binding legal obligations. In 1979, the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research issued the Belmont Report, which addressed the issue of informed consent in human experimentation. The Report identified respect for self-determination by "autonomous persons" as the first of three "basic ethical principles" which "demands that subjects enter into the research voluntarily and with adequate information."  Ultimately, the principles of the Belmont Report, which itself was guided by the Nuremberg Code and the Declaration of Helsinki, were adopted by the DHHS and FDA in their regulations requiring the informed consent of human subjects in medical research.

236.    45 CFR § 46.401 *et seq.*, applies to "all research involving children as subjects, conducted or supported by [DHHS]."  § 46.405 states:

*HHS will conduct or fund research in which the IRB finds that more than minimal risk to children is presented by an intervention or procedure that holds out the prospect of direct benefit for the individual subject, or by a monitoring procedure that is likely to contribute to the subject's well-being, only if the IRB finds that:*

*(a)  The risk is justified by the anticipated benefit to the subjects;*

*(b)  The relation of the anticipated benefit to the risk is at least as favorable to the subjects as that presented by available alternative approaches; and*

*(c)  Adequate provisions are made for soliciting the assent of the children and permission of their parents or guardians, as set forth in § 46.408.*

<u>U.S. Public Health Authorities' Involvement in Unlawful Human Experimentation</u>

237.   It is entirely reasonable to posit that the U.S. public health establishment would in fact design, fund, supervise and implement a non-consensual human medical experiment involving the Vaccines, in conjunction with private sector actors, given its historical track record.   On October 1, 2010, President Obama apologized to the Guatemalan government and people for a program of non-consensual human experimentation that had been funded and approved by the U.S. Public Health Service ("PHS") and implemented on the ground by a PHS doctor employed for this purpose by private institutions but reporting to supervisors including PHS doctors.  The evidence was suppressed and remained buried until discovered by a private researcher in 2010.   A presidential commission investigated and found that in fact thousands of Guatemalans, including orphans, insane asylum patients, prisoners and military conscripts, had been intentionally exposed to syphilis, gonorrhea and other pathogens in furtherance of experiments on the use of penicillin as a prophylaxis.

238.    On May 16, 1997, President Clinton apologized to the African American community for the so-called "Tuskegee Study of Untreated Syphilis in the Negro Male", a non-consensual human medical experiment funded, organized and implemented by the PHS, again with important private sector participation.   This was the longest non-therapeutic, non-consensual experiment on human beings in the history of public health, run by the PHS, spanning 40 years from 1932 until its exposure by a whistleblower in 1972. The purpose of the study was to observe the effects of untreated syphilis in black men and their family members.   There are numerous other examples, too many for inclusion here.

<u>Targeting Children Who Are Intrinsically Unable to Consent</u>

239.    Within days of the FDA extending the Pfizer EUA to children ages 12 to 15, local governments commenced hastily passing laws eliminating the requirement for parental consent, and even parental knowledge, of medical treatments administered to children as young as 12.   This is intended to pave the way for children to receive the Vaccines at school, without parental knowledge or consent.

240.    However, children in the 12 to 18 age group are not developmentally capable of giving voluntary, informed consent to the Vaccines.   Their brains are rapidly changing and developing, and their actions are guided more by the emotional and reactive amygdala and less by the thoughtful, logical frontal cortex.   Hormonal and body changes add to their emotional instability and erratic judgment. Children also have a well-known and scientifically studied vulnerability to pressure from peers and adults. This age group is particularly susceptible to pressure to do what others see as the right thing to do - in this case, to be injected with the Vaccine "for the sake of other people and society."

241.    That the American population, and children in particular, are being used as experimental test subjects (guinea pigs) in medical experimentation using the Vaccines is undeniable.  The Texas State Senate heard sworn testimony on May 6, 2021 from Dr. Angelina Farella, a pediatrician who has given tens of thousands of vaccinations in her office. She testified:

Dr. Farella:    "I have given tens of thousands of vaccinations in my career. I am very pro-vax actually except when it comes to this covid vaccine … We are currently allowing children 16, 17 years old to get this vaccine, and they were never studied in this trial… Never before in history have we given medications that were not FDA approved to people who were not initially studied in the trial. There were no trial patients under the age of 18… They're extrapolating the data from adults down to children and adolescents. This is not acceptable. Children are not little adults. … Children have 99.997% survivability from the Covid. Let me repeat that for you all to understand: 99.997%."

Senator Hall:    "Has there been another vaccine that had the high incidents of serious hospitalizations and deaths that this vaccine is now showing?

Dr. Farella:    "Not to this extent. Not even close."

Sen. Hall:    "Any other vaccine would have been pulled from the market?"

Dr. Farella:    "Absolutely."

Sen. Hall:    "Have you seen any other vaccine that was put out for the public that skipped the animal tests?"

Dr. Farella:    "Never before. Especially for children."

Sen. Hall:    "…Folks I think that's important to understand here, that what we're talking about is the American people … **this is the test program**."

Self-Disseminating Vaccines

242.    The phenomenon of "self-disseminating vaccines" adds a new dimension to the problem of the lack of informed consent.  These vaccines spread automatically from the vaccinated to the unvaccinated, without the knowledge or consent of the unvaccinated. They are not a science fiction concept, rather they have been a research subject for years if not decades.

243.    Page 67 of the Pfizer EUA application describes the possibility of **the passive "vaccination" of the unvaccinated through proximity to the vaccinated**, including inhalation or skin contact.  Pursuant to the referenced document, each person getting the Pfizer Vaccine had to consent to the possibility of exposing pregnant women through inhalation or skin contact (note that pharmaceutical companies can only disclose actual, not purely speculative, risks).  According to the document, an "exposure during pregnancy" event that must be reported to Pfizer within 24 hours occurs if:

> *A male participant who is receiving or has discontinued study intervention exposes a female partner prior to or around the time of conception.*
> *A female is found to be pregnant while being exposed or having been exposed to study intervention due to environmental exposure. Below are examples of environmental exposure during pregnancy:*
>
> > *A female family member or healthcare provider reports that she is pregnant after having been exposed to the study intervention by inhalation or skin contact.*

Further, an "exposure during breastfeeding" event occurs if "[a] female participant is found to be breastfeeding while receiving or after discontinuing study intervention."

244.    There are worldwide reports of irregular and often very heavy vaginal bleeding in the unvaccinated who are near those who have been injected with the Vaccines, even in post-menopausal women. These public reports are scrubbed from the Internet rapidly, however Plaintiff AFLDS has also received innumerable emails from

around the world with the same reports. It is well documented that the vaccinated have excessive bleeding and clotting disorders including vaginal bleeding, miscarriages, gastrointestinal bleeding and immune thrombocytopenia.

Psychological Manipulation

245.    The idea of using fear to manipulate the public is not new, and is a strategy frequently deployed in public health.   In June, 2020, three American public health professionals, concerned about the psychological effects of the continued use of fear-based appeals to the public in order to motivate compliance with extreme COVID-19 countermeasures, authored a piece for the journal *Health Education and Behavior* calling for an end to the fearmongering.   In doing so, they acknowledged that fear has become an accepted public health strategy, and that it is being deployed aggressively in the United States in response to COVID-19:

> "… behavior change can result by increasing people's perceived severity and perceived susceptibility of a health issue through heightened risk appraisal coupled by raising their self-efficacy and response-efficacy about a behavioral solution. In this model, fear is used as the trigger to increase perceived susceptibility and severity."

246.    In 1956, Dr. Alfred Biderman, a research social psychologist employed by the U.S. Air Force, published his study on techniques employed by communist captors to induce individual compliance from Air Force prisoners of war during the Korean War. The study was at the time and to some extent remains the core source for capture resistance training for the armed forces.   The chart below compares the techniques used by North Korean communists with the fear-based messaging and COVID-19 countermeasures to which the American population has been subjected over the last year.

| "COMMUNIST COERCIVE METHODS FOR ELICITING INDIVIDUAL COMPLIANCE".* The Biderman Report of 1956 and COVID-19 | |
| --- | --- |
| **Chart of Coercion** | **COVID-19** |
| **Isolation**<br>• Deprives individual of social support of his ability to resist<br>• Makes individual dependent upon the captor<br>• Individual develops an intense concern with self. | **Isolation**<br>• Social distancing<br>• Isolation from loved ones, massive job loss<br>• Solitary confinement semi-isolation<br>• Quarantines, containment camps |
| **Monopolization of Perception**<br>• Fixes all attention upon immediate predicament;<br>• Frustrates all actions not consistent with compliance<br>• Eliminates stimuli competing with those controlled by the captor | **Monopolization of perception**<br>• Restrict movement<br>• Create monotony, boredom<br>• Prevent gathering, meetings, concerts, sports<br>• Dominate all media the 24/7, censor information |
| **Induced Debility and Exhaustion**<br>• Weakens mental and physical ability to resist<br>• People …become worn out by tension and fear | **Induced debility**<br>• Forced to stay at home, all media is negative<br>• not permitted to exercise or socialize |
| **Threats**<br>• Cultivates anxiety and despair<br>• Gives demands and consequences for non compliance | **Threats and Intimidation**<br>• Threaten to close business, levy fines<br>• Predict extension of quarantine, force vaccines<br>• Create containment camps |
| **Occasional Indulgences**<br>• Provides motivation for compliance<br>• Hinders adjustment to deprivation.<br>• Creates hope for change, reduces resistance<br>• This keeps people unsure of what is happening. | **Occasional Indulgences**<br>• Allow reopening of some stores, services<br>• Let restaurants open but only at a certain capacity<br>• Increase more people allowed to gather<br>• Follow concessions with tougher rules |
| **Demonstrate Omnipotence**<br>• Demonstrates futility of resistance<br>• Shows who is in charge<br>• Provides positive motivation for compliance | **Demonstrate Omnipotence**<br>• Shut down entire economies across the world<br>• Create money out of nowhere, force dependency<br>• Develop total surveillance with nanochips and 5G |
| **Degradation**<br>• Makes resistance seem worse than compliance<br>• Creates feelings of helplessness.<br>• Creates fear of freedom, dependence upon captors | **Humiliation or Degradation techniques**<br>• Shame people who refuse masks, don't distance<br>• Make people stand on circles and between lines<br>• Make people stand outside and wait in queues<br>• Sanitation stations in every shop |
| **Enforcing trivial demands**<br>• Develops habit of compliance<br>• Demands made are illogical and contradictory<br>• Rules on compliance may change<br>• Reinforces who is in control | **Enforcing trivial demands**<br>• Family members must stand apart<br>• Masks in home and even when having sex<br>• Random limits on people allowed to be together<br>• Sanitizers to be used over and over in a day |

www.beingfree.ca

The Chart of Coercion above is drawn from the Biderman Report on communist brainwashing techniques used by the Chinese and North Koreans on captured American servicemen to make them psychological as well as physical prisoners. Dr. Alfred D. Biderman M.A. and presented his Report at the New York Academy of Medicine Nov 13, 1956. Compare right column with your experience this year.

After a year of sustained psychological manipulation, the population is now weakened, frightened, desperate for a return of their freedoms, prosperity and normal lives, and especially vulnerable to pressure to take the Vaccine. The lockdowns and shutdowns, the myriad rules and regulations, the confusing and self-contradictory controls, the enforced docility, and the consequent demoralization, anxiety and helplessness are typical of authoritarian and totalitarian conditions. This degree of systemic and purposeful coercion means that Americans cannot give truly free and voluntary informed consent to the Vaccines.

247.    At the same time, the population is being subjected to an aggressive, coordinated media campaign promoting the Vaccines funded by the federal government

with $1 billion.  The media campaign is reinforced by a system of coercive rewards and penalties designed to induce vaccination.  The federal government is offering a range of its own incentives, including free childcare.  The Ohio Governor rewarded those Ohio residents accepting the Vaccines by allowing them to enter into the "Vaxamillion" lottery with a total $5 million prize and the chance to win a fully funded college education, while barring entry for residents who decline the Vaccines.  In New York, metro stations offer free passes to those receiving the Vaccine in the station.  West Virginia is running a lottery exclusively for the vaccinated with free custom guns, trucks and lifetime hunting and fishing licenses, a free college education, and cash payments of $1.5 million and $600,000 as the prizes.  Previously, the state offered a $100 savings bond for each injection with a Vaccine.  New Mexican residents accepting the Vaccines will be entered into weekly drawings to take home a $250,000 prize, and those fully vaccinated by early August could win the grand prize of $5 million.  In Oregon, the vaccinated can win $1 million, or one of 36 separate $10,000 prizes through the state's "Take Your Shot" campaign.  Other state and local governments are partnering with fast food chains to offer free pizza, ice cream, hamburgers and other foods to the vaccinated.  Many people are desperate following the last year of economic destruction and deprivation of basic freedoms, and they are especially vulnerable to this coercion.

248.   The penalties take many forms, among them:

- Using guilt and shame to make unvaccinated children and adults feel badly about themselves for refusing the Vaccines
- Threatening the unvaccinated with false fears and anxieties about COVID-19, especially children who are at no risk statistically
- Removing the rights of those who are unvaccinated:
    - Being prohibited from working
    - Being prohibited from attending school or college

- o Being limited in the ability to travel in buses, trains and planes
- o Being prohibited from traveling outside the United States
- o Being excluded from public and private events, such as performing arts venues.

249.   The combined effect of (i) the suppression and censorship of information regarding the risks of the Vaccines, (ii) the failure to inform the public regarding the novel and experimental nature of the mRNA Vaccines, (iii) the suppression and censorship of information regarding alternative treatments, (iv) the failure to inform and properly educate the public that the Vaccines are not in fact "approved" by the FDA, (v) the failure to inform and properly educate the public that the DHHS Secretary has *not* determined that the Vaccines are "safe and effective" and on the contrary has merely determined that "**it is reasonable to believe**" that the Vaccines "**may be effective**" and that the benefits outweigh the risks, (vi) the sustained psychological manipulation of the public through official fear-based messaging regarding COVID-19, draconian countermeasures and a system of rewards and penalties, is to remove any possibility that Vaccine recipients are giving voluntary informed consent to the Vaccines.  They are participants in a large scale, ongoing non-consensual human experiment.

## I.  Conflicts-of-Interest

250.   While Plaintiffs make no allegations regarding the legality or illegality of the potential conflicts-of-interest identified herein, they are numerous, now well publicized, and may create an incentive to suppress alternative treatments while promoting and profiting from the experimental COVID-19 Vaccines.

251.   NIAID scientists developed the Moderna COVID-19 Vaccine in collaboration with biotechnology company Moderna, Inc. NIAID Director Dr. *Fauci* referred to the Moderna COVID-19 Vaccine when he said: "Finding a safe and effective

vaccine to prevent infection with SARS-CoV-2 is an urgent public health priority. This Phase 1 study, launched in record speed, is an important first step toward achieving that goal."   NIAID scientists submitted an Employee Invention Report to the NIH Office of Technology Transfer in order to receive a share in the profits from the sale of the Moderna COVID-19 Vaccine.  Each inventor stands to receive a personal payment of up to $150,000 annually from sales of the Moderna COVID-19 Vaccine.  NIAID stands to earn millions of dollars in revenue from the sale of the Moderna COVID-19 Vaccine.

252.    The NIH Director stated the following in May 2020: "We do have some particular stake in the intellectual property behind Moderna's coronavirus vaccine." In fact, NIH and Moderna signed a contract in December 2019 that states "mRNA coronavirus vaccine candidates are developed and jointly owned by the two parties." Moderna, Inc. is currently valued at $25 billion despite having no federally approved drugs on the market.

253.    The DHHS awarded $483 million in grants to Moderna, Inc. to accelerate the development of the Moderna COVID-19 Vaccine.  Dr. Fauci could have focused on treatments, including treatments he previously advised were beneficial in countering SARS-CoV-1. Instead, Dr. Fauci directed the NIAID, NIH, Congress and the White House to develop the Vaccines, where he has financial and professional ties.

254.    Further, on May 11, 2021, Senator Rand Paul asked Dr. Anthony Fauci under oath about the origins of SARS CoV-2 and the NIH and NIAID funding for Gain-of-Function research, and Dr. Fauci stated to the Senator and to all of Congress and to the American people stating that the NIH and NIAID did not fund Gain-of-Function (making viruses more lethal) research when in fact, he provided at least $60 million funding. The

Defendants obfuscate and profit financially, personally and professionally while the American people suffer.

255.    Plaintiffs' investigation has revealed additional conflicts-of-interest among members of the Vaccines and Related Biological Products Advisory Committee ("VRBPAC"), which is an FDA sub-agency that reviews and evaluates data concerning the safety, effectiveness, and appropriate use of vaccines and related biological products. VRBPAC makes recommendations to the FDA regarding whether or not to grant EUAs. The FDA is not bound to follow the VRBPAC's recommendations, but should VRBPAC advise against approval, especially over safety concerns, it would make it harder for the FDA to move forward.

256.    The University of Florida Conflicts of Interest Program and the Project on Government Oversight report that numerous members of the VRBPAC have conflicts-of-interest:

- Dr. Hana el-Sahly, the VRBPAC Chair, was working with Moderna, as one of the three lead investigators for the company's 30,000 person trial of its Vaccine in July 2020. Plaintififs cannot locate information related to payments made to Dr. el-Sahly by the company.

- The Acting Chair Dr. Arnold Monto received $54,114 from 2013 to 2019 from vaccine contenders Pfizer, GlaxoSmithKline and Shionogi. He also received $10,657 from Novartis, which has a contract to manufacture Vaccines.  Dr. Monto received a total of $194,254 from pharmaceutical companies, the largest contributor being Seqirus, a company developing COVID-19 vaccine in Australia.

- In 2019, Dr. Archana Chaterjee received $23,904 from Pfizer, $11,738 from Merck and $11,480 from Sanofi, each of which was racing to develop a COVID-19 vaccine.  Since 2013, she has received more than $200,000 in consulting fees, travel, lodging and other payments from those companies and others working on COVID-19 vaccines.  She is also a professor of epidemiology at the University of Michigan, which is partnering with AstraZeneca on a clinical trial of a potential COVID-19 vaccine.

- Dr. Myron Levine is Associate Dean of Global Health, Vaccinology and Infectious Diseases at the University of Maryland School of Medicine, which is participating in a clinical trial of the Moderna COVID-19 Vaccine.  Since 2013, Dr. Levine has received general payments of $41,635 and research funding of $2.3 million.  His 2019 funding was approximately six times the mean of similar physicians.  His largest source of funding is from Sanofi Pasteur, which is developing a COVID-19 vaccine.

- Dr. Cody Meissner is the head of all clinical trials for all of Tufts Children's Hospital.  Since 2013, Tufts University has been paid $13.2 million in general payments, and $34.2 million in research payments, by companies like Pfizer and Janssen.

- Dr. Paul Offit is Director of Vaccine Education Center and an attending physician in the Division of Infectious Diseases at Children's Hospital of Philadelphia.  Since 2013, the Hospital has received $4.6 million in general payments, and $32 million in research payments, from companies like Pfizer and Novartis.

- Dr. Steven Pergam is Associate Professor, Vaccine and Infectious Disease Division, and Clinical Research Division, Fred Hutchinson Cancer Research Center.  Since 2013, Dr. Pergam has received $4,167 in general payments, and $140,311 in research funding from companies like Merck, which has been developing a COVID-19 vaccine.  He is participating in clinical trials of the Sanofi-Aventis COVID-19 vaccine and has participated in research with Merck.

- Dr. Andrea Shane is professor of pediatrics at Emory University School of Medicine.  Since 2013, Emory University Hospital has received $44.1 million in general payments, and $170.7 million in research funding, with Pfizer being a primary donor.  Since 2013, the Wesley Woods Center of Emory University has received $41,205 in general payments, and $3.4 million in research payments, with Janssen being a primary donor.

- Dr. Paul Spearman is Director of the Division of Infectious Diseases at Cincinnati Children's Hospital and a Professor in the Department of Pediatrics at the University of Cincinnati School of Medicine.  Dr. Spearman received $39,459 in research funding from GlaxoSmithKline and AstraZeneca, both of which have developed COVID-19 vaccines. Plaintiffs cannot locate payment data for the years 2016-2019.  The University of Cincinnati Medical Center has received $2.2 million in general payments and $4.3 million in research

funding since 2013, with Pfizer topping the list of donors.  Cincinnati Children's Hospital is a COVID-19 vaccine clinical trial site.

- Dr. Geeta K. Swamy is a Senior Associate Dean in the Department of Obstetrics and Gynecology, and Associate Vice President for Research, Duke University School of Medicine.  Duke is a clinical trial site for the Pfizer-BioNTech COVID-19 Vaccine and the AstraZeneca vaccine. Since 2013, Dr. Swamy has received general payments of $63,000 largely from Pfizer, Sanofi and GlaxoSmithKline, all COVID-19 vaccine manufacturers, and $206,000 in research funding from GlaxoSmithKline, approximately three times the mean funding of similar physicicians.  Since 2013, Duke University Hospital has received $7.6 million in general payments ($866,000 from Pfizer) and $40.6 million in research funding ($2.7 million from Pfizer) from pharmaceutical companies.

## V.  COUNTS

## COUNT I

### DECLARATORY JUDGMENT
**§ 360bbb–3(b) - Cessation of Public Health Emergency; APA**
**(All Defendants)**

257.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

258.    The DHHS Secretary declared a "public health emergency" pursuant to 21 U.S.C. § 360bbb-3(b)(1)(C) on February 4, 2020, after finding that "there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad, and that involves the virus that causes COVID-19."[12]

259.    It is clearly not the intention of the statute that the DHHS Secretary should be able to renew his declaration of a "public health emergency" in perpetuity when the basis for the emergency no longer exists.  Further, the DHHS Secretary cannot continue

---

[12] *See* https://www.fda.gov/media/147737/download (last visited June 7, 2021).

renewing his emergency declaration as a pretense for dodging the licensing requirements for vaccines and other drugs all to the benefit of well-funded political partners.

260.    Further, in Home Building and Loan Association v. Blaisdell, 290 U.S. 398 (1934), the U.S. Supreme Court stated: "Whether an emergency exists upon which the continued operation of the law depends is always open to judicial inquiry."  290 U.S. at 442, citing Chastleton Corp. v. Sinclair, 264 U.S. 543 (1924).

261.    In Sinclair, the Supreme Court stated: "A law depending upon the existence of emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change."  264 U.S. at 547.

262.    Both Blaisdell and Sinclair are clear authority that an emergency and the rules promulgated thereunder must end when the facts of the situation no longer support the continuation of the emergency.

263.    They also forbid this Court to merely assume the existence of a "public health emergency" based on the pronouncements of the Defendants.  They are clear authority that it is the duty of the court of first instance to grapple with this question and conduct an inquiry.  "[A] Court is not at liberty to shut its eyes to an obvious mistake when the validity of the law depends upon the truth of what of what is declared."  Id. The Sinclair court instructed lower courts to inquire into the factual predicate underlying a declaration of emergency, where there appears to have been a change of circumstances: "the facts should be gathered and weighed by the court of first instance and the evidence preserved for consideration by this Court if necessary."  264 U.S. at 549.

264.    Whereas one can make allowances for an initial, precautionary declaration of a "public health emergency" in the absence of reliable information and experience of

SARS-CoV-2 and COVID-19 (though we do not concede this), over time that justification has worn thin and it is no longer valid.  We are no longer in the nascent stage. There is a wealth of data.  The Defendants' own data demonstrates an undeniable change in circumstances, and that the exigencies underlying the "public health emergency" no longer exist, if they ever did.  Plaintiffs have accumulated and will present expert medical and scientific evidence further supporting this contention. If the exigencies no longer exist, then the "public health emergency" must end.  Plaintiffs therefore seek a Declaratory Judgment terminating the "public health emergency" declared by DHHS Secretary Azar and extended by DHHS Secretary Becerra, and the EUAs which are legally predicated upon that "public health emergency."

265.    Plaintiffs therefore seek a Declaratory Judgment that: the actions of the Defendants are unlawful and arbitrary, capricious, not in accordance with § 360bbb-3, contrary to constitutional rights, powers, privileges and immunities, and in excess of statutory jurisdiction, authority or limitations; that the exigencies underlying the "public health emergency" no longer exist, if they ever did; that the "public health emergency" has ended; and that in the absence of a "public health emergency" the Defendants lack any reason to continue to authorize the emergency use by the American public of the dangerous, experimental Vaccines, thereby nullifying all Vaccine EUAs as unlawful.

## COUNT II

### DECLARATORY JUDGMENT
### § 360bbb–3(c) - Failure to Meet Criteria for Issuance of Vaccine EUAs; APA
### (All Defendants)

266.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

267.   Under § 360bbb–3(c), the DHHS Secretary and his delegee, the Commissioner of the FDA, are authorized to issue and sustain the Vaccine EUAs "only if" they can satisfy certain criteria. As Plaintiffs have alleged and for the reasons set forth herein, the Defendants have failed to do so:

   a.  SARS-CoV-2 and COVID-19 are not "a serious or life-threatening disease or condition" for 99% of the population;

   b.  the scientific evidence and data available to the DHHS Secretary are not derived from "adequate and well-controlled" clinical trials, since the Vaccine trials are compressed, overlapping, incomplete and in many cases run by the Vaccine manufacturers themselves;

   c.  it is *not* "reasonable to believe" that the Vaccines "may be effective" in treating or preventing SARS-CoV-2 and COVID-19;

   d.  it is *not* "reasonable to believe" that "the known and potential benefits of the [Vaccines]" in preventing or treating SARS-CoV-2 and COVID-19 "outweigh the known and potential risks of the product"; and

   e.  there are "adequate, approved, and available alternative[s] to the [Vaccines]" for preventing or treating SARS-CoV-2 and COVID-19, including *inter alia* Ivermectin and Hydroxychloroquine which are prescribed by doctors worldwide with great effect and are approved by physicians as meeting the standard of care among similarly situated medical professionals.

268.   Plaintiffs therefore seek a Declaratory Judgment that: the actions of the Defendants are unlawful and arbitrary, capricious, not in accordance with § 360bbb-3, contrary to constitutional rights, powers, privileges and immunities, and in excess of statutory jurisdiction, authority or limitations; and that the Vaccine EUAs are unlawful, since the DHHS Secretary and his delegee the FDA Commissioner cannot meet the criteria for their issuance, thereby nullifying all Vaccine EUAs.

## COUNT III

### DECLARATORY JUDGMENT

### § 360bbb–3(e) - Failure to Establish Conditions for Vaccine EUAs; APA

**(All Defendants)**

269.   Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

270.   § 360bbb–3(e) provides that the DHHS Secretary, as a condition to ongoing validity of the Vaccine EUAs, "shall [ ] establish" certain "[r]equired conditions" "designed to ensure" that both healthcare professionals and Vaccine recipients are duly informed of certain critical information. As Plaintiffs have alleged and for the reasons set forth herein, the Defendants have failed to do so:

  a.  neither healthcare professionals nor Vaccine recipients are being informed by the Defendants, and conditions do not exist ensuring that others will inform them, that the DHHS Secretary "has authorized the emergency use of the [Vaccines]" since they are not being informed of the true meaning of the EUAs, specifically, that the Secretary has *not* determined that the Vaccines are "safe and effective" (notwithstanding the President's widely publicized statements to the contrary, which are amplified daily by countless other governmental and private sector statements that the Vaccines are "safe and effective"), and that instead the DHHS Secretary has only determined that he has "reason to believe" that the Vaccines "may be effective" in treating or preventing SARS-CoV-2 and COVID-19, based on trials of the Vaccines that are not being conducted like any previous trials and are compressed, overlapping, incomplete and in many instances conducted by the Vaccine manufacturers themselves;

  b.  neither healthcare professionals nor Vaccine recipients are being informed by the Defendants, and conditions do not exist ensuring that others will inform them, of "the significant known and potential [ ] risks" of the Vaccines, since there is a coordinated campaign funded with $1 billion to extol the virtues of the Vaccines, and a simultaneous effort to censor information about the inefficacy of the Vaccines in preventing or treating SARS-CoV-2 and COVID-19, Vaccine risks, and injuries and deaths caused by the Vaccine;

  c.  Vaccine recipients are not being informed by the Defendants, who have a financial stake in the intellectual property underlying at least one Vaccine, and who have other financial conflicts of interest, and conditions do not exist ensuring that others will inform them, that there are alternatives to the Vaccines and of their benefits;

d.  Vaccine recipients are not being informed by the Defendants, and conditions do not exist ensuring that others will inform them, of their "option to accept or refuse" the Vaccines, since they have been saturated with unjustified fear-messaging regarding SARS-CoV-2 and COVID-19, psychologically manipulated, and coerced by a system of rewards and penalties that render the "option to [ ] refuse" meaningless; and

e.  Appropriate conditions do not exist for "the monitoring and reporting of adverse events" since only a fraction (as low as 1%) of adverse events are reported to VAERS by physicians fearing liability, and the Defendants have established a parallel reporting system for COVID-19 that is not accessible by Plaintiffs or the rest of the public.

271.  Plaintiffs therefore seek a Declaratory Judgment that: the actions of the Defendants are unlawful and arbitrary, capricious, not in accordance with § 360bbb-3, contrary to constitutional rights, powers, privileges and immunities, and in excess of statutory jurisdiction, authority or limitations; and that the Vaccine EUAs are unlawful, since the DHHS Secretary has not established and maintained the required conditions, thereby nullifying all Vaccine EUAs.

## <u>COUNT IV</u>

### DECLARATORY JUDGMENT
### Customary International Law - Non-Consensual Human Experimentation
### (All Defendants)

272.  Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

273.  All of the Vaccines are experimental, in that they have not completed the usual 10–15-year course of clinical trials that are still ongoing and are not approved by the FDA.  The trials that are underway do not test all applications and risks of the Vaccines, including long-term risks.  Further, the mRNA Vaccines are a novel gene therapy technology that has never before been used in the American population.  Vaccine

recipients are provided with a V-Safe application for their smart phones, unique to COVID-19 Vaccines, which assists the Defendants to collect data on the ongoing Vaccine experiment in the general population, even as the general population is excluded from this information.

274.    Vaccine recipients are not being informed of the risks of the Vaccines, and therefore cannot give informed consent.

275.    Vaccine recipients have been subjected, for over a year, to sustained psychological manipulation regarding SARS-CoV-2 and COVID-19 through fear-based public messaging designed to induce their compliance with draconian countermeasures of questionable constitutionality.   The COVID-19 countermeasures have inflicted incalculable psychological, emotional and economic loss.   In these dire circumstances, the public are now instructed to take the Vaccine in order to regain their freedoms and some semblance of normalcy in their daily lives.   At the same time, they are presented with substantial incentives and rewards for accepting the Vaccines, and penalties such as job loss, suspension or termination from school, and denial of access to performance venues, planes, trains and buses, should they exercise their "option" to refuse the Vaccines.   This is systemic, state-organized coercion of the kind ordinarily reserved to communist and other dictatorial regimes, and it vitiates voluntary consent.

276.    Defendants' acts described herein constitute medical experimentation on non-consenting human subjects in violation of the law of nations.   The customary international law prohibition against non-consensual human experimentation is expressed and defined international treaties and declarations, international judicial decisions, and in the domestic legislation of numerous countries throughout the world, including the

United States. It is widely accepted that experimentation on unknowing human subjects is morally and legally unacceptable.

277.    The deployment of the Vaccines in the foregoing circumstances violates the customary international law norm prohibiting non-consensual human experimentation.

278.    Plaintiffs therefore seek a Declaratory Judgment that the Vaccine EUAs are unlawful, since they violate the customary international law norm prohibiting non-consensual human experimentation, thereby nullifying all Vaccine EUAs.

## COUNT V

### DECLARATORY JUDGMENT
### 45 CFR Part 46 - Protection of Human Subjects; APA
### (All Defendants)

279.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

280.    For all of the foregoing reasons, the deployment of the Vaccines into the general population constitutes an ongoing human experiment, or "clinical trial" for purposes of 45 CFR Part 46, and triggers the mandatory protections of human experiment subjects mandated by this extensive regulation.  The Defendants have failed to implement those protections.

281.    For instance, 45 CFR § 46.405 states that DHHS will conduct or fund research involving children that presents "more than minimal risk" to the children "only if" an Institutional Review Board ("IRB") reviews the proposed experiment and makes certain mandatory findings. One of those findings is that "[t]he risk is justified by the anticipated benefit to the subjects."  The very real and substantial risks of the Vaccines

can *never* be justified when they are administered *en masse* to children under the age of 18, since they have statistically no risk from SARS-CoV-2 and COVID-19.

282.    Plaintiffs therefore seek a Declaratory Judgment that: the actions of the Defendants are unlawful and arbitrary, capricious, not in accordance with § 360bbb-3, contrary to constitutional rights, powers, privileges and immunities, and in excess of statutory jurisdiction, authority or limitations; and that the Vaccine EUAs are unlawful, since they violate 45 CFR Part 46, thereby nullifying all Vaccine EUAs.

## COUNT VI

### MANDAMUS

### 28 U.S.C. § 1361
### (Individual Federal Defendants)

283.    The individual federal defendants have a clear duty to act to ensure the faithful implementation of § 360bbb-3 and 45 CFR Part 46, the provisions of which are mandatory and intended to protect Plaintiffs.

284.    There is "'practically no other remedy.'"  <u>Collin v. Berryhill</u>, 2017 U.S. Dist. LEXIS 78222 at *9, quoting <u>Helstoski v. Meanor</u>, 442 U.S. 500, 505 (1979). Courts have held that the perceived medical urgencies created by COVID-19 itself, and also those created by the decisions, orders and actions of authorities responding to COVID-19, can make it impractical and inappropriate to force a plaintiff seeking mandamus to wait for alternative processes to run their course:

> *Moreover, given the broader context of the COVID-19 pandemic, we agree with the Fifth Circuit that '[i]n mill-run cases, it might be a sufficient remedy to simply wait for the expiration of the TRO, and then appeal an adverse preliminary injunction. In other cases, a surety bond may ensure that a party wrongfully enjoined can be compensated for any injury caused. Those methods would be woefully inadequate here.'*

In re Rutledge, 956 F.3d 1018, (8th Cir. 2020), quoting In re Abbott, 2020 U.S. App. LEXIS 10893 at *14.[13]

285.    Plaintiffs therefore seek mandamus, compelling the individual federal defendants to perform the duties owed to them pursuant to § 360bbb-3 and 45 CFR Part 46.

### COUNT VII

### CIVIL MONEY DAMAGES

**Bivens - Fifth Amendment, Personal Autonomy and Bodily Integrity
(Individual Federal Defendants in their Personal Capacity)**

286.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

287.    The Supreme Court has reminded us:

> *No man in this country is so high that he is above the law. . . . All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it. . . . [And the] Courts of justice are established, not only to decide upon the controverted rights of the citizens against each other, but also upon rights in controversy between them and the government.*

United States v. Lee, 106 U.S. 196, 220 (1882).

288.    Plaintiffs Joel Wood, Brittany Galvin, Aubrey Boone, Snow Mills, Angelia Deselle, Kristi Simmonds, Vidiella A/K/A Shawn Skelton and the Estate of Dovi Sanders Kennedy assert constitutional claims under the Fifth Amendment against the individual federal defendants pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).  "Bivens established that a citizen

---

[13] The Supreme Court subsequently vacated the judgment in In re Abbott, and remanded to the Fifth Circuit with instructions to dismiss the case as moot, following the Texas Governor's relaxation of his order restricting abortion as a non-essential surgical procedure, however the decision did not turn on an analysis of mandamus. *See*, Planned Parenthood Ctr. for Choice v. Abbott, 2021 U.S. LEXIS 647.

suffering a compensable injury to a constitutionally protected interest [can] invoke the general federal question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978).

Personal Autonomy and Bodily Integrity

289.    In Planned Parenthood v. Casey, 505 U.S. 833, 857 (1992), the U.S. Supreme Court stated:

> *Roe, however, may be seen not only as an exemplar of Griswold liberty, but as a rule (whether or not mistaken) of personal autonomy and bodily integrity, with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection. If so, our cases since Roe accord with Roe's view that a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims. Cruzan v. Director, Mo. Dept. of Health, 497 U.S. 261, 278, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990); cf., e. g., Riggins v. Nevada, 504 U.S. 127, 135, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992); Washington v. Harper, 494 U.S. 210, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990); see also, e. g., Rochin v. California, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952); Jacobson v. Massachusetts, 197 U.S. 11, 24-30, 49 L. Ed. 643, 25 S. Ct. 358 (1905).*

To reiterate: "a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims."

290.    The Defendants' purported interest in the protection of lives through mass injection of the Vaccines falls short of justifying "any plenary override" of Plaintiffs' "individual liberty claims."

291.    The Supreme Court has stated that the protected liberty claims inherent in personal autonomy and bodily integrity include both the right *to be free from* unwanted medical intervention, and the right *to obtain* medical intervention:

> *As the joint opinion acknowledges, ante, 505 U.S. at 857, this Court has recognized the vital liberty interest of persons in refusing unwanted medical*

*treatment.  Cruzan v. Director, Mo. Dept. of Health, 497 U.S. 261, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990). Just as the Due Process Clause protects the deeply personal decision of the individual to refuse medical treatment, it also must protect the deeply personal decision to obtain medical treatment, including a woman's decision to terminate a pregnancy.*

Id. at 927.

292.    The Vaccine-injured Plaintiffs were told and believed that they were allowing a "safe and effective" and FDA-approved vaccine, when in fact they were participating in a medical experiment involving an untested, unapproved, new intervention based on genetic manipulation.  "This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment.  [ ] The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment."  Cruzan, 497 U.S. at 269.

293.    Defendants are liable for the alleged conduct in that Defendants, acting under color of law and authority as United States officials, personally and through their own actions, with deliberate indifference, set the conditions for, committed, directed, ordered, confirmed, ratified, acquiesced, had command responsibility for, aided and abetted, conspired to, and/or otherwise directly or indirectly caused or facilitated, medical experimentation on Plaintiffs Brittany Galvin, Aubrey Boone, Snow Mills, Angelia Deselle, Kristi Simmonds, Vidiella A/K/A Shawn Skelton and the Estate of Dovi Sanders Kennedy without their informed consent, depriving them of their clearly established, constitutionally protected liberty interest in personal autonomy and bodily integrity, including their right to refuse medical treatment, of which a reasonable person would

have known, thereby injuring them physically, emotionally and psychologically, and in the case of Plaintiff Kennedy causing her death.

<u>Right to Work, Liberty Interest to Engage in Business Activity</u>

294.    The 14th Amendment guarantees a citizen's right to work for a living and support herself by pursuing a chosen occupation.  <u>Board of Regents v. Roth</u>, 408 U.S. 564, 572 (1972); <u>Truax v. Raich</u>, 239 U.S. 33, 41 (1915) ("It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [14[th]] Amendment to secure.").

295.    Without the right to work in a profession of our own choosing, rather than being directed into a profession by state bureaucrats or being directed not to work and placed on state subsidies, we are slaves.

296.    Defendants are liable for the alleged conduct in that Defendants, acting under color of law and authority as United States officials, personally and through their own actions, with deliberate indifference, set the conditions for, committed, directed, ordered, confirmed, ratified, acquiesced, had command responsibility for, aided and abetted, conspired to, and/or otherwise directly or indirectly caused or facilitated, the violations of law set forth herein, which have deprived Plaintiff Wood of his clearly established, constitutionally protected liberty interest in working in the profession of his own choosing, of which a reasonable person would have known, thereby injuring him economically, emotionally and psychologically.

## VI.  PRAYER FOR RELIEF

WHERFORE, and for the foregoing reasons, Plaintiffs request that this Court:

(A)     Declare that the exigencies underlying the DHHS Secretary's declaration of a "public health emergency" under § 360bbb-3(b) never existed, or if they ever did exist, have since ceased to exist, and in the absence of those exigencies, the declaration of the "public health emergency", the extensions thereof and the Vaccine EUAs are unlawful, null, void and terminated;

(B)     Declare that the DHHS Secretary and his delegee the Acting Commissioner of the FDA have failed to meet the criteria for issuing the Vaccine EUAs under § 360bbb-3(c), and therefore the Vaccine EUAs are unlawful, null, void and terminated;

(C)     Declare that the DHHS Secretary has failed to meet the conditions of authorization under § 360bbb-3(e), and therefore the Vaccine EUAs are unlawful, null, void and terminated;

(D)     Declare that the Defendants are engaged in non-consensual human experimentation in violation of the law of nations;

(E)     Declare that the Defendants have failed to meet the requirements of 45 CFR Part 46 for the protection of human subjects in medical experimentation;

(F)     Enjoin the enforcement of the challenged declaration of a "public health emergency" and further renewals thereof, the enforcement of the Vaccine EUAs, and further extensions of the Vaccine EUAs to children under the age of 16;

(G)     Award to the Plaintiffs named in Count VII, under <u>Bivens</u>, compensatory damages, including both economic and non-economic damages, against the individual federal Defendants; and

(H)     Award Plaintiffs such other and additional relief as the Court deems fit.

## VII.  JURY DEMAND

Plaintiffs request a jury trial on all issues so triable, including without limitation the quantum of damages.

/ / / / / /

/ / / / / /

110

Dated: June 10, 2021.                    Respectfully submitted,

/s/ *Lowell H. Becraft, Jr.*
Lowell H. Becraft, Jr.
Attorney for Plaintiffs
ASB 5005-F66L
403C Andrew Jackson Way
Huntsville, AL 35801
Phone: 256-533-2535
becraft@hiwaay.net

/s/ *Joseph S. Gilbert*
Joseph S. Gilbert
(Nevada Bar No. 9033)
Joey Gilbert & Associates
 D/B/A Joey Gilbert Law
405 Marsh Avenue
Reno, Nevada 89509
Telephone: 775-284-7700
joey@joeygilbertlaw.com
Attorney for Plaintiffs
*(Admission Pending Pro Hac Vice)*

/s/ *Michael A. Hamilton*
Michael A. Hamilton
(KY Bar No. 89471)
HAMILTON & ASSOCIATES
1067 N. Main St, PMB 224
Nicholasville, KY 40356
Tel. 859-655-5455
attymike@protonmail.com
Attorneys for Plaintiffs
*(Admission Pending Pro Hac Vice)*

/s/ *F.R. Jenkins*
F. R. Jenkins
(Maine Bar No. 004667)
Meridian 361 International Law
Group, PLLC
97A Exchange Street, Suite 202
Portland, ME 04101
Tel. (866) 338-7087
jenkins@meridian361.com
Attorney for Plaintiffs
(*Admission Pending Pro Hac Vice*)

/s/ *Robert J. Gargasz*
Robert J. Gargasz
(Ohio Bar ID: 0007136)
1670 Cooper Foster Park Rd.
Lorain, Ohio 44053
Phone: (440) 960-1670
Email: rjgargasz@gmail.com
Attorney for Plaintiffs
*(Admission Pending Pro Hac Vice)*

/s/ *N. Ana Garner*
N. Ana Garner
Garner Law Firm
1000 Cordova Place #644
Santa Fe, NM 87505
Phone: 505.930-5170
garnerlaw@yahoo.com
Attorney for Plaintiffs
*(Admission Pending Pro Hac Vice)*

/s/ *Thomas Renz*
Thomas Renz
(Ohio Bar ID: 98645)
1907 W. State St. #162
Fremont, OH 43420
Phone: 419-351-4248
Email: renzlawllc@gmail.com
Attorney for Plaintiffs
*(Admission Pending Pro Hac Vice)*

/s/ *Jonathan Diener*
Jonathan Diener
P.O. Box 27
Mule Creek, NM 88051
(575) 388-1754
jonmdiener@gmail.com
Attorney for Plaintiffs
*(Admission Pending Pro Hac Vice)*

CERTIFICATE OF SERVICE

I hereby certify that on this date, June 10, 2021, I electronically transmitted this pleading to the Clerk of the Court using the CM/ECF system for filing, which will send notification of such filing to the following counsel for the Defendants:

Don B. Long, III
Assistant United States Attorney United States Attorney's Office
Northern District of Alabama
1801 Fourth Avenue North
Birmingham, Alabama 35203

James W. Harlow
Trial Attorney, Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044-0386

 /s/ *Lowell H. Becraft, Jr.*
Lowell H. Becraft, Jr.

Thomas Renz