FILED

2022 Aug-25  PM 01:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **Dr. David Calderwood, Joseph Makowski, Michael Nelson, and Joseph Leahy,** Plaintiffs, | |
| **v.** | **Case No. 2:21-cv-702-CLM** |
| **The United States of America, Xavier Becerra,** *Secretary of the U.S. Department of Health and Human Services*, **U.S. Department of Health and Human Services, Dr. Janet Woodcock,** *Acting Commissioner of the Food and Drug Administration*, **and Food and Drug Administration,** Defendants. | |

## MEMORANDUM OPINION AND ORDER

This case is about emergency authorization for COVID-19 vaccines and executive orders that imposed vaccine mandates on federal contractors and federal employees. Two federal civilian employees, a federal contractor's employee, and a physician sued to challenge several agency actions of the Secretary of the Department of Health and Human Services and of the Food and Drug Administration under the Emergency Use Authorization statute, 21 U.S.C. § 360bbb-3. They also seek to challenge the constitutional and statutory validity of the President's Executive Orders 14042 (the federal-contractor mandate) and 14043 (the federal-employee mandate).

But the Court cannot address the merits of these COVID-related actions because, as explained below, the Court lacks subject-matter jurisdiction over the plaintiffs' claims. So the Court grants the defendants' motion to dismiss (doc. 38) and dismisses the plaintiffs' operative amended complaint (doc. 32-1).

## BACKGROUND

The Court lays out this case in three parts. First, the EUA statute and the defendants' actions under it. Second, the executive orders that imposed vaccine mandates on federal contractors and federal employees. And third, the factual and procedural histories.

## I.     The Emergency Use Authorization statute

Under the Public Health Service Act, "[a] manufacturer of a biologic" such as a vaccine "may market the drug only if the FDA has licensed it pursuant to either of two review processes set forth in § 262." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1670 (2017) (referring to 42 U.S.C. § 262). But "[n]otwithstanding" the PHSA's licensing requirements, the Emergency Use Authorization statute permits the HHS Secretary to authorize the immediate marketing of "biological product[s] intended for use in an actual or potential emergency" under limited circumstances. 21 U.S.C. § 360bbb-3(a)(1).[1] Three EUA-statute provisions warrant discussion: the emergency-declaration provision; the criteria-for-issuance provision; and the conditions-of-authorization provisions.[2]

**A. The emergency-declaration provision**. The EUA statute authorizes the HHS Secretary to determine "that there is a public health emergency . . . that affects, or has a significant potential to affect, national security or the health and security of United States citizens living abroad" and "involves a biological . . . agent or agents, or a disease or condition that may be attributable to such agent or agents." *Id.* § 360bbb-3(b)(1)(C). And that may serve as "the basis of" the HHS Secretary's declaration that "circumstances exist justifying the authorization" of biological products such as vaccines. *Id.* § 360bbb-3(b)(1).

The HHS Secretary determined in February 2020 "that there is a public health emergency" based on SARS-CoV-2, which causes COVID-19. Determination of Public Health Emergency, 85 Fed. Reg. 7,316, 7,317

---

[1] "FDA's licensing authority under 21 U.S.C. § 262 and its EUA authority under 21 U.S.C. § 360bbb-3 are independent of each other; FDA's licensing authority does not affect its EUA authority and vice versa." *Children's Health Defense v. U.S. Food & Drug Administration*, No. 21-6203, 2022 WL 2704554, at *1 (6th Cir. July 12, 2022).

[2] Also relevant is the provision that the Secretary's "[a]ctions under the authority of" the EUA statute "are committed to agency discretion." 21 U.S.C. § 360bbb-3(i).

(Feb. 7, 2020). The next month, the Secretary "declared that circumstances exist justifying the authorization of emergency use of drugs and biological products during the COVID-19 pandemic." Emergency Use Authorization Declaration, 85 Fed. Reg. 18,250, 18,250–51 (April 1, 2020).

**B. The criteria-for-issuance provision**. The Secretary may issue an EUA for a specific product "only if" three criteria (as relevant here) are satisfied:

> (1) that an agent referred to in a declaration under subsection (b) can cause a serious or life-threatening disease or condition;

> (2) that, based on the totality of scientific evidence available to the Secretary, including data from adequate and well-controlled clinical trials, if available, it is reasonable to believe that—

>> (A) the product may be effective in diagnosing, treating, or preventing—

>>> (i) such disease or condition; or

>>> (ii) a serious or life-threatening disease or condition caused by a product authorized under this section, approved or cleared under this chapter, or licensed under section 351 of the Public Health Service Act, for diagnosing, treating, or preventing such a disease or condition caused by such an agent; and

>> (B) the known and potential benefits of the product, when used to diagnose, prevent, or treat such disease or condition, outweigh the known and potential risks of the product, taking into consideration the material threat posed by the agent or agents identified in a declaration under subsection (b)(1)(D), if applicable;

> (3) that there is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition . . . .

21 U.S.C. § 360bbb-3(c)(1)–(3).

**C. The conditions-of-authorization provision**. Finally, the EUA statute requires "the Secretary, to the extent practicable given the applicable circumstances," to establish "appropriate conditions" for EUA products as "the Secretary finds necessary or appropriate to protect the public health." *Id.* § 360bbb-3(e)(1)(A). Those include conditions that ensure healthcare professionals and vaccine recipients receive certain information about the product. *Id.* § 360bbb-3(e)(1)(A)(i)–(ii). And also "conditions for the monitoring and reporting of adverse events associated with the emergency use of the product." *Id.* § 360bbb-3(e)(1)(A)(iii).

Beginning in December 2020, the FDA issued EUAs for vaccines from Pfizer, Moderna, and Janssen. (Docs. 40-6, 40-14, 40-20). And in August 2021, the FDA approved Pfizer's biologics license application for its COVID-19 vaccine, Comirnaty, for persons 16 and older. (Doc. 41-1).[3]

## II.   The executive orders imposing vaccine mandates

On his first day in office, President Biden issued Executive Order 13991 establishing the Safer Federal Workforce Task Force. Protecting the Federal Workforce and Requiring Mask-Wearing, 86 Fed. Reg. 7,045 (Jan. 25, 2021). That executive order explained that the SFWTF's mission would be to "provide ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic." *Id.* at 7,046. And that order set the stage for the vaccine mandates.

Months later, President Biden announced several measures "to require more Americans to be vaccinated."[4] One was Executive Order 14042, the federal-contractor mandate. Another was Executive Order 14043, the federal-employee mandate.

### A.   Executive Order 14042 (federal-contractor mandate)

President Biden issued Executive Order 14042 on September 9, 2021. Ensuring Adequate COVID Safety Protocols for Federal

---

[3] Despite full authorization under the PHSA for Comirnaty, the Pfizer EUA persists for a two-dose series for individuals 5 and older, and for a third dose for certain individuals. (Doc. 41-2).

[4] Remarks by President Biden on Fighting the COVID-19 Pandemic, White House (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ (last visited Aug. 25, 2022).

Contractors. 86 Fed. Reg. 50,985 (Sept. 14, 2021). The President stated that the order would "promote[] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument." *Id.* at 50,985 § 1.

Executive Order 14042 directs departments and agencies, "to the extent permitted by law," to include a clause in federal contracts that requires compliance with guidance that the SFWTF would publish and the Office of Management and Budget's director would approve. *Id.* § 2(a).

On September 24, the SFWTF issued the contemplated guidance.[5] That guidance imposed a vaccine mandate: "Covered contractors must ensure that all covered contractor employees are fully vaccinated for COVID-19, unless the employee is legally entitled to an accommodation." SFWTF EO 14042 Guidance at 5. It also ordered compliance with CDC guidance on masking and physical distancing, *id.* at 6, and the designation of a person who would oversee the workplace-safety-protocol implementation, *id.* at 7–8. The OMB Acting Director approved the guidance after determining that it "will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042, 86 Fed. Reg. 53,691, 53,692 (Sept. 28, 2021).[6]

---

[5] Safer Federal Workforce Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors ("SFWTF EO 14042 Guidance") (Sept. 24, 2021), https://www.saferfederalworkforce.gov/downloads/Draft%20contractor%20guidance%20doc_20 210922.pdf (last visited Aug. 25, 2022).

[6] The SFWTF issued revised (but substantially similar) guidance that included the vaccine mandate on November 10. Safer Federal Workforce Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors (Nov. 10, 2021), https://www.saferfederalworkforce.gov/downloads/Guidance%20for%20Federal%20Contractors _Safer%20Federal%20Workforce%20Task%20Force_20211110.pdf (last visited Aug. 25, 2022). And the OMB Acting Director approved the revised version on November 16. Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, 86 Fed. Reg. 63,418, 63,423 (Nov. 16, 2021). The Court assumes that November 5 is the relevant time for Article III standing purposes, so the Court will rely on the September 24 SFWTF guidance.

After the federal-contractor vaccine mandate went into effect, a federal district court entered a nationwide injunction barring enforcement of "the vaccine mandate for federal contractors and subcontractors in all covered contracts in any state or territory of the United States of America." *See Georgia v. Biden*, 574 F. Supp. 3d 1337, 1357 (S.D. Ga. 2021), *appeal docketed*, No. 21-14269 (Dec. 10, 2021). The Eleventh Circuit denied the motion to stay the injunction and expedited the case. *Georgia v. Biden*, No. 21-14269 (11th Cir. Dec. 17, 2021). So the federal-contractor mandate remains enjoined nationwide.

## B.   Executive Order 14043 (federal-employee mandate)

President Biden also issued Executive Order 14043 on September 9. Requiring Coronavirus Disease 2019 Vaccination for Federal Employees, 86 Fed. Reg. 50,989 (Sept. 14, 2021). The order directs agencies to "implement, to the extent consistent with applicable law, a program to require COVID-19 vaccination for all of its Federal employees, with exceptions only as required by law." *Id.* at 50,990 § 2. And it ordered the SFWTF to issue guidance on implementation. *Id.*

A federal district court has enjoined the government from enforcing Executive Order 14043 nationally. *See Feds for Med. Freedom v. Biden*, No. 3:21-cv-356, 2022 WL 188329, at *8 (S.D. Tex. Jan. 21, 2022). A Fifth Circuit motions panel declined to stay the injunction pending appeal. 25 F.4th 354, 355 (5th Cir. 2022) (mem.) (carrying the motion with the case and expediting the appeal). Then a merits panel vacated the district court's injunction after holding that the Civil Service Reform Act, 5 U.S.C. § 1101 *et seq.*, precluded the district court's subject-matter jurisdiction. 30 F.4th 503, 511 (5th Cir. 2022). But before the panel's mandate issued, the full Fifth Circuit vacated the panel's opinion and ordered rehearing en banc. 37 F.4th 1093 (5th Cir. 2022) (en banc) (mem.). So the federal-employee mandate remains enjoined nationwide.

## III.   Factual and procedural backgrounds

The Court begins this section by discussing the plaintiffs' claims. Then it covers the plaintiffs' background allegations. And then the defendants' factual attacks on justiciability.

### A.    The plaintiffs' claims

The plaintiffs raise six claims in the operative amended complaint. (Doc. 32-1).

**Count I** is an APA challenge to the HHS Secretary's ongoing emergency declaration. (Doc. 32-1 at 57). *See* 21 U.S.C. § 360bbb-3(b)(1)(C). The plaintiffs allege that the circumstances that supported the Secretary's February 2020 emergency declaration no longer exist (and they imply that the circumstances *never* justified the original declaration). (*Id.* at 58–59 ¶¶ 176–77). And they appear to allege that the Court should terminate the emergency declaration and the EUAs. (*Id.* at 59 ¶ 177).

**Count II** is a substantive-due-process constitutional challenge to Executive Orders 14042 and 14043. (*Id.* at 59). They request injunctive and declaratory relief barring "any mandate or action that would lead to the mandate of the COVID-19 vaccines." (*Id.* at 60 ¶ 181).

**Count III** is an APA challenge to the EUAs based on the defendants' failure to comply with the criteria-for-issuance provision. (*Id.* at 60). The plaintiffs allege that: (1) COVID-19 is not "a serious or life-threatening disease or condition"; (2) the Secretary didn't rely on "adequate and well-controlled clinical trials"; (3) it was not "reasonable to believe" that the vaccines "may be effective"; (4) it was not "reasonable to believe" that "the known and potential benefits of the product . . . outweigh the known and potential risks of the product"; and (5) there were "adequate, approved, and available alternative[s] to the product for diagnosing, preventing, or treating" COVID-19. (Doc. 32-1 at 60–61 ¶ 183). *See* 21 U.S.C. § 360bbb-3(c).[7] Based on these allegations, they seek a declaration that the EUAs are invalid. (Doc. 32-1 at 61 ¶ 184).

**Count IV** is an APA challenge to the EUAs based on the defendants' failure to comply with the conditions-of-authorization provision. (*Id.* at 61). *See* 21 U.S.C. § 360bbb-3(e). The plaintiffs allege that the defendants have arbitrarily and capriciously failed to provide

---

[7] The plaintiffs' complaint doesn't make clear whether they are trying to allege that those criteria were not satisfied at the times the defendants issued the relevant EUAs or, instead, that those findings proved later to be incorrect. In an APA challenge to agency action, the Court's review is "limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).

healthcare professionals and vaccine recipients with information about the vaccines. (Doc. 32-1 at 61–62 ¶ 186). And that the defendants have not established appropriate conditions for monitoring and reporting adverse events. (*Id.*). Based on these allegations, the plaintiffs seek a declaration that the EUAs are invalid. (Doc. 32-1 at 62–63 ¶ 187).

**Count V** seeks a writ of mandamus "compelling the individual federal defendants to perform the duties owed to them" under the EUA statute. (*Id.* at 63 ¶ 190). *See* 21 U.S.C. § 360bbb-3.

**Count VI** seeks two declarations. (Doc. 32-1 at 64). The first is a declaration that the executive orders "are invalid to authorize compulsory EUA vaccinations." (*Id.* ¶ 192). The second is a declaration that the EUA statute and the "constitutional right to bodily integrity" include a right "to refuse without adverse consequences any EUA vaccine." (*Id.*).

These six counts fit into three categories. First, Counts I, III, IV, and part of VI challenge the HHS Secretary's and the FDA's actions under the EUA statute. Second, Counts II and the other part of VI challenge the executive orders on constitutional and statutory grounds. And third, Count V seeks a writ of mandamus compelling the defendants to comply with the EUA statute.

### B.    The plaintiffs' background allegations

Thirty-one plaintiffs have participated in this lawsuit at one point or another.[8] Four remain: Joseph Makowski, Michael Nelson, Joseph Leahy, and Dr. David Calderwood.[9] The Court discusses these plaintiffs below.

**Joseph Makowski** "works for a federal contractor that provides services on a federal installation." (*Id.* at 6 ¶ 15). Makowski's physician, co-plaintiff Dr. Calderwood, advised him "that because of his medical problems, he should not take any Vaccine." (*Id.*). And his employer "issued a mandate declaring that he must be vaccinated no later than November 8, 2021." (*Id.*). The complaint does not explain whether Makowski is a "covered contractor employee" or whether his employer is a "covered contractor" under the SFWTF guidance that imposed the federal-

---

[8] (Docs. 1, 10, 32-1).
[9] (Docs. 32-1, 50, 51).

contractor vaccine mandate. *See* SFWTF EO 14042 Guidance at 3–5. Nor does it identify who his employer is or explain whether his employer's mandate is based on the federal-contractor vaccine mandate.

**Dr. David Calderwood** is Makowski's doctor. (*Id.* at 6 ¶ 14). He "advised Makowski to not take any of the vaccines at issue in this complaint due to his health condition(s)." (*Id.*). He claims authority to assert his Makowski's rights. (*Id.*).

**Michael Nelson** works "at the Marshall Space Flight Center." (Doc. 32-1 at 7 ¶ 19). As a federal employee, he was set to "confront the vaccine mandate" from Executive Order 14043 in November 2021. (*Id.*).

**Joseph Leahy** also works "at the Marshall Space Flight Center" as a federal civilian employee (*Id.*). So he was also set to "confront the vaccine mandate" from Executive Order 14043 in November 2021. (*Id.*).

### C.   The defendants' factual attacks on justiciability

The defendants have moved to dismiss under Rule 12(b)(1) (jurisdiction) and under Rule 12(b)(6) (failure to state a claim). (Doc. 38). Among other things, the defendants attack jurisdiction by arguing that none of the four plaintiffs has Article III standing. (*See* doc. 42 at 2).

To challenge standing, the defendants present a "factual attack" that "challenge[s]" jurisdiction "irrespective of the pleadings." *Makro Capital of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1258 (11th Cir. 2008) (citation omitted). "In resolving a factual attack, the district court 'may consider extrinsic evidence such as testimony and affidavits.'" *Id.* (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 925 n.5 (11th Cir. 2003)).

The defendants' "motion implicates the fundamental question of [the] trial court's jurisdiction," and the "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case without presuming the truthfulness of the plaintiff's allegations." *Id.* (citation and quotation marks omitted). In other words, the Court will "apply a summary judgment standard when ruling on the motion to dismiss as a factual attack on subject matter jurisdiction." *Miccosukee Tribe of Indians of Fla. v. EPA*, 105 F.3d 599, 603 (11th Cir. 1997).

For the EUA-statute claims, the defendants argue that plaintiffs Makowski, Nelson, and Leahy did not and do not face any material risk of harm traceable to the EUA-statute actions. (Doc. 42 at 13–14).[10] And for the executive-order claims, the defendants argue that there was never a material risk that these three plaintiffs would have to take a COVID-19 vaccine (based on the ready availability of exemption processes). (*Id.* at 18, 22–23). To support these arguments, the defendants rely on affidavits about vaccine-authorization processes (doc. 41 at 7 ¶ 15) and the plaintiffs' efforts to obtain exemptions (docs. 37-3, 37-4, 39).

### D.    The procedural history of this case

This case began when several individual plaintiffs and America's Frontline Doctors moved in May 2021 for a temporary restraining order. (Doc. 1). They sought to enjoin the vaccine EUAs for children under 16. (*Id.*). The Court denied it. (Doc. 3).

After that, the plaintiffs filed their complaint in June 2021, seeking to invalidate the emergency declaration and EUAs. (Doc. 10). They moved for a preliminary injunction. (Doc. 15). But the defendants responded with a motion to dismiss. (Doc. 23). So the plaintiffs withdrew their injunction motion and sought leave to amend. (Docs. 26, 27, 28, 29).

The plaintiffs filed an amended complaint on October 29, 2021. (Doc. 30). On November 4, they asked for leave to file a "revised amended complaint" that would fix typos and drop one claim. (Doc. 32). And they attached the revised amended complaint. (Doc. 32-1). The Court treats the revised amended complaint as the operative pleading. (*Id.*).[11]

With new allegations and claims, the plaintiffs again sought a preliminary injunction. (Doc. 37). And the defendants sought dismissal for lack of jurisdiction and failure to state a claim. (Doc. 38). With full briefing on the preliminary-injunction motion and the motion to dismiss, the Court

---

[10] The defendants oppose Dr. Calderwood's third-party standing by pointing out that Makowski (his only known patient) is not hindered in his "ability to protect" his "own interests." *See Powers v. Ohio*, 499 U.S. 400, 411 (1991). (Doc. 42 at 12).

[11] After they sought leave to file the "revised amended complaint," (doc. 32), the Court granted the plaintiffs leave on November 5 to do so and ordered them "to file the corrected amended complaint (doc. 32-1) as a separate docket entry." (Doc. 33). They never did. But the defendants treated the revised amended complaint as operative. (Doc. 42 at 4 n.4). The Court will too.

heard argument. (Doc. 49). After the hearing, the plaintiffs withdrew their preliminary-injunction motion. (Doc. 50). And the parties jointly moved to dismiss several parties. (*Id.*).

The Court turns now to decide whether this case is justiciable.

## DISCUSSION

Article III of the Constitution limits the federal judicial power to "Cases" and "Controversies." U.S. CONST. art. III, § 2. This means "[a]t all stages of litigation, a plaintiff must maintain a personal interest in the dispute." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). It also "prevent[s] the federal courts from issuing advisory opinions." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). And "[f]ederal courts have an independent obligation to ensure that subject-matter jurisdiction exists before reaching the merits of a dispute." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

This case is not justiciable. The Court explains why in three parts. First, the plaintiffs lack standing to pursue their challenges to the EUA-statute actions (Counts I, III, IV, and VI in part) and the executive orders (Counts II and the VI's other part). Second, the Court doesn't have jurisdiction over the plaintiffs' request for mandamus relief (Count V) because the plaintiffs have not shown that their "right to the writ is clear and indisputable." *Serrano v. U.S. Att'y Gen.*, 655 F.3d 1260, 1263 (11th Cir. 2011). And third, reaching the merits would require the Court to write an impermissible advisory opinion.

## I.   The plaintiffs lack Article III standing.

"[A]n essential and unchanging part of the case-or-controversy requirement of Article III" is that the plaintiff must establish standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, the plaintiff must show "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020). Put another way, the plaintiff must establish "personal injury fairly traceable to the defendant's allegedly unlawful conduct and

likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).

"The type of relief sought also bears on whether the plaintiff has standing." *Attala Cnty., Miss. Branch of NAACP v. Evans*, 37 F.4th 1038, 1042 (5th Cir. 2022). "[W]hen plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are 'certainly impending.'" *Jacobson*, 974 F.3d at 1245 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)). In other words, the plaintiff must establish "a material risk" of future harm. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 928 (11th Cir. 2020) (en banc).[12]

Here, the plaintiffs seek prospective declaratory and injunctive relief, so they must establish "a real and immediate threat of future harm." *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).[13]

The plaintiffs bear the burden to establish standing. *Lujan*, 504 U.S. at 561. And they cannot do so "in gross," *Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 734 (2008). To the contrary, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (quotation marks omitted).

With that framework, the Court proceeds in three parts. First, the Court explains why it assumes November 5, 2021, is the date on which the plaintiffs must have had standing. Second, the Court explains why the plaintiffs lack standing to challenge the executive orders. And third, the Court explains why the plaintiffs lack standing to challenge the defendants' EUA-statute actions.

---

[12] The plaintiffs do not have to show "that it is literally certain that the harms they identify will come about," but they must do more than make mere "allegations of *possible* future injury." *Clapper*, 568 U.S. at 409, 414 n.5 (quotation marks and alteration omitted).

[13] A past wrong is relevant to "whether there is a real and immediate threat of repeated injury," but "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

### A.    The Court assumes that November 5, 2021, is the relevant date for establishing Article III standing.

The Court must first decide the date on which to judge the plaintiffs' Article III standing: June 10, 2021, when the plaintiffs filed their original complaint (doc. 10) or November 5, 2021, when the Court granted the plaintiffs' motion to accept their revised amended complaint, making it operative (docs 32-1, 33). The Court assumes the latter: November 5th.

It's well established that Plaintiffs must have had standing when they filed their original complaint. *See, e.g.*, *Lujan*, 504 U.S. at 569 n.4 ("The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*."); *Friends of the Earth, Inc. v. Laidlaw Ent'l Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (courts have "an obligation to assure ourselves that [the plaintiff] had Article III standing at the outset of the litigation").

But also well-established is the "general rule" that "an amended complaint supersedes and replaces the original complaint unless the amendment specifically refers to or adopts the earlier pleading." *Varnes v. Local 91, Glass Bottle Blowers Ass'n*, 674 F.2d 1365, 1370 n.6 (11th Cir. 1982); *see also Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007). And the Supreme Court (although in a different context) has stated that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007); *id.* at 474 n.6 & 475 (holding that the plaintiff "plead[ed] away jurisdiction" by abandoning the original factual basis for jurisdiction). As Justice Scalia, who later wrote *Rockwell*, put it: "We have repeatedly recognized that what is required for litigation to continue is essentially identical to what is required for litigation to begin: There must be a justiciable case or controversy as required by Article III." *Friends of the Earth*, 528 U.S. at 212 (Scalia, J. dissenting).

This Court has not found a definitive answer to this question from the Supreme Court or the Eleventh Circuit, and the parties did not meaningfully brief it. So the Court will use the date of the operative complaint (November 5, 2021) from this point on to determine whether

the plaintiffs present a justiciable case or controversy as required by Article III. That said, the Court would reach the same conclusion if it used the date the complaint was filed (June 10, 2021) because, at the time, the risk that the defendants' actions would harm the plaintiffs was exceedingly "speculative." *Clapper*, 568 U.S. at 401.

### B. The plaintiffs lack standing to challenge Executive Order 14042 and Executive Order 14043.

The plaintiffs challenge the executive orders constitutionally (Count II) and statutorily (Count VI in part). But the plaintiffs lack standing because they have not shown that they faced a "certainly impending" risk of vaccine-mandate enforcement. *Id.*

### 1. The individual defendants lack standing.

In the operative amended complaint, the individual plaintiffs allege that each of them "fac[es] a COVID vaccine mandate." (Doc. 32-1 at 1 ¶ 1). According to that complaint, Makowski works for a federal contractor who "issued a mandate," merely implying that his employer issued the mandate under Executive Order 14042. (*Id.* at 6 ¶ 15). And both Nelson and Leahy are federal employees who were set to "confront" a mandate under Executive Order 14043. (*Id.* at 7 ¶ 19). The two future injuries the plaintiffs allege are forced vaccination and threats to their continued employment. (Doc. 32-1 at ¶¶ 1, 15, 19, 32, 181, 192).

The defendants make a "factual attack" on the individual plaintiffs' standing, so the Court "may consider extrinsic evidence such as testimony and affidavits." *Makro*, 543 F.3d at 1258. Based on available evidence, the Court finds that the ready availability of exemptions from the vaccine mandates (including Nelson's and Leahy's submitting exemption requests) forecloses a personal stake in the legality of the orders.

To begin, the orders contemplated exemptions. Executive Order 14042 directed departments and agencies to include a compliance clause in contracts "to the extent permitted by law." 86 Fed. Reg. at 50,985 § 2(a). And the SFWTF's guidance made room for exemptions: "Covered contractors must ensure that all covered contractor employees are fully vaccinated for COVID-19, *unless the employee is legally entitled to an accommodation*." SFWTF EO 14042 Guidance at 5 (emphasis added).

Likewise, Executive Order 14043 directed agencies "to require COVID-19 vaccination for all of its Federal employees, *with exceptions only as required by law*." 86 Fed. Reg. at 50,990 § 2 (emphasis added).

### i.   Nelson and Leahy

At the time of the operative complaint, Nelson and Leahy had submitted religious-exemption requests. The defendants submitted a declaration from those plaintiffs' employer (NASA) explaining that Nelson submitted an exemption request on October 15 and that "as long as [his] exception request remains pending," Nelson "will not be disciplined for being unvaccinated." (Doc. 39 at 3–4 ¶¶ 10–11). The declaration similarly explained that Leahy submitted an exemption request on September 20 and that he "will not be disciplined for being unvaccinated" before NASA processes his request. (*Id.* at 3 ¶¶ 7–8).

Nelson and Leahy don't dispute these facts. Rather, Nelson submitted his own declaration saying that he and Leahy submitted exemption requests and, on November 19, both requests remained pending. (Doc. 37-4 at 2).[14] So both were pending on November 5.

Based on these undisputed facts, the plaintiffs have not carried their burden to establish that they faced a "certainly impending" threat of forced vaccination or any adverse employment action. *See Clapper*, 568 U.S. at 401. And any fear that their exemption requests would be denied and that they would then face either forced vaccination or an adverse employment action relies on a "speculative" and "attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Id.* at 409–10. So Nelson and Leahy lack

---

[14] In fact, their requests are *still* pending. Soon after the federal court enjoined EO 14043 enforcement, the SFWTF instructed agencies to stop enforcing the vaccine mandate and to pause processing requests. (*See* doc. 44 at 7 n.5 (discussing SFWTF guidance as of January 24)). And on August 17, the SFWTF issued updated guidance directing agencies, among other things, to refrain from asking employees and potential employees about vaccination status; to not process exemption requests; and to hold any pending disciplinary actions in abeyance. SFWTF, Frequently Asked Questions Related to Compliance with the Applicable Preliminary Nationwide Injunction on Implementation and Enforcement of the Vaccination Requirement Pursuant to Executive Order 14043 (Aug. 17, 2022), https://www.saferfederalworkforce.gov/downloads/FAQs_compliance_injunction_EO%2014043_20220124.pdf (last visited Aug. 25, 2022). This guidance underscores the Court's view that this case calls for an impermissible advisory opinion. *See* Section III, *infra*, at 24.

Article III standing to challenge Executive Order 14043's federal-employee mandate.

### ii. Makowski

Assuming that Executive Order 14042 applies to Makowski, the plaintiffs have not met their burden to establish that Makowski has standing to seek prospective relief against the executive order.

On November 5, Makowski had reason to know that he would need a medical exemption and that such exemptions were readily available. The plaintiffs alleged in the operative complaint the "Makowski's physician, Dr. Calderwood, has advised that because of his medical problems, he should not take any Vaccine." (Doc. 32-1 at 6 ¶ 15). Makowski suggested in his November 18 declaration that he intended to seek "a medical and/or religious exemption." (Doc. 37-3 at 3). And even though he apparently didn't seek an exemption until November 21, (doc. 43 at 13), he *could have* done so on or before November 5. After all, the government had broadcasted the exemptions' availability in Executive Order 14042 and the SFWTF EO 14042 Guidance.[15]

Based on these undisputed facts, the Court finds that the plaintiffs have not shown that Makowski faced a "certainly impending" threat of forced vaccination or any adverse employment action. *See Clapper*, 568 U.S. at 401. And Makowski's failure to seek an exemption at an earlier stage does not change this outcome. *See id.* at 416 (explaining that parties "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"). So he lacks standing to challenge Executive Order 14042's federal-contractor mandate.

---

[15] Makowski's employer has granted his request for an exemption from the vaccine mandate. (Doc. 43 at 13). According to the plaintiffs, Makowski's employer exempted him from the vaccination requirement but has required him to wear a mask and undergo weekly testing. (*Id.*).

### iii. The plaintiffs' counterarguments are unpersuasive.

The plaintiffs try to raise new injuries in their response to the defendants' motion to dismiss. (Doc. 43). Those arguments include that:

- Makowski finds "wearing masks at work" to be "particularly bothersome." (*Id.* at 13).
- Makowski's "weekly testing consumes his time and also causes inconvenience, stress and fear." (*Id.*).
- Makowski is concerned that he "may be subjected in the future to another vaccine mandate." (*Id.*).
- Nelson must "wear masks at meetings" and "engage in social distancing." (*Id.* at 14).
- Nelson "is ostracized by his fellow workers because he is not vaccinated and is seeking a religious accommodation." (*Id.*).
- Nelson "had to investigate how to secure a vaccine exemption, draft and present such to his superiors, and deal with everything that has followed, all of which has consumed a substantial amount of time." (*Id.*).
- Nelson "is concerned that even though he has requested an exemption, it may be denied and he may very well lose his job." (*Id.*).

Recall that the only two injuries the plaintiffs allege in the operative complaint are forced vaccination and threats to their continued employment. (Doc. 32-1 at ¶¶ 1, 15, 19, 32, 181, 192). The new injuries they raise only in briefing do not support standing because they are found nowhere in their complaint, and a plaintiff cannot amend his complaint through counsel's arguments in opposition to a motion to dismiss. *Eiras v. Florida*, 239 F. Supp. 3d 1331, 1342 (M.D. Fla. 2017).[16]

Even if the plaintiffs had included these alleged injuries in their pleading, they would still not support standing to seek prospective relief against the vaccine mandates in Executive Order 14042 (and its

---

[16] It is true that, as here, a district court may consider extrinsic evidence when evaluating a "factual attack" on the "fundamental question" of whether subject-matter jurisdiction exists. *Makro*, 543 F.3d at 1258. But the party invoking federal jurisdiction must always "plausibly allege all jurisdictional elements." *Brownback v. King*, 141 S. Ct. 740, 749 (2021). And that includes "the burden of establishing" Article III standing. *Lujan*, 504 U.S. at 561.

accompanying guidance) or Executive Order 14043. The Court will explain why each injury falls short.

1. Makowski's complaint that "wearing masks at work" is "particularly bothersome" fails for three reasons. For one, that mask-wearing is bothersome is not a concrete injury. "[P]urely psychic injuries arising from disagreement with government action—for instance, 'conscientious objection' and 'fear'—don't qualify." *Gardner v. Mutz*, 962 F.3d 1329, 1341 (11th Cir. 2020). Contrast those injuries with "*physical* harms," which are concrete. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (emphasis added). But the plaintiffs didn't explain how the mask-wearing, while bothersome, causes a physical harm. For another, even if this complaint were enough, there is no basis to say that this *mask-wearing* injury is traceable the allegedly unlawful *vaccine mandate* authorized by Executive Order 14042 and implemented by the SFWTF EO 14042 Guidance. And lastly, even if this Court held the vaccine mandate within the executive order and guidance to be unlawful, that ruling wouldn't likely redress the mask-wearing injury.

2. Makowski's objection to "weekly testing" doesn't support standing to challenge the mandates within Executive Order 14042 and SFWTF guidance because neither mentions testing. *See* 86 Fed. Reg. 50,985; SFWTF EO 14042 Guidance. So this injury would not be "fairly traceable" to any defendant's "allegedly unlawful conduct." *See DaimlerChrysler*, 547 U.S. at 342. Nor would this injury be redressable through claims that only challenge the vaccine mandate's legality. And even if weekly testing "causes inconvenience, stress and fear," (doc. 43 at 13), those feelings aren't concrete injuries. *See Gardner*, 962 F.3d at 1341.

3. Makowski's concern that "he still may be subjected in the future to another vaccine mandate," (doc. 43 at 13), "is too speculative" to support standing. *Clapper*, 568 U.S. at 401. It is merely an insufficient allegation about "*possible* future injury." *Id.* at 409.

4. Nelson's complaint about being required to "wear masks at meetings" and "engage in social distancing" don't support standing to challenge Executive Order 14043's federal-employee vaccine mandate. Neither the executive order itself nor any available implementing

guidance mentions mask-wearing or social distancing. So these complaints are not traceable to the Executive Order 14043—and not traceable to the federal-employee vaccine mandate, itself.

5. Nelson's being "ostracized by his fellow workers" doesn't work either. With few exceptions, federal courts skepticize "standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414; *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (explaining that, where causation between the injury and the defendant's challenged action turns on the decision of an independent third party, the plaintiff must show that the third-party's action is a "predictable effect of [the] Government action"). The plaintiffs never try to explain how coworker ostracism is a predictable effect of the federal-employee mandate. So this injury is not traceable to the defendants' allegedly unlawful conduct. *DaimlerChrysler*, 547 U.S. at 342. And there is no basis to conclude that favorable legal relief would redress that ostracism. *Id.*

6. That Nelson "had to investigate how to secure a vaccine exemption, draft and present such to his superiors, and deal with everything that has followed, all of which has consumed a substantial amount of time," falls short, too. All these things happened *before* November 5 (Nelson submitted his accommodation request on October 15). (Doc. 39 at 3 ¶ 10). So it cannot support standing for *prospective* relief. *Elend*, 471 F.3d at 1207. And although a past injury is relevant to "whether there is a real and immediate threat of repeated injury," there is no non-speculative risk that Nelson will bear these harms again in the imminent future. *See O'Shea*, 414 U.S. at 496.

7. Nelson's "concern[] that even though he has requested an exemption, it may be denied and he may very well lose his job," (doc. 32-1 at 14), "is too speculative" to support standing. *Clapper*, 568 U.S. at 401. It is an insufficient allegation about "*possible* future injury." *Id.* at 409.

* * *

In sum, the plaintiffs have not met their burden to establish that, on November 5, they faced a certainly impending harm that would be traceable to the defendants' vaccine mandates in the executive orders and the corresponding SFWTF guidance and that the Court could redress. *DaimlerChrysler*, 547 U.S. at 342. So the plaintiffs don't have standing to bring Count II or Count IV's part about the mandates.

### 2.   Dr. Calderwood lacks third-party standing

The plaintiffs allege that Dr. Calderwood "has advised Makowski to not take any of the vaccines at issue in this complaint due to his health condition(s)." (Doc. 32-1 at 6 ¶ 14). They assert that Dr. Calderwood can assert Makowski's rights. (*Id.*). And this third-party standing theory is the plaintiffs' only basis for Dr. Calderwood being in this case.

"In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). But the Supreme Court has "characterized the rule" against third-party standing "as a prudential rather than jurisdictional matter." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1586 (2020) (Thomas, J., concurring). And the Court has crafted a narrow exception to the rule against third-party standing where (1) the litigant has "suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute"; (2) the litigant has "a close relation to the third party"; and (3) there is "some hindrance to the third party's ability to protect his or her interests." *Powers*, 499 U.S. at 411.

Dr. Calderwood cannot pursue the vaccine-mandate claims (Counts II and VI in part) because there is no "hindrance to" Makowski's "ability to protect his . . . interests." *Id.* After all, Makowski is a co-plaintiff in this lawsuit. So Dr. Calderwood lacks third-party standing.

### C.   The plaintiffs lack standing to challenge the defendants' actions under the EUA statute.

The plaintiffs challenge various actions by the HHS Secretary and the FDA in Counts I, III, IV, and VI in part. The plaintiffs seek only

prospective relief. So they must show a "certainly impending" threat of future harm, *Clapper*, 568 U.S. at 401, that would be "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief," *DaimlerChrysler*, 547 U.S. at 342. The plaintiffs have not made that showing.

The EUA statute "neither require[s] nor forbid[s] any action" by the plaintiffs. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). So standing "is ordinarily substantially more difficult to establish." *Id.* (quoting *Lujan*, 504 U.S. at 562) (quotation marks omitted). The plaintiffs therefore "can demonstrate standing only if application of the [EUA statute] by the Government will affect *them*." *Id.* at 494.

The plaintiffs have not established that the defendants' actions under the EUA statute—that is, the emergency declaration and EUA issuance without complying with the criteria-for-issuance provision or the conditions-of-authorization provision—will affect them in any meaningful way. So their claims don't rely on a "certainly impending" future harm. *Clapper*, 568 U.S. at 401. As explained in Section (I)(B), there was no imminent risk on November 5 that Makowski, Nelson, or Leahy would be forced to take any COVID-19 vaccine. And even if they had to take a vaccine, it wouldn't necessarily be an EUA vaccine. By November 5, they could have received Pfizer's Comirnaty vaccine that received FDA approval "in compliance" with their Biologics License Application under 21 U.S.C. § 262, (*see* doc. 41 at 7 ¶ 15), which is an "independent" authorization mechanism, *Children's Health Defense*, 2022 WL 2704554, at *1. So there was no non-speculative risk that the defendants' EUA-statute actions would harm them.[17]

The plaintiffs' EUA-statute claims amount to "generalized grievance[s]" that are "common to all members of the public." *Lujan*, 504 U.S. at 575 (citation omitted). And "generalized grievances" do not satisfy Article III. *Carney*, 141 S. Ct. at 498–99. So the Plaintiffs lack standing to pursue Counts I, III, IV, and VI's part aimed at EUA-statute actions.

---

[17] Dr. Calderwood lacks third-party standing because there is no "hindrance" to Makowski's "ability to protect his . . . interests." *Powers*, 499 U.S. at 411.

## II.    The Court lacks jurisdiction over the mandamus claim.

In Count V, the plaintiffs seek a writ of mandamus "compelling the individual federal defendants to perform the duties owed to them" under the EUA statute, 21 U.S.C. § 360bbb-3. (Doc. 32-1 at 63). The Court lacks jurisdiction over the request.

The Mandamus Act provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "[M]andamus is an extraordinary remedy which should be utilized only in the clearest and most compelling of cases." *Cash v. Barnhart*, 327 F.3d 1252, 1257 (11th Cir. 2003) (quoting *Carter v. Seamans*, 411 F.2d 767, 773 (5th Cir. 1969)). And "[a]lthough the issuance of a writ of mandamus is 'a legal remedy, it is largely controlled by equitable principles and its issuance is a matter of judicial discretion.'" *Id.* at 1257–58 (quoting *Carter*, 411 F.2d at 773).

"[T]he test for mandamus jurisdiction is 'whether mandamus would be an appropriate means of relief.'" *United States v. Salmona*, 810 F.3d 806, 811 (11th Cir. 2016). Mandamus jurisdiction exists only if: "(1) the plaintiff has a clear right to the relief requested; (2) the defendant has a clear duty to act; and (3) 'no other adequate remedy [is] available.'" *Cash*, 327 F.3d at 1258. "Put another way, a writ of mandamus 'is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty.'" *Id.* (quoting *Heckler v. Ringer*, 466 U.S. 602, 616 (1984)). "The party seeking mandamus has the burden of demonstrating that his right to the writ is clear and indisputable." *Serrano*, 655 F.3d at 1263.

The plaintiffs have not shown that their "right to the writ is clear and indisputable," *id.*, because they have not shown (and cannot show) that the defendants owe them "clear nondiscretionary dut[ies]" under the EUA statute, *Cash*, 327 F.3d at 1258. So the Court lacks jurisdiction over the mandamus claim.

First, the EUA statute says that "[a]ctions under the authority of this section by the Secretary"—which includes the emergency declaration and the issuance of the EUAs—"are committed to agency discretion." 21

U.S.C. § 360bbb-3(i). And it "strains credulity for even the most casual user of words," *McDonald v. City of Chicago*, 561 U.S. 742, 811 (2010) (Thomas, J., concurring in part and concurring in the judgment), to suggest that decisions committed to agency discretion are "nondiscretionary," *Cash*, 327 F.3d at 1258. That independently precludes mandamus jurisdiction.

Second, the individual EUA-statute provisions underlying the defendants' challenged actions also suggest that the defendants don't owe any "nondiscretionary" duties to the plaintiffs. *Id.* The emergency-declaration provision explains that "[t]he Secretary *may* make a declaration" that a public health emergency exists. 21 U.S.C. § 360bbb-3(b)(1)(C) (emphasis added). And the criteria-for-issuance provision explains that "[t]he Secretary *may* issue an authorization" if certain criteria are met. *Id.* § 360bbb-3(c) (emphasis added). Under these provisions, the Secretary enjoys discretion. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) (explaining that "the word 'may' . . . implies discretion").

The conditions-of-authorization provision explains that "the Secretary, *to the extent practicable given the applicable circumstances* described in subsection (b)(1), shall . . . establish such conditions on an authorization under this section *as the Secretary finds necessary or appropriate* to protect the public health." *Id.* § 360bbb-3(e)(1)(A) (emphasis added). Although "the word 'shall' usually connotes a requirement," *Kingdomware*, 579 U.S. at 171, any duty that exists here is qualified by the Secretary's discretionary determination about whether conditions would be "practicable," "necessary," and "appropriate." *Id.* § 360bbb-3(e)(1)(A). So there is not a "clear nondiscretionary duty" to establish any particular conditions. *See Cash*, 327 F.3d at 1258. And, at the very least, the plaintiffs have not satisfied their "burden of demonstrating that [their] right to the writ is clear and indisputable." *Serrano*, 655 F.3d at 1263. In fact, they did not even discuss mandamus jurisdiction in their briefing. (*See* doc. 43).

In sum, the plaintiffs have not shown that their right to mandamus relief is "clear and indisputable." *Serrano*, 655 F.3d at 1263. So the Court lacks jurisdiction over Count V.

### III.   Any decision on the merits would be an advisory opinion.

This case is also nonjusticiable because any decision on the merits would be an impermissible advisory opinion.

On justiciability, the Supreme Court has explained:

Under Article III, federal courts do not adjudicate hypothetical or abstract disputes. Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities. And federal courts do not issue advisory opinions.

*TransUnion*, 141 S. Ct. at 2203. At this point, any decision the Court writes would violate every word of the Court's admonition.

Presently, the government cannot enforce either vaccine mandate because of nationwide injunctions. *See Feds for Med. Freedom v. Biden*, No. 3:21-cv-356, 2022 WL 188329, at *8 (S.D. Tex. Jan. 21, 2022)[18]; *Georgia v. Biden*, 574 F. Supp. 3d 1337, 1357 (S.D. Ga. 2021), *appeal docketed*, No. 21-14269 (Dec. 10, 2021). And given that the EUA statute "neither require[s] nor forbid[s] any action" by the plaintiffs, *Summers*, 555 U.S. at 493, and does not otherwise affect them, an enforceable vaccine mandate appears to be necessary to justiciability.[19] So facts that developed after the plaintiffs filed their operative amended complaint have, at this point, ensured that the plaintiffs have no ongoing "personal interest in the dispute." *Uzuegbunam*, 141 S. Ct. at 796.

---

[18] The *Feds for Medical Freedom* case is pending review by the en banc Fifth Circuit. 37 F.4th 1093 (5th Cir. 2022) (en banc) (mem.).

[19] Count V is nonjusticiable for its own reasons. *See supra*, at 22–23.

* * *

For the reasons above, the Court **grants** the defendants' motion to dismiss because the Court lacks jurisdiction. (Doc. 38). The Court **dismisses** the plaintiffs' operative amended complaint **without prejudice**. (Doc. 32-1). The plaintiffs may file a Third Amended Complaint if, in that complaint, they can plausibly and in good faith allege a justiciable controversy. The Court does not expect to allow more amendments after the Third Amended Complaint.

**DONE** and **ORDERED** on August 25, 2022.

_____

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE